**21-71380**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Drip More LLC,

*Petitioner,*

v.

U.S. Food and Drug Administration,

*Respondent.*

On Petition For Review Of Marketing Denial Order Issued By The
U.S. Food and Drug Administration

## PETITIONER DRIP MORE LLC'S
## OPENING BRIEF

Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
(202) 434-4269
gotting@khlaw.com

*Counsel for Petitioner*

Dated: July 24, 2025

## CORPORATE DISCLOSURE STATEMENT

Petitioner Drip More LLC does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................ii

TABLE OF AUTHORITIES.................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE ................................................................3

    I.    The Tobacco Control Act And FDA's Deeming Rule .............3

    II.    PMTA Deadlines And FDA Enforcement Discretion ............4

    III.    The TCA's APPH Standard Requires FDA To Review And Weigh All Evidence In A PMTA And FDA's Possession.......................................................................5

    IV.    FDA Must Consider PMTA Evidence Indicating That A Subject ENDS May Pose A Low Risk To Minors....................8

    V.    Drip More's PMTA .............................................................12

    VI.    FDA's Marketing Denial Order ("MDO") And Technical Project Lead ("TPL") Review................................................18

STANDARD OF REVIEW.....................................................................22

SUMMARY OF ARGUMENT ...............................................................23

ARGUMENT ........................................................................................28

    I.    FDA Failed To Consider Drip More's Extensive Marketing and Access Restrictions, As Well As Data Showing A Low Risk To Minors, And Therefore The MDO Was Arbitrary And Capricious .................................28

    II.    FDA's Refusal To Address Information and Data Regarding Potential Underage Use Of Drip More's ENDS Products Was Not Harmless Error .........................36

ii

III.   FDA Instituted A De Facto Restriction And/Or Ban On Non-Tobacco Flavored ENDS Through The Comparative Efficacy Study Requirement In Direct Violation Of The TCA's Notice And Comment Procedures .......................................................................... 48

IV.   FDA's Comparative Efficacy Requirement Violated The APA's Notice And Comment Procedures ............................. 56

V.   FDA Unlawfully Applied The MDO To Zero-Nicotine Electronic Cigarettes ............................................................ 61

CONCLUSION ................................................................................ 62

CERTIFICATE OF COMPLIANCE ............................................... 64

CERTIFICATE OF SERVICE ....................................................... 65

STATEMENT OF RELATED CASES ........................................... 66

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

## **Cases**

*Alliance for the Wild Rockies v. United States Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) .......................................................28, 29

*Azanor v. Ashcroft*,
364 F.3d 1013 (9th Cir. 2004) ...........................................................38

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994) ......................................................... 35, 45

*Bidi Vapor LLC v. FDA*,
47 F.4th 1191 (11th Cir. 2022)......................... 33, 34, 36, 42, 44, 46, 47

*Dept' of Homeland Security v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................................................28

*FDA v. Brown & Williamson Tabacco Corp.*,
120 S.Ct. 1291 (2000) .........................................................................53

*FDA v. Wages and White Lion Inves., LLC*,
145 S. Ct. 898 (2025) ..................................25, 36, 38, 40, 41, 42, 52, 60

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ..................................................................29, 44

*Fed. Power Comm'n v. Idaho Power Co.*,
344 U.S. 17 (1952) .............................................................................37

*Florida Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ...........................................................................37

*Gill v. U.S. Dep't of Justice*,
913 F.3d 1179 (9th Cir. 2019) ...........................................................58

*Judulang v. Holder*,
556 U.S. 42 (2011) .............................................................................34

*Liquid Labs v. FDA*,
52 F.4th (3d Cir. 2022) ........................................................................41

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) .......................................................................53

*Lotus Vaping Techs., LLC v. FDA*,
73 F.4th 657 (9th Cir. 2023)..................26, 36, 37, 41, 42, 43, 44, 45, 47

*MacLean v. Dep't of Homeland Security*,
543 F.3d 1145 (9th Cir. 2008) ............................................................61

*Mada-Luna v. Fitzpatrick*,
813 F.2d 1006 (9th Cir. 1987) ............................................................57

*Magellan Tech., Inc. v. FDA*,
70 F.4th 622 (2d Cir. 2023) ...............................................................33

*Mass. Trustees of Eastern Gas & Fuel Assoc. v. U.S.*,
377 U.S. 235 (1964) ...........................................................................39

*Michigan v. EPA*,
135 S. Ct. 2699 (2015) ..................................................................28, 34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................................................28

*NLRB v. Bell Aerospace Co.*,
416 U.S. 267 (1974) ...........................................................................60

*Paulsen v. Daniels*,
413 F.3d 999 (9th Cir. 2005) ............................................................44

*Prohibition Juice Co. v. FDA*,
45 F.4th 8 (D.C. Cir. 2022)..........................................................34, 41

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .............................................................................38

*SEC v. Chenery II*,
332 U.S. 194 (1947) ..............................................................38, 60, 62

*Shinseki v. Sanders,*
   556 U.S. 396 (2009) ........................................................... 39

*Wages and White Lion Inves., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ...................................... 33, 34

*Wages and White Lion Inves., LLC v. FDA,*
   90 F.4th 357 (2024) ......................................................... 51

## Statutes

5 U.S.C. § 551(4) ................................................................. 56
5 U.S.C. § 553(b) ............................................................ 56, 57
5 U.S.C. § 706 ............................................................ 25, 37, 38
5 U.S.C. § 706(2)(A) ........................................................... 22
5 U.S.C. § 706(2)(C)-(E) ...................................................... 23
21 U.S.C. § 321(rr) ......................................................... 4, 61
21 U.S.C. § 387 ................................................................... 3
21 U.S.C. § 387a(a) .............................................................. 4
21 U.S.C. § 387f(d) .............................................................. 8
21 U.S.C. § 387g ................................................................ 54
21 U.S.C. § 387g(a)(1) ..................................................... 49, 50
21 U.S.C. § 387g(a)(3) ......................................................... 55
21 U.S.C. § 387g(a)(3)-(4) ..................................................... 49
21 U.S.C. § 387g(c)(1) ......................................................... 48
21 U.S.C. § 387g(c)(2)(A), (4) ................................................. 48
21 U.S.C. § 387(g)(d)(1) ....................................................... 48
21 U.S.C. § 387(g)(d)(2) ....................................................... 49
21 U.S.C. § 387j ............................................................. 1, 4
21 U.S.C. § 387j(c)(1)(B) ....................................................... 8
21 U.S.C. § 387j(c)(2) .......................................................... 6
21 U.S.C. § 387j(c)(2)(D) ...................................................... 54
21 U.S.C. § 387j(c)(4) .......................................................... 6
21 U.S.C. § 387j(d)(1)(A) ............................................ 11, 12, 35
21 U.S.C. § 387*l*(a) ........................................................... 1
21 U.S.C. § 387*l*(b) .......................................................... 22
21 U.S.C. § 387*l*(c)(2) ....................................................... 31
21 U.S.C. § 387*l*(c)(4) ....................................................... 31

## **Regulations**

21 C.F.R. § 1114.35 ........................................................................ 12, 35

21 C.F.R. § 1114.41 ........................................................................ 12, 18

81 Fed. Reg. 28974 (May 10, 2016) ...................................................... 4, 5

84 Fed. Reg. 50566 (Sept. 25, 2019) ....................................................... 9

86 Fed. Reg. 55300 (Oct. 5, 2021) ....................................................... 6, 9

87 Fed. Reg. 26454 (May 4, 2022) ......................................................... 49

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under Section 912 of the Family Smoking Prevention and Tobacco Control Act ("TCA"), 21 U.S.C. § 387*l*(a), to review Respondent U.S. Food and Drug Administration's ("FDA") marketing denial order ("MDO") issued to Petitioner Drip More LLC ("Drip More") on October 14, 2021. The MDO denied marketing authorization sought by Drip More in a Premarket Tobacco Product Application ("PMTA") submitted under Section 910 of the TCA, 21 U.S.C. § 387j, for various Drip More non-tobacco flavored Electronic Nicotine Delivery System ("ENDS") products. ER-17-20.[1] [2] The MDO fully and finally decided Drip More's PMTA at the administrative level. *See* 21 U.S.C. §§ 387j, 387*l*. Drip More filed a timely Petition for Review with this Court on November 13, 2021 (Doc. 1-6) pursuant to the 30-day deadline set forth in 21 U.S.C. § 387*l*(a). Venue is proper in this Circuit under 21 U.S.C. § 387*l*(a) as Drip More is headquartered in Riverside, California.

---

[1] The specific ENDS products are not listed in the MDO, but are set forth in Appendix A of the March 26, 2021, Acceptance Letter. ER-6-16.

[2] FDA did not bates stamp the PMTA due to its large size (Doc. 9-2 at n.1); PMTA pages in the Excerpts of Record are now bates stamped.

1

## STATEMENT OF THE ISSUES

Petitioner Drip More LLC ("Drip More") filed an extensive Premarket Tobacco Product Application ("PMTA") with Respondent U.S. Food and Drug Administration ("FDA") pursuant to the Family Smoking Prevention and Tobacco Control Act ("TCA") seeking FDA's authorization to market and sell various non-tobacco flavored (e.g., strawberry) Electronic Nicotine Delivery System ("ENDS") products (i.e., electronic cigarettes). FDA denied the PMTA before it formally began a scientific review because the application did not contain a specific type of study – a randomized controlled trial ("RCT"), a longitudinal cohort study, or a similar study (referred to herein as a "comparative efficacy study") – showing that Drip More's non-tobacco-flavored ENDS are more effective than a comparator tobacco-flavored ENDS in helping adult smokers switch away from traditional cigarettes. As such, FDA did not weigh other evidence in Drip More's PMTA, as well as its own data, showing that Drip More's ENDS in particular do not pose a significant risk of underage use.

This case raises the following issues:

2

1.     Did FDA violate the TCA and the Administrative Procedure Act ("APA"), and otherwise proceed in an arbitrary and capricious manner, when it issued the MDO without considering Drip More's extensive marketing and access restrictions, as well as sales data and FDA's own national youth survey results, demonstrating there is a low risk that minors will use Drip More's products?

2.     Did FDA's refusal to review information and data in Drip More's PMTA, showing that its ENDS products pose a low risk of underage use, otherwise constitute harmless error under the APA?

3.     Did FDA act unlawfully when it enforced the comparative efficacy standard without having adopted such standard through the TCA's and APA's notice and comment rulemaking procedures?

4.     Did FDA violate the TCA and APA when it applied the MDO to Drip More's zero-nicotine products?

## STATEMENT OF THE CASE

### I.     The Tobacco Control Act And FDA's Deeming Rule

In 2009, Congress enacted the TCA, amending the federal Food, Drug and Cosmetic Act ("FDCA"), to give FDA regulatory authority over the marketing and sale of "tobacco products." 21 U.S.C. § 387, *et seq.*

3

Seven years later, on August 8, 2016, FDA's "Deeming Rule" went into effect, which applied the TCA to ENDS and other deemed tobacco products that had not been initially subject to the TCA and FDA's tobacco authority. 21 U.S.C. § 387a(a); 81 Fed. Reg. 28974 (May 10, 2016). In September 2020, when Drip More timely submitted its PMTA, the TCA defined "tobacco product" in relevant part to mean "any product made or derived from tobacco that is intended for human consumption…" 21 U.S.C. § 321(rr) (2021).

Consequently, because nicotine is derived from tobacco, ENDS were immediately subject to numerous TCA provisions, including a requirement that ENDS manufacturers obtain premarket authorization from FDA to sell their ENDS products. 21 U.S.C. § 387j (attached as Addendum). A manufacturer must submit a PMTA which entails a time-consuming and costly process of compiling extensive scientific, technical, and marketing data that FDA must review and weigh before either granting or denying market authorization.

## II.    PMTA Deadlines And FDA Enforcement Discretion

Because the sudden application of the TCA's requirements to ENDS would have abruptly forced thousands of existing products off the

market, FDA established a series of deferred enforcement policies permitting existing ENDS to be sold until PMTAs were due. FDA said this approach balanced concerns regarding underage use and providing access to products adult smokers may be using to move away from more dangerous combustible cigarettes. 81 Fed. Reg. at 28,977-78.

A federal district court ultimately set the PMTA deadline for September 9, 2020. *Am. Academy of Pediatrics, et al. v. FDA*, 8:18-cv-00883-PWG (D. Md.) (Dkt. Nos. 127 & 182). Any ENDS subject to a timely filed PMTA could remain on the market until September 9, 2021, after which the product would be subject to FDA enforcement at the agency's discretion. *Id.* Petitioner is not aware of any instance in which FDA has initiated an enforcement action against an ENDS manufacturer for a product subject to a timely-filed PMTA pending before the agency and undergoing scientific review.

## III. The TCA's APPH Standard Requires FDA To Review And Weigh All Evidence In A PMTA And FDA's Possession

The TCA requires FDA to conduct a complex, science-based evaluation based on all contents in a PMTA and relevant evidence in FDA's possession to determine whether a product is APPH. Specifically, an MDO must be based on "information submitted to [FDA] as part of

5

the application and any other information before [FDA] with respect to such tobacco product." 21 U.S.C. § 387j(c)(2). The TCA directs FDA to make that determination "with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account – (A) the increased or decreased likelihood that existing users of tobacco products will stop using such products [called "cessation"]; and (B) the increased or decreased likelihood that those who do not use tobacco products will start using such products [called "initiation"]." 21 U.S.C. § 387j(c)(4).

Accordingly, FDA has repeatedly described APPH as an all-encompassing, multi-factored, multi-disciplinary standard. For instance, FDA noted in the final rule implementing the PMTA requirements that APPH involves a "complex determination," 86 Fed. Reg. 55300, 55335 (Oct. 5, 2021), that FDA "considers many factors," *id.* at 55314, and that FDA does not make a "determination on one static set of requirements," *id.* at 55385. FDA further declined "to assign weight to different types of evidence," *id.* at 55335, emphasizing APPH "requires a balancing" of risks and benefits. *Id.* at 55384. FDA also refused "to create a series of criteria" that all products must meet for

6

APPH, stated that an APPH "determination would involve consideration of many factors," and noted it "will be made with respect to…the population as a whole, rather than whether a product meets each item in a series of specific criteria." *Id.* at 55386. Significantly, FDA committed to determining APPH on an "individualized" basis, the "risks and benefits of a specific tobacco product," and "based on *all* of the contents of the application." *Id.* at 55320, 55390 (emphasis added).

During the rulemaking, FDA also rejected a comment demanding that an APPH evaluation focus on population segments most likely to be affected by ENDS and "require applications to show a public health benefit for those specific groups." FDA concluded that it does not require applicants to show a public health benefit for specific population segments. *Id* at 55385. Further, in response to comments asking FDA to impose specific requirements on flavored tobacco products before issuing a marketing order, FDA again "declin[ed] to create a series of criteria that either all products or a specific subset of products must meet…to be considered APPH." *Id.* at 55386.

In June 2019, FDA also issued final PMTA guidance "intended to assist persons submitting" PMTAs which also discussed APPH. ER-53.

7

Specifically, FDA said it "weighs all of the potential benefits and risks from information contained in the PMTA" to make an APPH determination. ER-57. And during October 2018[3] and October 2019 (ER-62) public meetings, FDA described a PMTA review as constituting a "multi-disciplinary" approach.

### IV. FDA Must Consider PMTA Evidence Indicating That A Subject ENDS May Pose A Low Risk To Minors

Consistent with this holistic review process, FDA is obligated under the TCA to consider the positive impact underage restrictions on the marketing and sale of a product to minors could have on the APPH determination. 21 U.S.C. § 387j(c)(1)(B) (providing a marketing granted order "may require that the sale and distribution of the tobacco product be restricted" and citing to 21 U.S.C. § 387f(d) as permitting FDA to impose underage "access" and "advertising and promotion" restrictions to meet the APPH standard).

Indeed, before Drip More filed its PMTA, FDA explicitly told manufacturers that marketing plans were key to obtaining an APPH finding. In its September 2019 proposed PMTA rule, FDA stated

---

[3] FDA, Tobacco Product Application Review Public Meeting, at 119 (Oct. 22, 2018), https://tinyurl.com/44a7mnbx.

marketing plans would be "critical." 84 Fed. Reg. 50566, 50581 (Sept. 25, 2019) (adding that "FDA *will review* the marketing plan to evaluate potential youth access to, and youth exposure to the labeling, advertising, marketing, or promotion of, a new tobacco product.") (emphasis added). It also noted marketing plans would be: (i) "relevant" and "important" to the APPH finding (*id.* at 50580); "help" FDA understand the impacts of a product's marketing and whether it is APPH (*id.* at 50580-81); and "provide valuable insight into the likelihood" youth would use the product (*id.* at 50581).

FDA made similar statements in the final PMTA rule, which was promulgated before issuing Drip More's MDO, noting that marketing plans would: (i) be "critical" to assessing potential initiation and cessation (86 Fed. Reg. at 55323-24, 553226-27); (ii) be "necessary" for FDA to gauge youth access to the product (*id.* at 55322); (iii) "allow" FDA to consider whether the manufacturer had addressed youth access (*id.* at 55322, 55324); (iv) "help" FDA determine whether the product is APPH (*id.* at 55322); (v) be "directly relevant" to the subject matter of the PMTA (*id.* at 55324); and (vi) "directly inform" FDA whether there are concerns regarding underage use (*id.*).

9

Likewise, in the June 2019 PMTA guidance, FDA said it would weigh marketing and access restrictions that would decrease the likelihood of underage use. ER-57; *see also* ER-60 (sales restrictions will "help support a showing that the marketing of the product would be" APPH). In fact, FDA recommended in an April 2020 enforcement policy "adequate measures" that manufacturers of open-system e-liquids, like Drip More, could take to guard against underage use.[4] ER-49-50. These measures included: (i) monitoring retailer compliance with age-verification and sales restrictions; (ii) establishing a manufacturer's right to terminate a retailer relationship if the retailer fails to comply

---

[4] By way of background, open-system devices are not pre-filled; instead, consumers manually fill the device's open tank with bottled e-liquids. This is distinct from closed-system ENDS – such as disposables or pod-based systems – which come pre-filled with e-liquid and are not designed to be refilled. In pod-based ENDS, the user inserts a sealed cartridge that is discarded and replaced once empty. Disposable ENDS are used until the e-liquid is depleted, at which point the entire device is discarded. A common misconception is that all ENDS products are inherently tobacco-flavored, like cigarettes. In reality, ENDS products do not contain tobacco. Rather, the base e-liquid ingredients – typically propylene glycol, vegetable glycerin, and nicotine – are neutral and do not impart any characterizing flavor. In traditional tobacco products such as cigarettes, flavors like menthol are added to modify or mask the natural tobacco taste and the harshness of smoke generated from combustion. Non-combustible ENDS and e-liquids, by contrast, are inherently flavorless until flavor additives, whether tobacco, menthol, fruit, or others, are introduced to create a specific flavor profile.

10

with underage restrictions; (iii) requiring retailers to limit the quantity of ENDS a customer may purchase within a given period of time; (iv) obligating retailers to implement mystery shopper programs; and (v) establishing a policy of notifying FDA of retailer violations. *Id.*

Importantly, FDA also requested in the 2019 PMTA guidance that, for products already in the marketplace, manufacturers submit sales data on their products broken down by population demographics, including age. ER-58-59. *Id.* The guidance also sought the same type of information from national surveys. These comments mirrored an October 2018 public meeting where FDA stated "[i]nferences regarding youth may be extrapolated from young adults, as well as derived from marketing data…[and] national surveys."[5] According to FDA, it asked for this type of information to better understand underage use patterns. ER-59.

Finally, where an ENDS product is found to be APPH, Congress explicitly gave FDA authority to withdraw a marketing granted order ("MGO") if it finds that the "continued marketing of such tobacco

---

[5] FDA, *Premarket Tobacco Product Application Content Overview*, at 18 (Oct. 23, 2018), https://tinyurl.com/yacczkz8.

product no longer is appropriate for the protection of the public health."
21 U.S.C. § 387j(d)(1)(A); *see also* 21 C.F.R. § 1114.35 (governing
withdrawal of MGO). Along these lines, the final PMTA rule allows
FDA to impose in an MGO post-marketing surveillance requirements,
such as: (i) reporting sales and distribution data showing
"[d]emographic characteristics of product(s) purchasers, such as age…";
and (ii) a "summary of the implementation and effectiveness of policies
and procedures regarding verification of the age and identity of
purchasers of the product." 21 U.S.C. §§ 1114.31, 1114.41.

## V.    Drip More's PMTA

Drip More was started in 2016 and is located in Riverside,
California. ER-17, ER-63. The company was founded with the goal of
helping adult smokers find an alternative to traditional cigarettes. ER-
63. Drip More submitted its PMTA on September 9, 2020, covering 64
non-tobacco flavored bottled e-liquids that are used in open-system
devices. ER-6-16. The e-liquids are offered with characterizing flavors
such as citrus, mixed berry, apple, peach, strawberry, watermelon, and
lemon. *Id.* Many of the individually flavored e-liquids come in zero

nicotine and nicotine options. ER-6-13 (e.g., citrus flavor ranging from 0mg/mL to 6mg/mL nicotine concentrations).

The PMTA was a significant undertaking. Drip More spent hundreds of thousands of dollars preparing the application. As relevant to this petition, Drip More's PMTA contained substantial marketing and access restrictions guarding against underage use. Specifically, Drip More submitted: (i) a "Marketing Plan for Drip More, LLC" ("Marketing Plan") (ER-63-68); and (ii) "Requirements for Distributors and Retailers" ("Contractual Requirements") (ER-69-76). Indeed, its products are for adult use only, with Drip More fully supporting compliance with all applicable age limitations. ER-63.

As to marketing and labeling restrictions, the company would pursuant to the Marketing Plan: (i) avoid marketing material that could be perceived as targeting individuals below the legal vaping age, such as materials with childish images, cartoons, or characters; (ii) restrict marketing to channels (e.g., Internet) where more than 15% of its audience are minors; (iii) prohibit the use of trademarks or trade dress that resemble products (e.g., foods) marketed to underage consumers; (iv) avoid contracting with social media influencers and refrain from

13

using live models (that look under 35 years old); and (v) use appropriate social media strategies, such as age-restricted Instagram pages. ER-65-66.

Further, with regard to access restrictions, Drip More would under the Marketing Plan: (i) use independent, third-party age-verification technology (i.e., BlueCheck) for online sales based on public records database searches; and (ii) require all retailers to comply with stringent access limitations, including prohibiting minors from entering any establishment selling the company's products, requiring photo ID verification in all face-to-face transactions, displaying signage making clear that minors may not enter the premises or purchase Drip More products, implementing retailer training programs, taking any corrective actions required by FDA or other government enforcement personnel, and employing third-party age verification for any online sales. ER-66-67.

In fact, the Marketing Plan also requires Drip More retailers to comply with FDA's "Tobacco Retailer Training Programs" guidance

14

document. ER-66-67.[6] The guidance, in turn, sets out detailed protocols for employee training, including: (i) establishing and enforcing written policies; (ii) instruction on laws and regulations governing ENDS products, including age restrictions; (iii) training on face-to-face age verification techniques (such as identifying non-authentic IDs); (iv) techniques for refusing sales; (v) implementing various audits (e.g., mystery shopping programs) to gauge employee compliance; (vi) training frequency, methods, and review; and (vii) recommended hiring and management practices (e.g., providing compliance incentives). *Id.* at 10-18.

In addition, under the Contractual Requirements, Drip More would impose stringent obligations on distributors and retailers to prevent underage use, with non-compliance resulting in breach of contract and penalties. Key restrictions would include: (i) entering into an enforceable contract with Drip More, including indemnification provisions; (ii) complying with all federal, state, and local laws governing tobacco products, including California's Stop Tobacco Access

---

[6] FDA, *Tobacco Retailer Training Programs (Revised): Guidance for Industry* (August 2018), https://tinyurl.com/3x322388.

to Kids Enforcement Act ("STAKE Act"); (iii) checking for a valid government ID in face-to-face transactions and employing independent age verification technology for online sales; (iv) limiting the quantity of products that a customer may purchase in a given period; (v) prohibiting free samples; (vi) not selling products in vending machines outside adult-only establishments; (vii) not selling products to downstream distributors or retailers who are known to have sold to minors; (viii) not bundling Drip More products with other consumable products; (ix) not modifying or distributing any Drip More advertising without the company's permission; and (x) requiring that all downstream distributors and retailers also enter into agreements imposing these same obligations. ER-69-76.

As to distributors in particular, the Contractual Requirements also obligate them to: (i) notify Drip More of any customer complaints; and (ii) conduct routine audits to ensure prevention of access by minors. And regarding retailers, they must also: (i) establish and publicize a hotline for anonymous reporting of noncompliant sales; (ii) implement appropriate retailer hiring and management practices (e.g., only hiring individuals 21 years and older, taking into account compliance in

16

compensation and promotion decisions); (iii) develop an internal compliance check process, such as a mystery shopping program; and (iv) not sell any ENDS product without a required nicotine warning statement. ER-72-76.

As requested by FDA in its July 2019 guidance, Drip More also submitted sales data demonstrating that the company's products pose a low risk to minors. Based on Drip More consumer sales data between May and November 2018, the median age of Drip More consumers was 34 years old. Out of approximately 650 transactions, less than one percent (or 6 transactions by three individuals) involved consumers under the age of 21, with nobody under 20 purchasing a Drip More product. ER-77-86 (the federal government did not raise the legal purchase age to 21 until December 2019).

And these sales data were confirmed by FDA's own national survey results. The National Youth Tobacco Survey ("NYTS"), conducted annually by FDA and the Centers for Disease Control ("CDC") and involving tens of thousands of high school and middle school respondents, demonstrated that minors were not using Drip More ENDS. No underage respondent in 2018, 2019, 2020, or 2021

17

reported having used a Drip More product.[7] Although FDA explicitly relied on NYTS data in the TPL to support the MDO, *see, e.g.*, ER-31-33 (citing 2019 and 2020 NYTS data), it never discussed Drip More's complete absence from the survey responses.

Finally, per 21 C.F.R. § 1114.41, Drip More committed to post-market surveillance. ER-87-88 (stating in section titled "6.7 POST MARKET SURVEILLANCE AND POSTMARKET STUDY PLAN OR PROTOCOL" that "Drip More LLC will monitor it's products sales and perform quality checks with distributors, wholesalers, and retailers to make sure they are compliant with federal regulations regarding sales of tobacco products.").

## VI. FDA's Marketing Denial Order ("MDO") And Technical Project Lead ("TPL") Review

FDA issued the MDO to Drip More on October 14, 2021. ER-17-20. FDA found Drip More's products are not APPH because the PMTA "lack[ed] sufficient evidence demonstrating that your flavored ENDS will provide a benefit to adult users that would be adequate to outweigh the risks to youth." ER-17. Particularly, FDA based the MDO on the

---

[7] *See* Centers for Disease Control, *About Historical NYTS Data and Documentation*, https://tinyurl.com/yztnwy86.

absence of a single study showing Drip More's non-tobacco flavored products were more efficacious in helping adult smokers reduce or quit their smoking habits than a comparator tobacco-flavored product. *Id.* Indeed, FDA simply engaged in a box checking exercise in which it indicated on a standard form whether the PMTA included a randomized controlled trial ("RCT"), longitudinal cohort study ("LCS"), or other similar comparative efficacy study. ER-21-23, ER-24-25.

The MDO made clear, however, that FDA did not consider any other evidence or conduct any further analysis of the PMTA. ER-18 ("[S]cientific review did not proceed to assess other aspects of the applications. FDA finds that it is not practicable to identify at this time an exhaustive list of all possible deficiencies."). *Id.*; *see also* ER-22, ER-24 (checklists indicating that FDA only reviewed the PMTA for an RCT, LCS, or other study going to comparative efficacy, and noting that the presence of at least one was necessary to move to a "full scientific review"). Significantly, at no point did the MDO mention the potential impact of Drip More's Marketing Plan and Contractual Requirements on minimizing underage use, or acknowledge Drip More's sales data or FDA's own national survey data indicating no use by minors.

19

At the same time, FDA internally issued a Technical Project Lead ("TPL") document summarizing its rationale underlying the comparative efficacy standard and the MDO. ER-26-45. The TPL was based on an almost identical, cookie-cutter version of an exemplar TPL published by FDA on its website in September 2021 and issued to other applicants covering over one million ENDS products.[8] [9] Drip More's TPL

---

[8] FDA, *Tobacco Product Marketing Orders: FDA Sample Decision Summary Document*, http://tinyurl.com/npn2x4ec. The exemplar TPL was first published on FDA's website on September 28, 2021, before FDA issued Drip More's MDO. *See* Internet Archive, Way Back Machine, https://www.fda.gov/media/152482/download.

[9] FDA has issued MDOs for over 1.2 million products, almost all of which covered non-tobacco flavored ENDS. *See* FDA, *FDA Makes Determinations On More Then 99% of the 26 Million Tobacco Products For Which Applications Were Submitted* (March 15, 2023), https://tinyurl.com/3spczmy5. The remaining ~25 million determinations constituted instances in which FDA did not accept or file the PMTAs because they were incomplete or otherwise non-compliant. FDA has issued Marketing Granted Orders ("MGOs") for only 39 ENDS products, only six of which were for non-tobacco flavored ENDS (i.e., menthol flavored products). FDA, New Release: *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://tinyurl.com/yzy38mnm; FDA, *FDA Authorizes Marketing of Tobacco- and Menthol-Flavored JUUL E-Cigarette Products*, https://tinyurl.com/55v3xey7 (July 17, 2025). To date, FDA has not authorized any ENDS product in a flavor other than tobacco or menthol.

20

contained almost no specific discussion of its ENDS subject to the PMTA.

In any event, the TPL highlighted the significance of information and data regarding underage use of a given ENDS. FDA noted the TCA requires "an *accounting* of the risks and benefits to the population as a whole, *balancing* the potential impacts to both current tobacco users and non-users." ER-28 n.iii (emphasis added). As part of this process, FDA stated it must "tak[e] into account all relevant evidence and circumstances, including whether there are effective limitations on youth access." ER-35. In fact, FDA maintained it would need to "determine that the totality of the evidence supports a marketing authorization. As it relates to the risk to youth…this assessment includes evaluating the appropriateness of the proposed marketing plan." ER-36.

Despite these comments, FDA conducted only a limited review to determine whether a comparative efficacy study was included, and did not undertake a full scientific review of the remaining contents of the PMTA. Indeed, FDA stated it "did not assess other aspects of the application as part of this scientific review." ER-39. Importantly, as to

21

Drip More's Marketing Plan and Contractual Requirements, FDA

acknowledged that:

> Limiting youth access and exposure to marketing is a critical aspect of product regulation. It is theoretically possible that significant mitigation efforts could adequately reduce youth access and appeal such that the risk for youth initiation would be reduced.

ER-36 n.xix.

But FDA then refused to review Drip More's materials because

FDA had concluded that *unspecified* marketing and access restrictions

FDA had considered in the past did not adequately reduce risks to

minors. *Id.* FDA concluded "for the sake of efficiency, the evaluation of

the marketing plans in applications will not occur at this stage of the

review, and we have not evaluated any marketing plans submitted with

these applications." *Id.*

## STANDARD OF REVIEW

When an ENDS manufacturer challenges an MDO, the TCA

requires this Court's review be conducted pursuant to the APA, 5 U.S.C.

§ 706(2)(A). 21 U.S.C. § 387*l*(b). Accordingly, the Court must evaluate

whether the MDO was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Because

Petitioners also challenge the lawfulness of the MDO under the TCA itself, the Court must also determine whether the MDO is: (i) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (ii) without observance of procedure required by law; or (iii) unsupported by substantial evidence. 5 U.S.C. § 706(2)(C)-(E).

## SUMMARY OF ARGUMENT

This case challenges Respondent U.S. Food and Drug Administration's ("FDA") denial of marketing authorization for non-tobacco flavored, Electronic Nicotine Delivery System ("ENDS") products (i.e., electronic cigarettes) manufactured by Petitioner Drip More LLC ("Drip More") as unlawful under the Family Smoking Prevention and Tobacco Control Act ("TCA") and the Administrative Procedure Act ("APA"). As required by the TCA, Drip More submitted to FDA an extensive Premarket Tobacco Product Application ("PMTA") containing information and data showing that its ENDS meet the TCA's "appropriate for the protection of the public health" ("APPH") standard.

On October 14, 2021, FDA issued Drip More a marketing denial order ("MDO") prohibiting the continued marketing and sale of the subject ENDS. ER-17-20. FDA denied the PMTA based on a single

ground – namely, the PMTA did not contain a specific type of study – a randomized controlled trial, longitudinal cohort study, or other similar study (referred to herein as a "comparative efficacy study") – showing that Drip More's non-tobacco flavored ENDS are more effective than a comparator tobacco-flavored ENDS at helping adult smokers switch away from more risky combustible cigarettes. ER-17-18. In FDA's mind, such a showing was necessary to demonstrate that the non-tobacco flavored products' benefits outweighed any risks to youth. *Id.*

As a result, Drip More's MDO became just one of many that have denied marketing authorization for over one million non-tobacco flavored ENDS, thus imposing what remains today a *de facto* restriction and/or ban, instituted without notice and comment rulemaking, on products that have a characterizing flavor other than tobacco.

In this petition, Drip More makes the following arguments:

1. FDA acted in an arbitrary and capricious manner when it did not conduct a full scientific review of all information and data contained in the PMTA and, in particular, explicitly refused to evaluate Drip More's extensive marketing plan and access restrictions aimed at preventing underage use – information that FDA otherwise considered

"critical" to determining whether a manufacturer would minimize underage use and its products are APPH. Moreover, FDA did not consider, or even acknowledge, data that it specifically requested from manufacturers like Drip More, including actual sales data, as well as FDA's own national youth survey data, all showing that minors were not using Drip More's products.

2.     FDA's failure to consider Drip More's marketing plans and access restrictions, as well as data showing a low risk of underage use, was not harmless error. The Supreme Court, in *FDA v. Wages and White Lion Inves., LLC*, 145 S. Ct. 898 (2025) ("*Wages II*"), recently clarified the scope of the harmless error rule under the APA. *See* 5 U.S.C. § 706 (incorporating "rule of prejudicial error"). The Court concluded that FDA had advocated for a harmless error rule that set the bar too high – i.e., a petitioner would need to show that the agency would not have reached the same decision absent the error or, at a minimum, that the error had a substantial bearing on the decision.

Instead, according to the Court, the harmless error rule only permits a lower court to affirm an otherwise flawed decision when it is "clear" the error had "no bearing" on the procedure used or the

substance of the decision. When properly applied in the instant case, it cannot be reasonably argued that FDA's failure to evaluate multiple lines of evidence showing that Drip More's products pose only a low risk of underage use – all information FDA had repeatedly deemed relevant to any APPH determination – had absolutely no impact on FDA's decision to issue an MDO. Further, as this Court (at FDA's urging) previously applied the more stringent version of the harmless error rule under similar circumstances in *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657 (9th Cir. 2023), that decision is no longer controlling.

3.    FDA violated the TCA's and APA's notice and comment rulemaking requirements when it effectively instituted a *de facto* restriction and/or ban on all non-tobacco flavored ENDS products by applying the comparative efficacy standard. The TCA obligates FDA to adopt what are called "tobacco product standards" through notice and comment procedures. Significantly, the TCA considers a flavor restriction or ban to be a tobacco product standard. Given that FDA has not granted marketing authorization to a single non-tobacco flavored product where the PMTA was missing a comparative efficacy study,

26

FDA was required to (but did not) promulgate the comparative efficacy standard through the TCA's rulemaking procedures.

In addition, the APA requires that an agency employ notice and comment rulemaking whenever it adopts a legislative rule. In this Circuit, an agency policy statement may constitute a legislative rule if the directive limits the discretion of agency personnel when it is applied in an individual case. The comparative efficacy approach, as articulated in an exemplar document called a Technical Project Lead ("TPL") memorandum, affords FDA almost no discretion but to issue an MDO if a PMTA does not contain evidence showing the manufacturer's non-tobacco flavored ENDS are better at helping smokers quit than a comparator tobacco-flavored product. As such, that standard had to be adopted through the APA's rulemaking procedures. Moreover, while agencies may also establish rules for the first time in an adjudication, in this Circuit that does not hold true when doing so would be an abuse of discretion, such as here where the comparative efficacy standard applies broadly to all non-tobacco flavored ENDS manufacturers.

4.     FDA unlawfully applied the MDO to Drip More's products that do not contain any nicotine or tobacco. The TCA only applies to

27

products that contain nicotine derived from tobacco or any other source. Moreover, FDA does not regulate zero-nicotine electronic cigarettes unless there is evidence that the manufacturer intends for consumers to mix nicotine into the product. As FDA did not cite to any such evidence, and cannot do so now, the zero-nicotine electronic cigarette products should have been considered exempt from the TCA.

## ARGUMENT

### I. FDA Failed To Consider Drip More's Extensive Marketing and Access Restrictions, As Well As Data Showing A Low Risk To Minors, And Therefore The MDO Was Arbitrary And Capricious

Under the APA, courts strike down agency action as arbitrary and capricious if the agency has, *inter alia,* "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Dept' of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020) (same); *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) ("It follows that agency action is lawful only if it rests on consideration of the relevant factors") (internal quotations and citation omitted).

Indeed, in this Circuit, the agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Alliance*

*for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1112 (9th Cir. 2018) (citation and internal quotations omitted). In short, "the arbitrary and capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Here, FDA completely ignored evidence, without adequate explanation, that was plainly relevant to the APPH determination.

By its own admission, FDA wholly disregarded information that was especially relevant to potential underage use of Drip More's products, including the company's comprehensive Marketing Plan, Contractual Requirements, sales data, and FDA's own NYTS survey results. *Supra* at 21-22. Indeed, in the proposed and final PMTA rules, FDA characterized this type of evidence as "critical," "directly relevant," "important," and "necessary." Moreover, FDA described it as "providing valuable insight," "directly inform[ing]," and "help[ing]" FDA's APPH determinations. *Supra* at 8-10.

Similarly, the 2019 PMTA guidance stated that "restrictions on the sales and distribution" of ENDS would "help support a showing that the marketing of the product would be" APPH. ER-60; *see also supra* at

29

10 (noting FDA committed to weighing marketing and access restrictions). The guidance also explicitly asked for sales data and national survey results regarding consumer demographics to aid in FDA's PMTA review. *Supra* at 11. And even the TPL, which in Drip More's case eventually turned a blind eye to this type of evidence, indicated at the same time that FDA must "account" for and "balance" relevant evidence informing potential use by minors, and "evaluat[e]" any "proposed marketing plans." *Supra* at 21.

Taking FDA at its word, Drip More committed to implementing aggressive marketing and access restrictions. Among other measures, Drip More's Marketing Plan would require the company to: (i) avoid marketing strategies that could attract underage individuals; (ii) institute third party, age verification measures for online sales; and (iii) obligate retailers to follow FDA's employee training program aimed at minimizing underage use. *Supra* at 13-15. Moreover, Drip More's Contractual Requirements would apply to distributors and retailers and, together with other provisions, require them in written agreements to: (i) conduct compliance audits; (ii) limit purchase quantities; (iii) establish a hotline to anonymously report compliance violations; and

30

(iv) stop partnering with other downstream establishments that have sold products to minors. *Supra* at 15-17.

Further, at FDA's direction, Drip More submitted online sales data for its ENDS products for 2018 showing the average customer was 34 years old, and that less than one percent constituted consumers under the age of 21, with nobody falling under the then-legal age of 20 years old. *Supra* at 17. Even more telling, while the TPL relied on FDA's own NYTS surveys to establish that underage consumers use flavored products, it neglected to consider the fact that no high school or middle school respondent between 2018-21 reported having used a Drip More product. *Supra* at 17-18; *see also* 21 U.S.C. § 387*l*(c)(2) (the TCA obligating FDA to consider "any other information before [FDA] with respect to such tobacco product").

Indeed, neither the MDO nor the TPL weighed any of this information and data against FDA's general claims that minors were using non-tobacco flavored ENDS products. The TCA requires FDA to consider the "likelihood" that a given product will lead to tobacco use initiation. 21 U.S.C. 387*l*(c)(4). Certainly, underage use information regarding Drip More's products would help gauge the actual risks posed

31

by those particular ENDS. But nowhere in the MDO or TPL did FDA even mention evidence demonstrating that minors were not attracted to or using Drip More products, let alone explain why it was completely written off during the review of Drip More's PMTA.

It is true FDA generally argued in the TPL that underage preference for device types is "likely fluid" and is "affected by the marketplace" where, as one device type is removed from the marketplace through enhanced enforcement activity, minors will "migrate" to another "ENDS type." ER-32-33 (noting youth transitioned from cartridge-based ENDS following increased enforcement against those devices to recently introduced disposable ENDS).[10]

But FDA's analysis cannot end there. Under the TCA and FDA's own regulations, it must balance "all" relevant information in an

---

[10] FDA did not cite any evidence showing that minors had switched to open systems and, in fact, conceded in the TPL that "[n]ational surveillance data suggest that, within the ENDS category, there is variability in the popularity of device types among youth, suggesting there may be differential appeal of certain product styles." ER-32. In fact, as FDA pointed out in the 2020 enforcement guidance, bulky open-system devices requiring the use of separate e-liquid bottles do not have the same design features as closed-systems which are found particularly attractive by youth (e.g., "relatively small size that allows for easy concealability" and "intuitive and convenient features that facilitate ease of use"). ER-47.

application on an "individualized" basis, including data going directly to Drip More's products (i.e., not merely device types in general). *Supra* at 5-8. FDA deemed product-specific information as relevant to APPH, and here it could tip the scales in favor of an APPH finding. At a minimum, if youth are not using Drip More's products, then the lack of a comparative efficacy study (which presupposes significant underage use of ENDS products) takes on much less significance.

But FDA never considered this evidence or explained why it was ignored. That is the epitome of arbitrary and capricious decision-making. *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202-05 (11th Cir. 2022) ("Because the marketing and sales-access-restriction plans were relevant factors and addressed an important aspect of the problem…it was arbitrary and capricious for [FDA] not to consider them.") (internal citations and quotations omitted); *Wages and White Lion Inves., L.L.C. v. FDA*, 16 F.4th 1130, 1136-38 (5th Cir. 2021) ("*Wages*") (FDA's failure to review marketing plan was arbitrary and capricious); *see also Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 631 (2d Cir. 2023) ("it was likely error that the FDA did not review the marketing plan") (internal citations and quotations omitted).

33

What is more, FDA's cursory explanations as to why it cut short the review also fail under the APA. FDA said it did not evaluate Drip More's marketing and access restrictions "for the sake of efficiency." ER-36 n.xix. However, efficiency goals "cannot save an arbitrary agency policy." *Judulang v. Holder*, 556 U.S. 42, 63-64 (2011) (holding irrelevant agency goal to save time and money); *Michigan*, 576 U.S. at 750 (efficiency is no substitute for "reasoned decision-making"); *Bidi*, 47 F.4th at 1204-05 (same); *Wages*, 16 F.4th at 1137 (same). Similarly, FDA argued that marketing and access restrictions it had reviewed to date (although FDA did not specifically identify those plans or restrictions) were not sufficient to address youth use and thus further review was unnecessary. ER-36 n.xix. But relying solely on past experience without actually considering relevant factors is equally arbitrary and capricious. *Bidi*, 47 F.4th at 1203-04; *Wages*, 16 F.4th at 1137-38; *see also Prohibition Juice Co. v. FDA*, 45 F.4th 8, 24 (D.C. Cir. 2022) (petitioner "make[s] plausible arguments that the agency erred in [not reviewing youth access plan] without a more persuasive explanation").

34

Finally, an agency acts in an arbitrary and capricious manner when it fails to consider reasonable alternatives to agency action. *See Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (holding decision by Department of Health and Human Services ("HHS") to grant waiver to California from certain federal laws to be arbitrary and capricious because it did not consider alternative proposals previously suggested by petitioners). Here, Congress explicitly instructed FDA on how to proceed when a particular ENDS is APPH but there is a risk that youth might eventually begin using the product. As discussed above, the TCA allows FDA to withdraw an MGO if evidence demonstrates the product is no longer APPH. 21 U.S.C. § 387j(d)(1)(A). In fact, FDA's own regulations permit it to condition marketing authorization on the filing of periodic reports regarding post-authorization sales demographics and the effectiveness of the manufacturer's marketing and access restrictions. 21 U.S.C. § 1114.35; *see also supra* at 11-12. Moreover, in its PMTA, Drip More committed to post-market surveillance and tracking of sales by downstream retailers. *Supra* at 18.

Yet nowhere in the MDO or TPL did FDA consider moving Drip More's application to a full scientific review (or adequately explain why

35

it did not), with the possibility of post-authorization surveillance (if Drip More's ENDS are found to be APPH), a glaring omission given the low risk that youth would start using Drip More's products.

Therefore, this Court should vacate the MDO and remand Drip More's PMTA for further review so that FDA may properly account for all such information.

## II. FDA's Refusal To Address Information and Data Regarding Potential Underage Use Of Drip More's ENDS Products Was Not Harmless Error

Perhaps realizing it had run afoul of the APA, FDA repeatedly argued in prior cases, including before this Court in *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657 (9th Cir. 2023), that even if it had arbitrarily and capriciously failed to review marketing plans and underage access restrictions that such failure was harmless. *See*, *e.g.*, *Bidi*, 47 F.4th at 1205 (rejecting claim of harmless error); *Lotus*, 73 F.4th at 674-75 (finding harmless error). More recently, the U.S. Supreme Court considered this issue in *FDA v. Wages and White Lion Inves., LLC*, 145 S. Ct. 898 (2025) ("*Wages II*"). As discussed below, the Court found, in part, that FDA had advocated in *Wages* for a harmless error rule that was too stringent and remanded the issue to the Fifth

36

Circuit to apply the correct rule. *Id.* at 931. Given that *Lotus* applied

FDA's erroneous interpretation of the harmless error rule, that decision

does not control here and thus this Court should find there was no

harmless error as to FDA's review of Drip More's PMTA.

Under the APA, a court must "hold unlawful and set aside agency

action…found to be…arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706. Under

longstanding Supreme Court precedent:

> If the record before the agency does not support the agency
> action, if the agency has not considered all relevant factors,
> or if the reviewing court simply cannot evaluate the
> challenged agency action on the basis of the record before it,
> the proper course, *except in rare circumstances*, is to remand
> to the agency for additional investigation or explanation.

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)

(emphasis added). This so-called "remand rule" means the "function of

the reviewing court ends when an error of law is laid bare. At that point

the matter once more goes to the [agency] for reconsideration." *Fed.*

*Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952); *see also*

37

*Azanor v. Ashcroft*, 364 F.3d 1013, 1021 (9th Cir. 2004) (applying

remand rule where agency failed to adequately explain decision).[11]

As the Supreme Court recognized in *Wages II*, however, the

remand rule may in some instances be in tension with the APA's

harmless error rule or "rule of prejudicial error." *Wages II*, 145 S. Ct. at

929; 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of

prejudicial error"). That said, while the APA's version finds its origins

in the common law's harmless error rule, the Supreme Court was

careful to note that under the APA courts must "take due account" of

the rule of prejudicial error, meaning it must be read in context with

the remand rule. *Id.* at 928-929 ("Taking 'due account' of a rule is not

literally the same as applying that rule lock, stock, and barrel").

The *Wages II* Court then set out to articulate the proper scope of

the APA's harmless error rule. Significantly, the Court established a

---

[11] The remand rule is a logical extension of the "now-bedrock principle" set forth in *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("*Chenery I*") and *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) ("*Chenery II*"), in which a court may not affirm an agency decision on alternative grounds not considered by the agency below. *See Wages II*, 145 S. Ct. at 928. Otherwise, a court would "intrude upon the domain which Congress…exclusively entrusted to an administrative agency." *Id.* (citing *Chenery I*).

relatively low bar for petitioners to overcome an agency claim of no prejudice. It said that "[w]hen it is *clear* that the agency's error *had no bearing* on the procedure used or the substance of [the] decision reached, a remand would be pointless." *Id.* at 930 (citing *Mass. Trustees of Eastern Gas & Fuel Assoc. v. U.S.,* 377 U.S. 235, 248 (1964)) (emphasis added) (internal quotations omitted) (brackets in original). The Court then provided further guidance and cited with approval an observation by then-Judge Friendly in a 1969 law review article that "[w]here the agency has rested decision on an unsustainable reason, the court should generally reverse and remand even though it discerns a possibility, *even a strong one*, that by another course of reasoning the agency might come to the same result." *Id.* at 930 (italics and brackets in original); *cf. Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) ("To say that the claimant has the 'burden' of showing that an error was harmful is not to impose…a particularly onerous requirement.").

In doing so, the Supreme Court concluded that FDA had been pushing for a harmless error rule that set petitioner's bar too high. As the Court put it, FDA's reading of [the harmless error rule] may…be excessive." *Id.* "There is an important distinction, if only a subtle one,

39

between [Judge Friendly's] formulation and the FDA's argument that a party attacking an agency decision must *prove* that an error had a '*substantial bearing*' on the decision." *Id.* (emphasis added) (citing to FDA's merits brief at 36-37). Stated differently, the Court worried that the common law version of the harmless error rule taken to its extreme "could permit a reviewing court to sustain a flawed agency decision whenever it finds that the agency *would have* reached the same result absent the initial error. Understood that way, harmless error might swallow the remand rule." *Id.* at 929 (emphasis added).

Indeed, in its *Wages II* merits brief, FDA argued for a strict harmless error standard that could significantly weaken the remand rule. *See, e.g.*, Pet. Br. at 36, 39 (No. 23-1038) (Aug. 26, 2024) (rule applies to "errors that have *no substantial bearing* on the ultimate rights of the parties") (rule "requires a court to ask whether the judgment *would have* been the same") (rule considers whether the court "*would have* reached the same conclusion") (citations and internal quotations omitted) (emphasis added). As such, under *Wages II*, Drip More does not need to prove that it was, in fact, prejudiced, or even that

40

there was a substantial chance FDA would have viewed differently the impact of the company's products on minors absent the error.

Moreover, in light of *Wages II*, this Court's decision in *Lotus* and its treatment of the harmless error rule is now in serious doubt.[12] The Court began by correctly describing a harmless error as one that "had no bearing on the procedure used or the substance of [the] decision reached." *Lotus*, 73 F.4th at 673-74 (citations omitted) (brackets in original). But it then held FDA's refusal to review marketing and access restriction plans as harmless because the petitioners did not prove prejudice. *Id.* 673-74 (petitioners "were unable to identify *any prejudice they suffered*") (also citing *Prohibition Juice*, 45 F.4th at 24-25, as requiring that a petitioner "show that an agency error *harmed it*") (emphasis added) (also citing *Liquid Labs v. FDA*, 52 F.4th 553, 544 (3d Cir. 2022), concluding that petitioner "did not show that its marketing plans *would have* changed the result…") (emphasis added). Not surprisingly, as in *Wages II*, FDA had advocated for a more rigorous harmless error rule by maintaining in its *Lotus* response brief there was

---

[12] This Court "assum[ed], without deciding, that the FDA erred in ignoring Petitioners' marketing plans." *Lotus*, 73 F.4th at 673.

41

"no basis to conclude that *any harm flowed*" from FDA's alleged failures. Resp't Br. (ECF 27) at 34 (No. 21-71328) (March 10, 2022). The harmless error test applied in *Lotus* is therefore contrary to *Wages II*.

When the Supreme Court's more modest version of the harmless error rule is applied in Drip More's case, it cannot be reasonably argued that FDA's failure to review the marketing plan and access restrictions, let alone sales and NYTS data indicating that youth were not using Drip More's products, "clearly" had "no bearing" on FDA's decision. As discussed above, FDA repeatedly claimed these types of information and data were, among other things, "critical" and "directly relevant" to the APPH determination. *Supra* at 8-10. FDA asked manufacturers to provide this evidence and committed to review all such submissions. *Id*. Accordingly, "[i]t is difficult to imagine how failure to consider a relevant factor would" have absolutely no impact "on the procedure used or the substance of the decision reached." *Bidi*, 47 F.4th at 1205.

Indeed, from a procedural standpoint, FDA must weigh "all" contents in a PMTA when deciding whether a particular product meets the APPH standard. APPH is a relative concept and evidence on both sides of the scale must be considered. *Supra* at 5-8. Unfortunately, that

42

did not happen here. Moreover, as to the merits, FDA had in its possession real world data indicating Drip More's products may never pose a significant risk to underage consumers. And on top of that, Drip More proposed extensive marketing and access restrictions that could only have an additional, positive impact on minimizing underage use. When taken together, all of this at least suggests that the underage use concerns animating the comparative efficacy test may be less prominent in Drip More's case. This showing is all that is required for Drip More to overcome FDA's claims of harmless error.

To be sure, the *Lotus* decision found harmless error because petitioners had not proposed any measures that were "materially different" from those FDA had purportedly found in the 2020 enforcement guidance as insufficient to stem underage use. 73 F.4th at 674-75. This argument fails for several reasons as to Drip More. First, it was made in the context of this Court applying a more stringent version of the harmless error rule. *Id.* at 674 (petitioners did not "identify *any prejudice*" because their marketing plans "contained virtually identical measures to those that the FDA had already described as insufficient.") (citation and internal quotations omitted) (emphasis added). But now,

43

the fact that FDA failed to evaluate Drip More's extensive marketing plans and access restrictions, all of which FDA said were "critical" to its APPH determination, is enough to find no harmless error.[13]

Second, the *Lotus* decision turned solely on FDA's failure to consider petitioners' marketing plan and sales restrictions. The Court did not have before it additional evidence, as it does here, demonstrating that minors are not, in fact, using Drip More products. It would strain all credulity to argue that almost a year's worth of sales data showing no purchases by underage consumers, and more significantly FDA's own NYTS survey results in which no respondents

---

[13] Relatedly, it is not clear how this Court could even determine whether Drip More's proposed measures were materially different than those previously considered by FDA. FDA did not identify in the decisional documents – the MDO or TPL – which PMTAs it had reviewed in the past or the specific measures it had found lacking; nor did it cite to the 2020 enforcement guidance for support. *See* ER-36 n.xix; *see Bidi*, 47 F.4th at 1203-04 (noting FDA did not identify the applications or measures that were considered). FDA must engage in reasoned decision-making and adequately explain its rationale. *Prometheus*, 141 S. Ct. at 1158. Simply being able to assert an *ipse dixit* – i.e., marketing and access restrictions are insufficient because we say so – would render the harmless error rule meaningless. *See, e.g.*, *Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005) (holding an agency cannot merely claim that it would have adopted the same rule even if it had complied with APA procedures). For this reason alone, the Court should find no harmless error.

reported having used Drip More's products, are somehow completely irrelevant to an APPH finding. *See Beno*, 30 F.3d at 1076 ("agency action arbitrary where the record did not include data of the sort [the agency] would [have] considered if it had considered [the issue] in any meaningful way") (citation and internal quotations omitted) (brackets in original). At a minimum, FDA was obligated to consider this information, coupled with Drip More's marketing plan and access restrictions, and offer an explanation if those submissions were ultimately given little weight.

Finally, we respectfully disagree with two additional points made in the *Lotus* decision and ask that this Court reconsider those issues. First, the 2020 enforcement guidance did not find that measures listed by FDA in that document are always "insufficient" in countering underage use. *See Lotus*, 73 F.4th at 674 (citing measures such as age verification requirements and limiting purchase quantities). Instead, as to open-system ENDS products like Drip More's, the guidance explicitly stated that such measures may be "adequate" and pledged to consider them when deciding whether to bring an enforcement action against open-system manufacturers. ER-49-50.

45

This is because, as FDA noted, minors are drawn more to closed-systems (e.g., disposables) given their more attractive design features. *Supra* at 32 n.10 (e.g., ease of use and concealability). Open-system devices, and particularly bottled e-liquids, do not share those characteristics. *Id.* In fact, FDA explicitly stated that the 2020 enforcement guidance "should have minimal impact on small manufacturers (e.g., vape shops) that primarily sell [open-system] ENDS products, unless they market to youth or fail to take *adequate measures* to prevent youth access." ER-48 (emphasis added); *see also Bidi*, 47 F.4th at 1206-07 (concluding 2020 enforcement guidance did not find that common marketing and access restrictions were "categorically" ineffective, especially with regard to open-system products). In short, the "2020 Guidance did not absolve [FDA] of the requirement to consider [Drip More's] youth-access-prevention plans." *Id.* at 1208.

Accordingly, just as FDA said it would consider these measures in potential enforcement actions against manufacturers of open-system products, it should have also evaluated any marketing plans and access

restrictions contained in Drip More's PMTA. In both instances, FDA conceded that such information would be plainly relevant.

Second, the Eleventh Circuit in *Bidi* did not base its no harmless error finding solely on "novel" access restrictions proposed by the petitioners which were not listed in the 2020 enforcement guidance. *Lotus*, 73 F.4th at 675 (distinguishing *Bidi* by noting the PMTAs had included novel measures, such as counterfeit prevention systems and "Trace/Verify technology"). In fact, out of the five consolidated petitioners, three had filed PMTAs that did not propose any measures that were arguably "novel," yet the Eleventh Circuit still vacated each of the MDOs and remanded all of the PMTAs for further review. *Bidi*, 47 F.4th at 1205 (majority only identifying petitioners Bidi and Johnny Copper as proposing novel measures); *id.* at 1216 (dissent noting "there were only two among all the Companies' plans" with novel measures).[14] *Bidi* is therefore directly on point with the instant case and provides persuasive authority that FDA's failures were not harmless error.

---

[14] FDA also argued in its response briefs that Petitioners had not proposed any novel measures outside of FDA's own experience. *See, e.g.*, *Diamond Vapor v. FDA* (21-13387), Resp't Br. (Doc. 38) at 36, 38 (Feb. 18, 2022); *Pop Vapor Co., LLC v. FDA* (21-13522), Resp't Br. (Doc. 42) at 33, 36 (March 4, 2022).

### III. FDA Instituted A De Facto Restriction And/Or Ban On Non-Tobacco Flavored ENDS Through The Comparative Efficacy Study Requirement In Direct Violation Of The TCA's Notice And Comment Procedures

Congress required in the TCA that FDA comply with notice and comment procedures before adopting what is called a "tobacco product standard." 21 U.S.C. § 387g(c)(1) (FDA must publish "a notice of proposed rulemaking for the establishment…of any tobacco product standard."). Among other things, FDA must "set forth a finding with supporting justification that the tobacco product standard is appropriate for the protection of the public health [or APPH]" and provide "not less than 60 days" for public comment. 21 U.S.C. § 387g(c)(2)(A), (4). Then, before issuing the final standard, FDA must consider comments submitted in response to the proposal (including "information concerning the countervailing effects of the tobacco product standard on the health of adolescent tobacco users, adult tobacco users, or nontobacco users…," as well as the creation of a significant demand for contraband or black market), and ultimately make an APPH determination. 21 U.S.C. § 387g(d)(1). And the standard must also account for the interests of ENDS manufacturers,

48

including "economic loss to…domestic…trade," as well as the "technical achievability of compliance with the standard." 21 U.S.C. § 387g(d)(2).

As pertinent here, Congress also made clear in the TCA that any restriction or ban on a given flavor would constitute a "tobacco product standard." These standards include, *inter alia*, the "reduction or elimination of an additive, constituent…or other component of a tobacco product because [FDA] has found that [they are] or may be harmful," "provisions respecting the…ingredients, additives, constituents…and properties" of the tobacco product," and "provisions for the reduction or elimination of other constituents [in addition to nicotine yields]…or harmful components of the product." 21 U.S.C. § 387g(a)(3)-(4); *see* also ER-54-55 (2019 PMTA guidance defining "additive" and "component" as including "flavoring" and "flavors."). Indeed, FDA conceded as much when it stated in the 2020 enforcement guidance that "restricting or eliminating the use of flavors" in ENDS would be a "tobacco product standard." ER-51; *see also* 87 Fed. Reg. 26454, 26456 (May 4, 2022) (FDA proposing a tobacco product standard that would have banned menthol as a characterizing flavor in cigarettes); 21 U.S.C. § 387g(a)(1) (TCA establishing a tobacco product

49

standard that banned characterizing flavors in traditional cigarettes other than tobacco or menthol).

Accordingly, there can be no question that the comparative efficacy study requirement constitutes a tobacco product standard, effectively restricting and/or banning all non-tobacco flavors. The checklist form used by FDA in these reviews: (i) only applied to PMTAs for non-tobacco flavored ENDS; (ii) required a comparison of non-tobacco flavored ENDS against a tobacco-flavored comparator product; and (iii) would only move the non-tobacco flavored product to scientific review if there was an RCT, longitudinal cohort study, or similar study showing such product was better at helping smokers quit than a tobacco-flavored comparator. ER-22, ER-24.

Likewise, the TPL repeatedly stated FDA would refuse to conduct any further scientific review and instead deny the application if one of these studies was absent from the PMTA. ER-28-29, ER-36-39. In language similar to statements appearing in the template TPL, *see supra* at 20 n.8, FDA concluded as to Drip More:

> The reviews determined that the PMTAs did not contain evidence from a [RCT] and/or longitudinal cohort study examining the benefit to adult users of their flavored ENDS over an appropriate comparator tobacco-flavored ENDS in

50

terms of switching from or reducing cigarettes. The PMTAs contained a cross-sectional customer survey, but this evidence is not sufficiently strong to support…[a showing of comparative efficacy]. Accordingly, this evidence is not adequate and therefore, we did not assess other aspects of the application as part of this scientific review.

ER-39.

When FDA issued Drip More's MDO, it had yet to grant marketing authorization for a single, non-tobacco flavored ENDS, and since then has only approved six menthol products. *Supra* at 20 n.9. Tellingly, FDA has rejected to date 1.2 million non-tobacco flavored ENDS using the comparative efficacy standard, with the few authorized menthol ENDS constituting a mere 0.0005% of that total. To be clear, this is not FDA coincidently reaching the same conclusion after a thorough, case-by-case evaluation of over one million, non-tobacco flavored ENDS. Rather, FDA has enforced the comparative efficacy requirement in practice as though it were a tobacco product standard – effectively restricting or banning nearly all non-tobacco flavored products across the board – while failing to substantively review the applications as required by the TCA. *Wages and White Lion Inves., LLC v. FDA*, 90 F.4th 357, 384 n.5 (5th Cir. 2024) (holding FDA used the

51

comparative efficacy requirement to impose a *de facto* ban on non-tobacco flavors), *vacated on other grounds*, 145 S. Ct. at 915.

The Supreme Court's decision in *Wages II*, moreover, does nothing to change this fact. The Court explicitly stated it was not deciding whether FDA had an obligation to adopt the comparative efficacy standard through notice and comment rulemaking. 145 S. Ct. at 915-16 ("We did not grant certiorari on that question, and without adequate briefing, it would not be prudent to decide it here."). Further, *Wages II* supports the conclusion that FDA unlawfully applied a tobacco product standard without satisfying the TCA's notice and comment requirements. While the Court noted agencies are generally free to develop regulatory standards through individual orders issued in adjudication, it also made clear that "[o]f course, if a statute requires rulemaking, the affected agency must comply." *Id.* at 915. That is precisely the situation here. Ignoring Congress's instructions to the contrary, FDA did an end-run on the TCA's rulemaking requirements and proceeded to restrict or ban virtually all non-tobacco flavored ENDS via the comparative efficacy standard.

52

Finally, under the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the "best" – and, in fact, the only – interpretation of the TCA is that Congress never intended FDA to impose what amounts to a tobacco product standard through the PMTA review process. *Id.* at 2264 (requiring lower courts to employee "traditional tools of statutory construction" to determine the "best" statutory interpretation). This holds true for at least three reasons given the plain language and structure of the TCA's tobacco product standard and PMTA provisions. *See FDA v. Brown & Williamson Tabacco Corp.*, 120 S. Ct. 1291, 1301 (2000) ("A court must…interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.") (citations and internal quotations omitted).

First, Congress was obviously concerned that some controls placed on tobacco products, such as flavor restrictions or bans, could have such far reaching impacts on manufacturers and the marketplace that it wanted to ensure all interested stakeholders had an opportunity to comment on such limitations before they were adopted and enforced. *Supra* at 48-49. But here, in establishing and applying a comparative

53

efficacy standard during the PMTA review process, FDA did not solicit input from manufacturers or consider factors such as the significant economic impact on the ENDS marketplace. It makes no sense that Congress would have obligated FDA to account for those issues in promulgating tobacco product standards, only to turn around and let FDA completely ignore them in the PMTA process.

Second, the PMTA provisions are not entirely separate or distinct from the tobacco product standard provisions. Congress linked the two and ensured that FDA would still be able to take into consideration tobacco product standards when deciding whether to deny marketing authorization. The TCA explicitly allows FDA to issue an MDO if a PMTA does not comply with a tobacco product standard. 21 U.S.C. § 387j(c)(2)(D) (FDA to issue MDO if "such tobacco product is not shown to conform in all respects to a tobacco product standard in effect under [21 U.S.C. § 387g], and there is a lack of adequate information to justify the deviation from such standard."). As such, Congress gave FDA authority to deny marketing authorization based on a standard that is effectively an industry-wide flavor restriction or ban, but only if it has gone through the prescribed notice and comment rulemaking process.

54

Third, to further ensure that the tobacco product standard and PMTA provisions work together in a consistent manner, Congress explicitly requires FDA to find that a tobacco product standard is APPH. Just as it does when reviewing a PMTA, in promulgating a tobacco product standard, FDA must consider:

> (I) the risks and benefits to the population as a whole including users and nonusers of tobacco products…; (II) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and (III) the increased or decreased likelihood that those who do not use tobacco products will start using such products.

21 U.S.C. § 387g(a)(3). That way, if FDA, as it did here, completely foregoes a full scientific review of PMTAs, and instead applies an across-the-board standard to all similarly situated ENDS products, Congress would be assured that such an approach still incorporates the TCA's APPH standard, while at the same time accounts for critical stakeholder input during notice and comment rulemaking.

In the end, because FDA unquestionably did not follow the TCA's notice and comment procedures before imposing the comparative efficacy standard on Drip More's ENDS and similar products, this Court must vacate and remand the MDO.

55

## IV. FDA's Comparative Efficacy Requirement Violated The APA's Notice And Comment Procedures

In addition, FDA also contravened the APA's rulemaking procedures when it gave agency staff no choice but to issue an MDO if a PMTA for non-tobacco flavored ENDS did not contain a specific study comparing the cessation efficacy of the manufacturer's non-tobacco flavored products and a comparator tobacco flavored ENDS.

Under the APA, a "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy…" 5 U.S.C. § 551(4). A rule, in turn, must then be promulgated through notice and comment rulemaking, including a statement of "basis and purpose" upon issuing a final rule. 5 U.S.C. § 553(b).

In the instant case, the comparative efficacy standard is clearly a "rule," as it was designed to implement the TCA and has been applied by FDA to deny PMTAs for 1.2 million non-tobacco flavored ENDS. *Supra* at 20 n.9. Indeed, the TPL (consistent with the exemplar TPL published by FDA in September 2021), which summarizes FDA's rationale for the comparative efficacy standard, reads more like a

56

preamble to an agency rulemaking than a case-by-case evaluation of a PMTA; in fact, Drip More's TPL barely mentions its products at all.

So the only remaining question is whether the comparative efficacy standard is exempt from APA rulemaking. The answer is "no." It is true the APA exempts from rulemaking, *inter alia,* "general statements of policy." 5 U.S.C. § 553(b). In this Circuit, the "critical factor to determine whether a directive announcing a new policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987) (citations and internal quotations exempted) (brackets in original). Stated differently, "the extent to which the directive narrowly limits administrative discretion or established a binding norm that so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion, it effectively replaces agency discretion with a new binding rule of substantive law." *Id.* (citations and internal quotations omitted). While "legislative rules have the "force of

57

law…policy guidance statements…do not have the force and effect of law." *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1186 (9th Cir. 2019).

Here, the comparative efficacy standard, as set forth in the TPL (including the exemplar TPL issued before Drip More's MDO was issued), is a legislative rule requiring notice and comment rulemaking as it plainly limited what FDA could consider in each PMTA and afforded FDA little discretion when a comparative efficacy study was missing. To begin, the TPL repeatedly states that the FDA's review was limited to this type of study. *See, e.g.*, ER-28, ER-36, ER-38-40; *see also supra* at 20 n.8 at 3, 11, 13-15 (template TPL stating same). The form checklists make similar assertions. *See, e.g.*, ER-22, -24. Consequently, the reviewers were not to evaluate any other information in the PMTA.

Moreover, the MDO, TPL, and the checklists indicate that if such evidence is missing, then FDA would not conduct further scientific review. *See, e.g.*, ER-18 (MDO stating "[S]cientific review did not proceed to assess other aspects of the applications"); ER-39 (TPL noting FDA "did not assess other aspects of the application as part of this scientific review"); *supra* at 20 n.8 at 14 (template TPL stating same); ER-22, ER-24 (both checklists indicating "[i]f such evidence is present in

58

the applications, the [reviewer] will determine if full scientific review is necessary"). Under the comparative efficacy approach, even if FDA wanted to exercise further discretion based on additional, relevant information and data in a PMTA, it could not. Once FDA's reviewers marked the "Absent" boxes in the checklists, and otherwise determined there was no other evidence resembling a comparative efficacy study, FDA's work was done. ER-22-23, ER-24-25.

Most importantly, the TPL itself concluded that, if there was no study going to comparative efficacy, "a Denial letter should be issued to the applicant….The following deficiency [lack of comparative efficacy study] should be conveyed to the applicant as the key basis for our determination that marketing of the new products is not APPH. The applicant cannot introduce or deliver for introduction these products into interstate commerce…" ER-39; *supra* at 20 n.8 at 14 (template TPL stating same). And FDA has consistently enforced the TPL and its comparative efficacy standard as an across-the-board, binding norm. Where the comparative efficacy standard has been applied, FDA has never granted marketing authorization to a non-tobacco flavored ENDS

59

where the study was missing; instead, it issued MDOs to over one million such products. *Supra* at 20 n.9.

FDA will likely argue in response that it is also free under the APA to adopt a rule or regulation in an adjudication. And we recognize the Supreme Court in *Wages II* noted that FDA was not required under the TCA to issue guidance detailing the comparative efficacy standard as that "would be in tension with *Chenery II's* teaching that, absent a statutory prohibition, agencies may generally develop regulatory standards through either adjudication or rulemaking." *Wages II*, 145 S. Ct. at 925 (citing *Chenery II*, 332 U.S. at 202-03).

However, *Wages II* does not entirely answer the question of whether FDA violated the APA's notice and comment requirements. First, as already discussed, the TCA does in fact prohibit FDA from adopting something like the comparative efficacy standard without formal rulemaking. *Supra* at 48-50. Moreover, the Supreme Court has previously noted that "there may be situations where [an agency's] reliance on adjudication would amount to an abuse of discretion." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974). Indeed, this Circuit has similarly explained that "[a]n agency adjudication may require a notice

60

and comment period if it constitutes de facto rulemaking that affects the rights of broad classes of unspecified individuals." *MacLean v. Dep't of Homeland Security*, 543 F.3d 1145, 1151 (9th Cir. 2008).

That is exactly what has happened here. The TPLs set forth a comparative efficacy standard that has been enforced against PMTAs filed by hundreds of ENDS manufacturers for over one million products. Indeed, the standard TPL is clearly written so as to easily apply to any PMTA and to cover a "broad class" of manufacturers going forward. And, as discussed above, the comparative efficacy standard has been applied in a manner that established a *de facto* restriction and/or ban on non-tobacco flavored ENDS products.

Accordingly, while agencies generally have authority to adopt regulations in adjudications, in this case it was an abuse of discretion to do so and, in the process, violate the APA's rulemaking requirements.

## V. FDA Unlawfully Applied The MDO To Zero-Nicotine Electronic Cigarettes

The TCA only applies to products derived from tobacco and/or that contain nicotine from any source, or that are otherwise a "component" or "part" of a tobacco product. 21 U.S.C. § 321(rr) (2025). Fourteen of Drip More's products subject to the MDO have zero-nicotine options and

61

are not made or derived from tobacco (and do not contain nicotine from another source). ER-6-12. Moreover, as FDA stated in the 2019 PMTA guidance, zero-nicotine electronic cigarettes that are "not intended or reasonably expected to be mixed with liquid nicotine or materials made from or derived from tobacco" are not subject to the TCA. ER-55-56. Drip More clearly does not intend for its zero-nicotine products to be mixed with nicotine or tobacco. A consumer wishing to use these flavors with nicotine would simply purchase one of Drip More's nicotine options. *Supra* at 12-13.

In any event, neither the MDO nor the TPL claimed that Drip More intended those products to be covered tobacco products or provided any evidence in support. FDA cannot now argue otherwise. *See Chenery II*, 332 U.S. at 196. Accordingly, at a minimum, the MDO should be set aside as to those products.

## CONCLUSION

This Court should grant the Petition for Review, and vacate and remand the MDO for further agency proceedings.

Dated: July 24, 2025

62

/s Eric P. Gotting
Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioners*

63

## CERTIFICATE OF COMPLIANCE

I hereby certify the foregoing complies with the length limitations of Circuit Rule 32-1 because it is 12,218 words, excluding the parts that are exempted under Rule 32(f).  It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Century Schoolbook font.

/s Eric P. Gotting
Eric P. Gotting

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2025, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

/s Eric P. Gotting
Eric P. Gotting

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned certifies that the following related cases are pending in the Ninth Circuit and raise the same or closely related issues as *Drip More v. FDA*, 21-71380:

*Vertigo Vapor v. FDA*, 24-4011 (held in administrative closure)

*My Vape Order v. FDA*, 21-71302 (held in abeyance)

*MH Global v. FDA*, 21-71327

/s Eric P. Gotting
Eric P. Gotting

# ADDENDUM

# **INDEX**

21 U.S.C. § 387g…............................................................... ADD001

21 U.S.C. § 387j….................................................................. ADD005

cept that no such period shall be extended for more than 90 days, see section 6 of Pub. L. 111–31, set out as a note under section 387 of this title.

### § 387f–1. Enforcement action plan for advertising and promotion restrictions

#### (a) Action plan

##### (1) Development

Not later than 6 months after June 22, 2009, the Secretary of Health and Human Services (in this section referred to as the ''Secretary'') shall develop and publish an action plan to enforce restrictions adopted pursuant to section 387f of this title, as added by section 101(b) of this division, or pursuant to section 387a–1(a) of this title, on promotion and advertising of menthol and other cigarettes to youth.

##### (2) Consultation

The action plan required by paragraph (1) shall be developed in consultation with public health organizations and other stakeholders with demonstrated expertise and experience in serving minority communities.

##### (3) Priority

The action plan required by paragraph (1) shall include provisions designed to ensure enforcement of the restrictions described in paragraph (1) in minority communities.

#### (b) State and local activities

##### (1) Information on authority

Not later than 3 months after June 22, 2009, the Secretary shall inform State, local, and tribal governments of the authority provided to such entities under section 1334(c) of title 15, as added by section 203 of this division, or preserved by such entities under section 387p of this title, as added by section 101(b) of this division.

##### (2) Community assistance

At the request of communities seeking assistance to prevent underage tobacco use, the Secretary shall provide such assistance, including assistance with strategies to address the prevention of underage tobacco use in communities with a disproportionate use of menthol cigarettes by minors.

(Pub. L. 111–31, div. A, title I, § 105, June 22, 2009, 123 Stat. 1841.)

#### Editorial Notes

##### CODIFICATION

Section was enacted as part of the Family Smoking Prevention and Tobacco Control Act, and not as part of the Federal Food, Drug, and Cosmetic Act which comprises this chapter.

#### Statutory Notes and Related Subsidiaries

##### MODIFICATION OF DEADLINES FOR SECRETARIAL ACTION

With respect to any time periods specified in div. A of Pub. L. 111–31 that begin on June 22, 2009, within which the Secretary of Health and Human Services is required to carry out and complete specified activities, with certain limitations, the calculation of such time periods shall commence on the first day of the first fiscal quarter following the initial 2 consecutive fiscal quarters of fiscal year 2010 for which the Secretary has

collected fees under section 387s of this title, and the Secretary may extend or reduce the duration of one or more such time periods, except that no such period shall be extended for more than 90 days, see section 6 of Pub. L. 111–31, set out as a note under section 387 of this title.

### § 387g. Tobacco product standards

#### (a) In general

##### (1) Special rules

###### (A) Special rule for cigarettes

Beginning 3 months after June 22, 2009, a cigarette or any of its component parts (including the tobacco, filter, or paper) shall not contain, as a constituent (including a smoke constituent) or additive, an artificial or natural flavor (other than tobacco or menthol) or an herb or spice, including strawberry, grape, orange, clove, cinnamon, pineapple, vanilla, coconut, licorice, cocoa, chocolate, cherry, or coffee, that is a characterizing flavor of the tobacco product or tobacco smoke. Nothing in this subparagraph shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter applicable to menthol or any artificial or natural flavor, herb, or spice not specified in this subparagraph.

###### (B) Additional special rule

Beginning 2 years after June 22, 2009, a tobacco product manufacturer shall not use tobacco, including foreign grown tobacco, that contains a pesticide chemical residue that is at a level greater than is specified by any tolerance applicable under Federal law to domestically grown tobacco.

##### (2) Revision of tobacco product standards

The Secretary may revise the tobacco product standards in paragraph (1) in accordance with subsection (c).

##### (3) Tobacco product standards

###### (A) In general

The Secretary may adopt tobacco product standards in addition to those in paragraph (1) if the Secretary finds that a tobacco product standard is appropriate for the protection of the public health.

###### (B) Determinations

####### (i) Considerations

In making a finding described in subparagraph (A), the Secretary shall consider scientific evidence concerning—

(I) the risks and benefits to the population as a whole, including users and nonusers of tobacco products, of the proposed standard;

(II) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

(III) the increased or decreased likelihood that those who do not use tobacco products will start using such products.

####### (ii) Additional considerations

In the event that the Secretary makes a determination, set forth in a proposed to-

bacco product standard in a proposed rule, that it is appropriate for the protection of public health to require the reduction or elimination of an additive, constituent (including a smoke constituent), or other component of a tobacco product because the Secretary has found that the additive, constituent, or other component is or may be harmful, any party objecting to the proposed standard on the ground that the proposed standard will not reduce or eliminate the risk of illness or injury may provide for the Secretary's consideration scientific evidence that demonstrates that the proposed standard will not reduce or eliminate the risk of illness or injury.

**(4) Content of tobacco product standards**

A tobacco product standard established under this section for a tobacco product—

(A) shall include provisions that are appropriate for the protection of the public health, including provisions, where appropriate—

(i) for nicotine yields of the product;

(ii) for the reduction or elimination of other constituents, including smoke constituents, or harmful components of the product; or

(iii) relating to any other requirement under subparagraph (B);

(B) shall, where appropriate for the protection of the public health, include—

(i) provisions respecting the construction, components, ingredients, additives, constituents, including smoke constituents, and properties of the tobacco product;

(ii) provisions for the testing (on a sample basis or, if necessary, on an individual basis) of the tobacco product;

(iii) provisions for the measurement of the tobacco product characteristics of the tobacco product;

(iv) provisions requiring that the results of each or of certain of the tests of the tobacco product required to be made under clause (ii) show that the tobacco product is in conformity with the portions of the standard for which the test or tests were required; and

(v) a provision requiring that the sale and distribution of the tobacco product be restricted but only to the extent that the sale and distribution of a tobacco product may be restricted under a regulation under section 387f(d) of this title;

(C) shall, where appropriate, require the use and prescribe the form and content of labeling for the proper use of the tobacco product; and

(D) shall require tobacco products containing foreign-grown tobacco to meet the same standards applicable to tobacco products containing domestically grown tobacco.

**(5) Periodic reevaluation of tobacco product standards**

The Secretary shall provide for periodic evaluation of tobacco product standards established under this section to determine whether such standards should be changed to reflect new medical, scientific, or other technological data. The Secretary may provide for testing under paragraph (4)(B) by any person.

**(6) Involvement of other agencies; informed persons**

In carrying out duties under this section, the Secretary shall endeavor to—

(A) use personnel, facilities, and other technical support available in other Federal agencies;

(B) consult with other Federal agencies concerned with standard setting and other nationally or internationally recognized standard-setting entities; and

(C) invite appropriate participation, through joint or other conferences, workshops, or other means, by informed persons representative of scientific, professional, industry, agricultural, or consumer organizations who in the Secretary's judgment can make a significant contribution.

**(b) Considerations by Secretary**

**(1) Technical achievability**

The Secretary shall consider information submitted in connection with a proposed standard regarding the technical achievability of compliance with such standard, including with regard to any differences related to the technical achievability of compliance with such standard for products in the same class containing nicotine not made or derived from tobacco and products containing nicotine made or derived from tobacco.

**(2) Other considerations**

The Secretary shall consider all other information submitted in connection with a proposed standard, including information concerning the countervailing effects of the tobacco product standard on the health of adolescent tobacco users, adult tobacco users, or nontobacco users, such as the creation of a significant demand for contraband or other tobacco products that do not meet the requirements of this subchapter and the significance of such demand.

**(c) Proposed standards**

**(1) In general**

The Secretary shall publish in the Federal Register a notice of proposed rulemaking for the establishment, amendment, or revocation of any tobacco product standard.

**(2) Requirements of notice**

A notice of proposed rulemaking for the establishment or amendment of a tobacco product standard for a tobacco product shall—

(A) set forth a finding with supporting justification that the tobacco product standard is appropriate for the protection of the public health;

(B) invite interested persons to submit a draft or proposed tobacco product standard for consideration by the Secretary;

(C) invite interested persons to submit comments on structuring the standard so that it does not advantage foreign-grown tobacco over domestically grown tobacco; and

(D) invite the Secretary of Agriculture to provide any information or analysis which the Secretary of Agriculture believes is relevant to the proposed tobacco product standard.

### (3) Finding

A notice of proposed rulemaking for the revocation of a tobacco product standard shall set forth a finding with supporting justification that the tobacco product standard is no longer appropriate for the protection of the public health.

### (4) Comment

The Secretary shall provide for a comment period of not less than 60 days.

## (d) Promulgation

### (1) In general

After the expiration of the period for comment on a notice of proposed rulemaking published under subsection (c) respecting a tobacco product standard and after consideration of comments submitted under subsections (b) and (c) and any report from the Tobacco Products Scientific Advisory Committee, the Secretary shall—

(A) if the Secretary determines that the standard would be appropriate for the protection of the public health, promulgate a regulation establishing a tobacco product standard and publish in the Federal Register findings on the matters referred to in subsection (c); or

(B) publish a notice terminating the proceeding for the development of the standard together with the reasons for such termination.

### (2) Effective date

A regulation establishing a tobacco product standard shall set forth the date or dates upon which the standard shall take effect, but no such regulation may take effect before 1 year after the date of its publication unless the Secretary determines that an earlier effective date is necessary for the protection of the public health. Such date or dates shall be established so as to minimize, consistent with the public health, economic loss to, and disruption or dislocation of, domestic and international trade. In establishing such effective date or dates, the Secretary shall consider information submitted in connection with a proposed product standard by interested parties, including manufacturers and tobacco growers, regarding the technical achievability of compliance with the standard, and including information concerning the existence of patents that make it impossible to comply in the timeframe envisioned in the proposed standard. If the Secretary determines, based on the Secretary's evaluation of submitted comments, that a product standard can be met only by manufacturers requiring substantial changes to the methods of farming the domestically grown tobacco used by the manufacturer, the effective date of that product standard shall be not less than 2 years after the date of publication of the final regulation establishing the standard.

### (3) Limitation on power granted to the Food and Drug Administration

Because of the importance of a decision of the Secretary to issue a regulation—

(A) banning all cigarettes, all smokeless tobacco products, all little cigars, all cigars other than little cigars, all pipe tobacco, or all roll-your-own tobacco products; or

(B) requiring the reduction of nicotine yields of a tobacco product to zero,

the Secretary is prohibited from taking such actions under this chapter.

### (4) Amendment; revocation

#### (A) Authority

The Secretary, upon the Secretary's own initiative or upon petition of an interested person, may by a regulation, promulgated in accordance with the requirements of subsection (c) and paragraph (2), amend or revoke a tobacco product standard.

#### (B) Effective date

The Secretary may declare a proposed amendment of a tobacco product standard to be effective on and after its publication in the Federal Register and until the effective date of any final action taken on such amendment if the Secretary determines that making it so effective is in the public interest.

### (5) Referral to Advisory Committee

#### (A) In general

The Secretary may refer a proposed regulation for the establishment, amendment, or revocation of a tobacco product standard to the Tobacco Products Scientific Advisory Committee for a report and recommendation with respect to any matter involved in the proposed regulation which requires the exercise of scientific judgment.

#### (B) Initiation of referral

The Secretary may make a referral under this paragraph—

(i) on the Secretary's own initiative; or

(ii) upon the request of an interested person that—

(I) demonstrates good cause for the referral; and

(II) is made before the expiration of the period for submission of comments on the proposed regulation.

#### (C) Provision of data

If a proposed regulation is referred under this paragraph to the Tobacco Products Scientific Advisory Committee, the Secretary shall provide the Advisory Committee with the data and information on which such proposed regulation is based.

#### (D) Report and recommendation

The Tobacco Products Scientific Advisory Committee shall, within 60 days after the referral of a proposed regulation under this paragraph and after independent study of the data and information furnished to it by the Secretary and other data and information before it, submit to the Secretary a report and recommendation respecting such

ADD003

**§ 387h**                    TITLE 21—FOOD AND DRUGS                    Page 682

regulation, together with all underlying data and information and a statement of the reason or basis for the recommendation.

### (E) Public availability

The Secretary shall make a copy of each report and recommendation under subparagraph (D) publicly available.

## (e) Menthol cigarettes

### (1) Referral; considerations

Immediately upon the establishment of the Tobacco Products Scientific Advisory Committee under section 387q(a) of this title, the Secretary shall refer to the Committee for report and recommendation, under section 387q(c)(4) of this title, the issue of the impact of the use of menthol in cigarettes on the public health, including such use among children, African-Americans, Hispanics, and other racial and ethnic minorities. In its review, the Tobacco Products Scientific Advisory Committee shall address the considerations listed in subsections (a)(3)(B)(i) and (b).

### (2) Report and recommendation

Not later than 1 year after its establishment, the Tobacco Product Scientific Advisory Committee shall submit to the Secretary the report and recommendations required pursuant to paragraph (1).

### (3) Rule of construction

Nothing in this subsection shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter applicable to menthol.

## (f) Dissolvable tobacco products

### (1) Referral; considerations

The Secretary shall refer to the Tobacco Products Scientific Advisory Committee for report and recommendation, under section 387q(c)(4) of this title, the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children. In its review, the Tobacco Products Scientific Advisory Committee shall address the considerations listed in subsection (a)(3)(B)(i).

### (2) Report and recommendation

Not later than 2 years after its establishment, the Tobacco Product Scientific Advisory Committee shall submit to the Secretary the report and recommendations required pursuant to paragraph (1).

### (3) Rule of construction

Nothing in this subsection shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter at any time applicable to any dissolvable tobacco product.

(June 25, 1938, ch. 675, § 907, as added Pub. L. 111–31, div. A, title I, § 101(b)(3), June 22, 2009, 123 Stat. 1799; amended Pub. L. 117–103, div. P, title I, § 111(f), Mar. 15, 2022, 136 Stat. 790.)

#### EDITORIAL NOTES

##### PRIOR PROVISIONS

A prior section 907 of act June 25, 1938, was renumbered section 1007 and is classified to section 397 of this title.

#### AMENDMENTS

2022—Subsec. (b)(1). Pub. L. 117–103 inserted before period at end '', including with regard to any differences related to the technical achievability of compliance with such standard for products in the same class containing nicotine not made or derived from tobacco and products containing nicotine made or derived from tobacco''.

## § 387h. Notification and other remedies

### (a) Notification

If the Secretary determines that—

(1) a tobacco product which is introduced or delivered for introduction into interstate commerce for commercial distribution presents an unreasonable risk of substantial harm to the public health; and

(2) notification under this subsection is necessary to eliminate the unreasonable risk of such harm and no more practicable means is available under the provisions of this subchapter (other than this section) to eliminate such risk,

the Secretary may issue such order as may be necessary to assure that adequate notification is provided in an appropriate form, by the persons and means best suited under the circumstances involved, to all persons who should properly receive such notification in order to eliminate such risk. The Secretary may order notification by any appropriate means, including public service announcements. Before issuing an order under this subsection, the Secretary shall consult with the persons who are to give notice under the order.

### (b) No exemption from other liability

Compliance with an order issued under this section shall not relieve any person from liability under Federal or State law. In awarding damages for economic loss in an action brought for the enforcement of any such liability, the value to the plaintiff in such action of any remedy provided under such order shall be taken into account.

### (c) Recall authority

#### (1) In general

If the Secretary finds that there is a reasonable probability that a tobacco product contains a manufacturing or other defect not ordinarily contained in tobacco products on the market that would cause serious, adverse health consequences or death, the Secretary shall issue an order requiring the appropriate person (including the manufacturers, importers, distributors, or retailers of the tobacco product) to immediately cease distribution of such tobacco product. The order shall provide the person subject to the order with an opportunity for an informal hearing, to be held not later than 10 days after the date of the issuance of the order, on the actions required by the order and on whether the order should be amended to require a recall of such tobacco product. If, after providing an opportunity for such a hearing, the Secretary determines that inadequate grounds exist to support the actions required by the order, the Secretary shall vacate the order.

ADD004

§ 387j                    TITLE 21—FOOD AND DRUGS                    Page 684

**Editorial Notes**

PRIOR PROVISIONS

A prior section 909 of act June 25, 1938, was renumbered section 1009 and is classified to section 399 of this title.

## § 387j. Application for review of certain tobacco products

### (a) In general

#### (1) New tobacco product defined

For purposes of this section the term ''new tobacco product'' means—

(A) any tobacco product (including those products in test markets) that was not commercially marketed in the United States as of February 15, 2007; or

(B) any modification (including a change in design, any component, any part, or any constituent, including a smoke constituent, or in the content, delivery or form of nicotine, or any other additive or ingredient) of a tobacco product where the modified product was commercially marketed in the United States after February 15, 2007.

#### (2) Premarket review required

##### (A) New products

An order under subsection (c)(1)(A)(i) for a new tobacco product is required unless—

(i) the manufacturer has submitted a report under section 387e(j) of this title; and the Secretary has issued an order that the tobacco product—

(I) is substantially equivalent to a tobacco product commercially marketed (other than for test marketing) in the United States as of February 15, 2007; and

(II) is in compliance with the requirements of this chapter; or

(ii) the tobacco product is exempt from the requirements of section 387e(j) of this title pursuant to a regulation issued under section 387e(j)(3) of this title.

##### (B) Application to certain post-February 15, 2007, products

Subparagraph (A) shall not apply to a tobacco product—

(i) that was first introduced or delivered for introduction into interstate commerce for commercial distribution in the United States after February 15, 2007, and prior to the date that is 21 months after June 22, 2009; and

(ii) for which a report was submitted under section 387e(j) of this title within such 21-month period,

except that subparagraph (A) shall apply to the tobacco product if the Secretary issues an order that the tobacco product is not substantially equivalent.

#### (3) Substantially equivalent defined

##### (A) In general

In this section and section 387e(j) of this title, the term ''substantially equivalent'' or ''substantial equivalence'' means, with respect to the tobacco product being compared to the predicate tobacco product, that the Secretary by order has found that the tobacco product—

(i) has the same characteristics as the predicate tobacco product; or

(ii) has different characteristics and the information submitted contains information, including clinical data if deemed necessary by the Secretary, that demonstrates that it is not appropriate to regulate the product under this section because the product does not raise different questions of public health.

##### (B) Characteristics

In subparagraph (A), the term ''characteristics'' means the materials, ingredients, design, composition, heating source, or other features of a tobacco product.

##### (C) Limitation

A tobacco product may not be found to be substantially equivalent to a predicate tobacco product that has been removed from the market at the initiative of the Secretary or that has been determined by a judicial order to be misbranded or adulterated.

#### (4) Health information

##### (A) Summary

As part of a submission under section 387e(j) of this title respecting a tobacco product, the person required to file a premarket notification under such section shall provide an adequate summary of any health information related to the tobacco product or state that such information will be made available upon request by any person.

##### (B) Required information

Any summary under subparagraph (A) respecting a tobacco product shall contain detailed information regarding data concerning adverse health effects and shall be made available to the public by the Secretary within 30 days of the issuance of a determination that such tobacco product is substantially equivalent to another tobacco product.

### (b) Application

#### (1) Contents

An application under this section shall contain—

(A) full reports of all information, published or known to, or which should reasonably be known to, the applicant, concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products;

(B) a full statement of the components, ingredients, additives, and properties, and of the principle or principles of operation, of such tobacco product;

(C) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such tobacco product;

(D) an identifying reference to any tobacco product standard under section 387g of this

title which would be applicable to any aspect of such tobacco product, and either adequate information to show that such aspect of such tobacco product fully meets such tobacco product standard or adequate information to justify any deviation from such standard;

　　(E) such samples of such tobacco product and of components thereof as the Secretary may reasonably require;

　　(F) specimens of the labeling proposed to be used for such tobacco product; and

　　(G) such other information relevant to the subject matter of the application as the Secretary may require.

**(2) Referral to Tobacco Products Scientific Advisory Committee**

Upon receipt of an application meeting the requirements set forth in paragraph (1), the Secretary—

　　(A) may, on the Secretary's own initiative; or

　　(B) may, upon the request of an applicant,

refer such application to the Tobacco Products Scientific Advisory Committee for reference and for submission (within such period as the Secretary may establish) of a report and recommendation respecting the application, together with all underlying data and the reasons or basis for the recommendation.

**(c) Action on application**

**(1) Deadline**

**(A) In general**

As promptly as possible, but in no event later than 180 days after the receipt of an application under subsection (b), the Secretary, after considering the report and recommendation submitted under subsection (b)(2), shall—

　　(i) issue an order that the new product may be introduced or delivered for introduction into interstate commerce if the Secretary finds that none of the grounds specified in paragraph (2) of this subsection applies; or

　　(ii) issue an order that the new product may not be introduced or delivered for introduction into interstate commerce if the Secretary finds (and sets forth the basis for such finding as part of or accompanying such denial) that 1 or more grounds for denial specified in paragraph (2) of this subsection apply.

**(B) Restrictions on sale and distribution**

An order under subparagraph (A)(i) may require that the sale and distribution of the tobacco product be restricted but only to the extent that the sale and distribution of a tobacco product may be restricted under a regulation under section 387f(d) of this title.

**(2) Denial of application**

The Secretary shall deny an application submitted under subsection (b) if, upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product, the Secretary finds that—

　　(A) there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health;

　　(B) the methods used in, or the facilities or controls used for, the manufacture, processing, or packing of such tobacco product do not conform to the requirements of section 387f(e) of this title;

　　(C) based on a fair evaluation of all material facts, the proposed labeling is false or misleading in any particular; or

　　(D) such tobacco product is not shown to conform in all respects to a tobacco product standard in effect under section 387g of this title, and there is a lack of adequate information to justify the deviation from such standard.

**(3) Denial information**

Any denial of an application shall, insofar as the Secretary determines to be practicable, be accompanied by a statement informing the applicant of the measures required to remove such application from deniable form (which measures may include further research by the applicant in accordance with 1 or more protocols prescribed by the Secretary).

**(4) Basis for finding**

For purposes of this section, the finding as to whether the marketing of a tobacco product for which an application has been submitted is appropriate for the protection of the public health shall be determined with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account—

　　(A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

　　(B) the increased or decreased likelihood that those who do not use tobacco products will start using such products.

**(5) Basis for action**

**(A) Investigations**

For purposes of paragraph (2)(A), whether permitting a tobacco product to be marketed would be appropriate for the protection of the public health shall, when appropriate, be determined on the basis of well-controlled investigations, which may include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product.

**(B) Other evidence**

If the Secretary determines that there exists valid scientific evidence (other than evidence derived from investigations described in subparagraph (A)) which is sufficient to evaluate the tobacco product, the Secretary may authorize that the determination for purposes of paragraph (2)(A) be made on the basis of such evidence.

**(d) Withdrawal and temporary suspension**

**(1) In general**

The Secretary shall, upon obtaining, where appropriate, advice on scientific matters from the Tobacco Products Scientific Advisory

TITLE 21—FOOD AND DRUGS

Committee, and after due notice and opportunity for informal hearing for a tobacco product for which an order was issued under subsection (c)(1)(A)(i), issue an order withdrawing the order if the Secretary finds—

(A) that the continued marketing of such tobacco product no longer is appropriate for the protection of the public health;

(B) that the application contained or was accompanied by an untrue statement of a material fact;

(C) that the applicant—

(i) has failed to establish a system for maintaining records, or has repeatedly or deliberately failed to maintain records or to make reports, required by an applicable regulation under section 387i of this title;

(ii) has refused to permit access to, or copying or verification of, such records as required by section 374 of this title; or

(iii) has not complied with the requirements of section 387e of this title;

(D) on the basis of new information before the Secretary with respect to such tobacco product, evaluated together with the evidence before the Secretary when the application was reviewed, that the methods used in, or the facilities and controls used for, the manufacture, processing, packing, or installation of such tobacco product do not conform with the requirements of section 387f(e) of this title and were not brought into conformity with such requirements within a reasonable time after receipt of written notice from the Secretary of nonconformity;

(E) on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when the application was reviewed, that the labeling of such tobacco product, based on a fair evaluation of all material facts, is false or misleading in any particular and was not corrected within a reasonable time after receipt of written notice from the Secretary of such fact; or

(F) on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when such order was issued, that such tobacco product is not shown to conform in all respects to a tobacco product standard which is in effect under section 387g of this title, compliance with which was a condition to the issuance of an order relating to the application, and that there is a lack of adequate information to justify the deviation from such standard.

**(2) Appeal**

The holder of an application subject to an order issued under paragraph (1) withdrawing an order issued pursuant to subsection (c)(1)(A)(i) may, by petition filed on or before the 30th day after the date upon which such holder receives notice of such withdrawal, obtain review thereof in accordance with section 387*l* of this title.

**(3) Temporary suspension**

If, after providing an opportunity for an informal hearing, the Secretary determines there is reasonable probability that the continuation of distribution of a tobacco product under an order would cause serious, adverse health consequences or death, that is greater than ordinarily caused by tobacco products on the market, the Secretary shall by order temporarily suspend the authority of the manufacturer to market the product. If the Secretary issues such an order, the Secretary shall proceed expeditiously under paragraph (1) to withdraw such application.

**(e) Service of order**

An order issued by the Secretary under this section shall be served—

(1) in person by any officer or employee of the department designated by the Secretary; or

(2) by mailing the order by registered mail or certified mail addressed to the applicant at the applicant's last known address in the records of the Secretary.

**(f) Records**

**(1) Additional information**

In the case of any tobacco product for which an order issued pursuant to subsection (c)(1)(A)(i) for an application filed under subsection (b) is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, as the Secretary may by regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination of, whether there is or may be grounds for withdrawing or temporarily suspending such order.

**(2) Access to records**

Each person required under this section to maintain records, and each person in charge of custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

**(g) Investigational tobacco product exemption for investigational use**

The Secretary may exempt tobacco products intended for investigational use from the provisions of this subchapter under such conditions as the Secretary may by regulation prescribe.

(June 25, 1938, ch. 675, § 910, as added Pub. L. 111–31, div. A, title I, § 101(b)(3), June 22, 2009, 123 Stat. 1807.)

EDITORIAL NOTES

PRIOR PROVISIONS

A prior section 910 of act June 25, 1938, was renumbered section 1010 and is classified to section 399a of this title.

STATUTORY NOTES AND RELATED SUBSIDIARIES

SUBMISSION OF APPLICATIONS FOR PREVIOUSLY MARKETED PRODUCTS

Pub. L. 117–103, div. P, title I, § 111(d), Mar. 15, 2022, 136 Stat. 789, provided that:

''(1) TRANSITION PERIOD FOR ALL PRODUCTS.—With respect to a tobacco product that contains nicotine from

any source other than tobacco and that was being marketed in the United States within 30 days after the date of enactment of this Act [Mar. 15, 2022], such product shall not be considered to be in violation of section 910 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387j) (relating to applications for review of certain tobacco products) during the 60-day period following the date of enactment of this Act.

''(2) SUBMISSION OF APPLICATIONS.—

''(A) IN GENERAL.—As a condition for continuing to market a product described in paragraph (1) after the 60-day period specified in such paragraph, during the 30-day period beginning on the effective date specified in subsection (c) [21 U.S.C. 321 note], the manufacturer shall submit a new tobacco product application under section 910(b) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387j(b)) with respect to such product.

''(B) TRANSITION PERIOD.—Except as provided in subparagraph (C), with respect to a tobacco product for which an application is submitted as described in subparagraph (A), the manufacturer of such product may continue to market such product during the 90-day period beginning on the effective date specified in subsection (c).

''(C) EXCEPTION.—If the Secretary of Health and Human Services previously denied an application under section 910(c)(2) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387j(c)(2)), refused to file an application under section 910(b) of such Act, or withdrew an order under section 910(d) of such Act for a previous version of a tobacco product that used nicotine made or derived from tobacco, such product is not eligible for continued marketing under subparagraph (B).

''(3) END OF TRANSITION PERIOD.—Beginning on the date that is 90 days after the effective date specified in subsection (c), a tobacco product described in paragraph (1) (including such a tobacco product that is the subject of a pending application under section 910 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 387j)) is in violation of such section 910 if such tobacco product does not have an order in effect under subsection (c)(1)(A)(i) of such section.''

### § 387k. Modified risk tobacco products

#### (a) In general

No person may introduce or deliver for introduction into interstate commerce any modified risk tobacco product unless an order issued pursuant to subsection (g) is effective with respect to such product.

#### (b) Definitions

In this section:

#### (1) Modified risk tobacco product

The term ''modified risk tobacco product'' means any tobacco product that is sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products.

#### (2) Sold or distributed

##### (A) In general

With respect to a tobacco product, the term ''sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products'' means a tobacco product—

(i) the label, labeling, or advertising of which represents explicitly or implicitly that—

(I) the tobacco product presents a lower risk of tobacco-related disease or is less harmful than one or more other commercially marketed tobacco products;

(II) the tobacco product or its smoke contains a reduced level of a substance or presents a reduced exposure to a substance; or

(III) the tobacco product or its smoke does not contain or is free of a substance;

(ii) the label, labeling, or advertising of which uses the descriptors ''light'', ''mild'', or ''low'' or similar descriptors; or

(iii) the tobacco product manufacturer of which has taken any action directed to consumers through the media or otherwise, other than by means of the tobacco product's label, labeling, or advertising, after June 22, 2009, respecting the product that would be reasonably expected to result in consumers believing that the tobacco product or its smoke may present a lower risk of disease or is less harmful than one or more commercially marketed tobacco products, or presents a reduced exposure to, or does not contain or is free of, a substance or substances.

##### (B) Limitation

No tobacco product shall be considered to be ''sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products'', except as described in subparagraph (A).

##### (C) Smokeless tobacco product

No smokeless tobacco product shall be considered to be ''sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products'' solely because its label, labeling, or advertising uses the following phrases to describe such product and its use: ''smokeless tobacco'', ''smokeless tobacco product'', ''not consumed by smoking'', ''does not produce smoke'', ''smokefree'', ''smoke-free'', ''without smoke'', ''no smoke'', or ''not smoke''.

#### (3) Effective date

The provisions of paragraph (2)(A)(ii) shall take effect 12 months after June 22, 2009, for those products whose label, labeling, or advertising contains the terms described in such paragraph on June 22, 2009. The effective date shall be with respect to the date of manufacture, provided that, in any case, beginning 30 days after such effective date, a manufacturer shall not introduce into the domestic commerce of the United States any product, irrespective of the date of manufacture, that is not in conformance with paragraph (2)(A)(ii).

#### (c) Tobacco dependence products

A product that is intended to be used for the treatment of tobacco dependence, including smoking cessation, is not a modified risk tobacco product under this section if it has been approved as a drug or device by the Food and Drug Administration and is subject to the requirements of subchapter V.