**No. 21-71380**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

DRIP MORE LLC,

Petitioner,

v.

U.S. FOOD AND DRUG ADMINISTRATION,

Respondent.

---

On Petition for Review of a Final Marketing Denial Order
by the U.S. Food and Drug Administration

---

**BRIEF FOR RESPONDENT**

---

*Of Counsel:*

MICHAEL B. STUART
  *General Counsel*
  *U.S. Department of Health and*
    *Human Services*

SEAN R. KEVENEY
  *Chief Counsel*
  *Food and Drug Administration*

WENDY S. VICENTE
  *Deputy Chief Counsel, Litigation*

MAGGIE R. REDDEN
  *Associate Chief Counsel*
  *U.S. Food and Drug Administration*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

JOSHUA M. KOPPEL
BEN LEWIS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7250*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2494*

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF AUTHORITIES................................................................ iii

INTRODUCTION ...........................................................................1

STATEMENT OF JURISDICTION.................................................3

STATEMENT OF THE ISSUES......................................................4

PERTINENT STATUTES AND REGULATIONS ..........................4

STATEMENT OF THE CASE .........................................................4

    A.    Statutory Background ..................................................4

    B.    Regulatory Background...............................................8

    C.    Procedural History....................................................14

SUMMARY OF ARGUMENT.......................................................19

STANDARD OF REVIEW .............................................................22

ARGUMENT..................................................................................23

I.    FDA appropriately denied marketing authorization based on a lack of evidence that marketing Drip More′s products would be appropriate for the protection of the public health..........................23

    A.    The record amply supports FDA′s determination...................23

    B.    Any error in failing to consider Drip More′s marketing plan was harmless................................................................32

    C.    FDA did not err in denying authorization to market Drip More′s zero-nicotine products. ..............................................41

II.    FDA properly conducted a comparative analysis in adjudicating Drip More's applications ............................................ 45

CONCLUSION ................................................................................. 58

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                      **Page(s)**

*American Hosp. Ass'n v. NLRB*,
499 U.S. 606 (1991) ..................................................................... 56

*Avail Vapor, LLC v. FDA*,
55 F.4th 409 (4th Cir. 2022) ........................................... 35, 37

*Bidi Vapor LLC v. FDA*,
134 F.4th 1282 (11th Cir. 2025) ...................................... 53, 54

*Breeze Smoke, LLC v. FDA*,
18 F.4th 499 (6th Cir. 2021) ................................................ 37

*California Wilderness Coal. v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011).............................................36

*Electric Clouds, Inc. v. FDA*,
94 F.4th 950 (10th Cir. 2024) .............................................. 37

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ...............................................................5

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) ...................... 2, 4, 5, 6, 7, 8, 9, 10, 13, 19, 21, 22, 22-
23,23, 30, 32, 39, 40, 45, 46, 47, 48, 52, 53, 55

*Fontem US, LLC v. FDA*,
82 F.4th 1207 (D.C. Cir. 2023) ........................................... 54

*Gripum, LLC v. FDA*,
47 F.4th 553 (7th Cir. 2022) ........................................ 53, 57

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*,
71 F.4th 1028 (D.C. Cir. 2023) ........................................... 51

*Lands Council v. McNair*,
629 F.3d 1070 (9th Cir. 2010) ............................................. 43

*Lawrence v. Chater*,
516 U.S. 163 (1996) .............................................................. 39

*Liquid Labs LLC v. FDA,*
52 F.4th 533 (3d Cir. 2022) .................................................................. 37

*Lotus Vaping Techs., LLC v. FDA:*
73 F.4th 657 (9th Cir. 2023)
............... 2, 19, 20, 23, 26, 27, 28, 31, 32, 35, 36, 37, 38, 43, 45-46, 46, 52
145 S. Ct. 1920 (2025) ........................................................................ 39

*Magellan Tech., Inc. v. FDA,*
70 F.4th 622 (2d Cir. 2023) ............................................................. 36-37

*Mendez-Garcia v. Lynch,*
840 F.3d 655 (9th Cir. 2016) ............................................................... 48

*Miguel-Miguel v. Gonzales,*
500 F.3d 941 (9th Cir. 2007) ............................................................... 49

*Mobil Expl. & Producing N. Am., Inc. v. FERC,*
881 F.2d 193 (5th Cir. 1989) ............................................................... 50

*Neustar, Inc. v. FCC,*
857 F.3d 886 (D.C. Cir. 2017) ............................................................. 48

*Nicopure Labs, LLC v. FDA:*
944 F.3d 267 (D.C. Cir. 2019) ............................................................... 8
266 F. Supp. 3d 360 (D.D.C. 2017) ...................................................... 44

*NLRB v. Bell Aerospace Co.,*
416 U.S. 267 (1974) ................................................................. 48, 49, 50

*Pfaff v. U.S. Dep't of Hous. & Urb. Dev.,*
88 F.3d 739 (9th Cir. 1996) ................................................................. 52

*Prohibition Juice Co. v. FDA,*
45 F.4th 8 (D.C. Cir. 2022) ............................................... 31-32, 32, 37

*SEC v. Chenery Corp. (Chenery II),*
332 U.S. 194 (1947) ........................................................................... 48

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
605 U.S. 168 (2025) ...................................................................... 30-31

*SSA Terminals v. Carrion,*
  821 F.3d 1168 (9th Cir. 2016) ................................................ 43

*Velasco-Giron v. Holder,*
  773 F.3d 774 (7th Cir. 2014) ................................................ 49

*Vincent v. Garland,*
  144 S. Ct. 2708 (2024) ....................................................... 40

**Statutes:**

Administrative Procedure Act:
  5 U.S.C. § 706 ................................................................. 36
  5 U.S.C. § 706(2)(A) .......................................................... 22

Family Smoking Prevention and Tobacco Control Act of 2009,
  Pub. L. No. 111-31, div. A, 123 Stat. 1776 ............................. 5, 6
    21 U.S.C. § 387a(b) .......................................................... 6
    21 U.S.C. § 387e(j)(3)(B) .................................................. 53
    21 U.S.C. § 387g .......................................................... 55, 56
    21 U.S.C. § 387g(a)(1)(A) ................................................. 55
    21 U.S.C. § 387g(a)(3) ..................................................... 56
    21 U.S.C. § 387g(a)(4) ..................................................... 54
    21 U.S.C. § 387g(c) ........................................................ 54
    21 U.S.C. § 387j ........................................................... 56
    21 U.S.C. § 387j(a)(1)-(2) .................................................. 6
    21 U.S.C. § 387j(a)(2) ...................................................... 41
    21 U.S.C. § 387j(b) ........................................................ 53
    21 U.S.C. § 387j(b)(1)(A) .................................................. 46
    21 U.S.C. § 387j(c) ..................................................... 53, 54
    21 U.S.C. § 387j(c)(2) .................................................... 7, 24
    21 U.S.C. § 387j(c)(2)(A) ................................. 1, 7, 15, 19, 23, 32, 54
    21 U.S.C. § 387j(c)(2)(D) .................................................. 54
    21 U.S.C. § 387j(c)(4) ................................... 1, 7, 15, 24, 47
    21 U.S.C. § 387j(c)(5) ...................................................... 7
    21 U.S.C. § 387k(*l*)(1) .................................................... 53
    21 U.S.C. § 387*l*(a)(1)(B) ................................................. 3

21 U.S.C. § 387*l*(b) ................................................................ 22, 36

Pub. L. No. 75-717, 52 Stat. 1040 (1938) ........................................5

21 U.S.C. § 321(rr)(1) ......................................................... 6, 41, 43

**Regulatory Materials:**

21 C.F.R. § 1140.3 ................................................................ 41, 43

**Other Authorities:**

Jan Birdsey et al., *Tobacco Product Use Among U.S. Middle
and High School Students — National Youth Tobacco Survey,
2023,* 72 Morbidity & Mortality Wkly. Rep. 1173 (2023).................... 29-30

FDA, *E-Cigarettes Authorized by the FDA* (July 2025),
https://perma.cc/S6GJ-NBJ3 ............................................12-13, 14, 57

FDA, *Technical Project Lead (TPL) Review of PMTAs for
Applications Submitted by R.J. Reynolds Vapor Company*
(Oct. 12, 2021), https://go.usa.gov/xef5N .........................................35

FDA, *Technical Project Lead (TPL) Review of PMTAs*
(May 12, 2022), https://perma.cc/A9BC-H6R3....................................13

79 Fed. Reg. 23,142 (Apr. 25, 2014) .................................................. 9, 10

81 Fed. Reg. 28,974 (May 10, 2016) ................................. 8, 9, 10, 41, 43, 44

Press Release, FDA, *FDA Authorizes Marketing of Four
Menthol-Flavored E-Cigarette Products After Extensive
Scientific Review* (June 21, 2024),
https://perma.cc/63WX-GFBF .................................................. 14, 57

Press Release, FDA, *FDA Authorizes Marketing of Tobacco-
and Menthol-Flavored JUUL E-Cigarette Products*
(July 17, 2025), https://perma.cc/7PDN-MYCM .......................... 14, 57

## INTRODUCTION

The Family Smoking Prevention and Tobacco Control Act (TCA or Tobacco Control Act) prohibits marketing a new tobacco product without authorization from the U.S. Food and Drug Administration (FDA). The Act directs that FDA "shall deny" a marketing application unless the applicant shows that marketing the product would be "appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2)(A). In making that assessment, FDA must evaluate "the risks and benefits to the population as a whole," taking into account both the "likelihood that those who do not use tobacco products will start using such products" and the "likelihood that existing users of tobacco products will stop." *Id.* § 387j(c)(4).

FDA properly applied this statutory standard in denying petitioner Drip More LLC's applications to market electronic cigarette products under the Candy King brand name in flavors such as Berry Dweebz, Peachy Rings, Ice Worms, and Strawberry Bubblegum. FDA explained that flavored e-cigarettes like Drip More's pose a significant risk to youth because flavoring increases the appeal of tobacco products to youth, makes the products more palatable for novice users, and can increase nicotine exposure, making it more likely that youth will initiate tobacco use and

become regular tobacco users. And the agency found that Drip More's applications lacked evidence demonstrating that its flavored e-cigarettes would provide a benefit to adult tobacco users that would be adequate to outweigh this significant risk to youth. Drip More thus failed to demonstrate that marketing its products would be appropriate for the protection of the public health, and FDA was required under the statute to deny the applications.

The agency's reasoning here closely tracks the reasoning that the Supreme Court upheld in *FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542 (2025), and that this Court upheld in *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657 (9th Cir. 2023), where FDA denied similar applications to market flavored e-cigarettes. Although petitioner argues that FDA erred in evaluating the risks of its products, it does not dispute FDA's conclusion that petitioner failed to demonstrate any public-health benefit not provided by less risky tobacco-flavored products. Furthermore, petitioner's arguments that FDA erred in concluding that the products present substantial risks are meritless. As this Court has already held in *Lotus Vaping*, even if FDA erred by not reviewing petitioner's marketing plan, any such error was harmless because FDA has made clear that the types of

2

measures that petitioner proposed are inadequate to substantially reduce the risk to youth and would not have changed FDA's weighing of the public-health risks and benefits.

Petitioner also contends that its zero-nicotine products are not subject to regulation under the Tobacco Control Act, but this argument is inconsistent with petitioner's own statements when it chose to seek marketing authorization for those products. Finally, petitioner's broader contention that FDA needed to proceed through rulemaking rather than adjudication is also meritless, as it ignores the Tobacco Control Act's provisions for case-by-case review and the background principles of administrative law that allow agencies to develop standards through rulemaking or adjudication.

The petition for review should be denied.

## STATEMENT OF JURISDICTION

FDA denied Drip More's applications to market certain new tobacco products on October 14, 2021. *See* ER-17-20. Petitioner timely petitioned for review on November 15, 2021. This Court has jurisdiction under 21 U.S.C. § 387*l*(a)(1)(B).

3

## STATEMENT OF THE ISSUES

1.  Whether it was arbitrary and capricious for FDA to deny marketing authorization where Drip More failed to show that the benefits of its e-cigarette products outweigh their substantial risk to youth so as to make their marketing appropriate for the protection of the public health.

2.  Whether FDA was required to provide notice and an opportunity for comment before reviewing applications to market flavored e-cigarettes for evidence of an added benefit over tobacco-flavored e-cigarettes that might outweigh flavored e-cigarettes' greater risks to youth.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.   Statutory Background

"One of the FDA's longstanding responsibilities, dating back nearly a century, is to determine whether manufacturers may market new drugs." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 548 (2025).  Congress enacted the Federal Food, Drug, and Cosmetic Act in 1938, establishing "a system for premarket authorization under which manufacturers are

4

prohibited from marketing 'any new drug' in interstate commerce without the FDA's approval." *Id.* at 549 (citing Pub. L. No. 75-717, § 505(a)-(b), (d), 52 Stat. 1040, 1052 (1938)). But the statute "was enacted long before public awareness of the dangers" of tobacco products, and for many decades Congress did not grant FDA the authority to regulate "tobacco or tobacco products." *Id.* at 550-51. In 2000, the Supreme Court held in *FDA v. Brown & Williamson Tobacco Corp.* that Congress had not granted FDA the authority to regulate tobacco products based on the statutes enacted at that time. 529 U.S. 120, 133.

Congress granted FDA that authority in the Family Smoking Prevention and Tobacco Control Act of 2009, Pub. L. No. 111-31, div. A, 123 Stat. 1776, which established a comprehensive scheme for the regulation of tobacco products. Congress found that the "use of tobacco products by the Nation's children is a pediatric disease of considerable proportions," noting that "[v]irtually all new users of tobacco products are under the minimum legal age to purchase such products," and an "overwhelming majority" of tobacco users "become addicted to the nicotine in those products before reaching the age of 18." TCA § 2(1), (4), (31), 123 Stat. at 1777, 1779. Congress further found that tobacco companies

5

regard "young people" as a "crucial segment of the tobacco market," TCA § 2(24), 123 Stat. at 1778, and that "past efforts" had not adequately "curb[ed] tobacco use by adolescents," TCA § 2(6), 123 Stat. at 1777.

Accordingly, the Tobacco Control Act gave FDA "the authority that [the Supreme Court] previously found lacking: namely, the power to regulate the manufacturing, marketing, sale, and distribution of tobacco products." *Wages*, 604 U.S. at 551. The Act granted FDA immediate regulatory authority over "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco," and allowed FDA to also regulate "any other tobacco products" that the agency "by regulation deems to be subject to" the Act. 21 U.S.C. § 387a(b). The TCA, as amended, defines "tobacco product" as "any product made or derived from tobacco, or containing nicotine from any source, that is intended for human consumption, including any component, part, or accessory of a tobacco product." *Id* § 321(rr)(1).

Congress made it unlawful to introduce in interstate commerce without FDA authorization any "new tobacco product" not commercially marketed in the United States as of February 15, 2007, or that was modified after that date. 21 U.S.C. § 387j(a)(1)-(2). As relevant here, the Act instructs

6

that FDA "shall deny" a manufacturer's application to market a new tobacco product if the agency "finds that … there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." *Id.* § 387j(c)(2)(A). The statute thus places the burden on the applicant to make the required showing. *See Wages*, 604 U.S. at 552. In determining whether an applicant has met that standard, FDA must evaluate "the risks and benefits to the population as a whole," taking into account both the "likelihood that those who do not use tobacco products will start using such products" and the "likelihood that existing users of tobacco products will stop." 21 U.S.C. § 387j(c)(4).

FDA assesses an application based on "the information submitted" by the applicant and "any other information" before the agency. 21 U.S.C. § 387j(c)(2). The agency's determination must be based on "well-controlled investigations" or other "valid scientific evidence" that is "sufficient to evaluate the tobacco product." *Id.* § 387j(c)(5). The statute "leaves it to the FDA to decide what constitutes a 'well-controlled investigatio[n]' or other 'valid scientific evidence' that is 'sufficient.'" *Wages*, 604 U.S. at 572 (alteration in original).

7

### B. Regulatory Background

1. Electronic nicotine delivery systems—"popularly known as electronic cigarettes, e-cigarettes, or vapes"—entered the American market in 2007. *Wages*, 604 U.S. at 553. In contrast to a "traditional combustible cigarette," which "contains shredded tobacco wrapped in paper" and produces nicotine-infused smoke when lit, "an e-cigarette contains a battery, a heating element or atomizer, a liquid nicotine reservoir, and a mouthpiece." *Id.* "When an e-cigarette user inhales through the device's mouthpiece, the heating coil engages, and the liquid (called e-liquid or e-juice) turns into a nicotine-infused" aerosol. *Id.*

In 2016, FDA exercised its statutory authority to deem e-cigarettes and other products meeting the statutory definition of "tobacco product" subject to the Tobacco Control Act's requirements. 81 Fed. Reg. 28,974, 28,974 (May 10, 2016). The rulemaking was precipitated by "rampant and climbing" e-cigarette use "among middle and high school students." *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 275 (D.C. Cir. 2019). FDA recognized that adults "currently using combusted tobacco products" may benefit from "completely switching" to e-cigarettes because the aerosol generated by e-cigarettes generally contains lower levels of toxicants than

8

the smoke generated by traditional cigarettes.  81 Fed. Reg. at 29,030-31; *see also Wages*, 604 U.S. at 554 (noting that e-cigarettes "enable current smokers who are addicted to nicotine to reduce exposure to some of the more harmful byproducts of traditional combustible cigarettes").  FDA also found, however, that "inhaled nicotine" from e-cigarettes can be "as addictive as inhaled nicotine delivered by combusted tobacco products." 81 Fed. Reg. at 29,047.  FDA noted that nicotine's effect on youth is particularly alarming: Research indicates that exposure to nicotine "can disrupt adolescent brain development," "decreas[e] attention performance[,] and increas[e] impulsivity."  *Id.*; *see Wages*, 604 U.S. at 554 (noting that e-cigarettes "pose their own health risks, and there is concern that the use of e-cigarettes by non-smokers—and especially young non-smokers—may eventually lead them to smoke conventional cigarettes").

In light of this evidence, FDA recognized that the overall public-health impact of e-cigarettes depends upon "who uses the products and how."  79 Fed. Reg. 23,142, 23,147 (Apr. 25, 2014) (proposed rule).  "If such products result in minimal initiation by children and adolescents while significant numbers of smokers quit, then there is a potential for the net impact at the population level to be positive."  *Id.*  "If, on the other hand,

9

there is significant initiation by young people, minimal quitting, or significant dual use of combustible and non-combustible products, then the public health impact could be negative." *Id.*

2. Most e-cigarettes were not on the market as of February 15, 2007, and thus meet the TCA's definition of "new tobacco products," making it unlawful to market them without FDA authorization after the rule's August 2016 effective date. *See Wages*, 604 U.S. at 555. Initially, FDA announced that, for e-cigarettes already on the market as of the rule's effective date, the agency generally would not take enforcement action based on a product's lack of premarket authorization for a two-to-three-year period while manufacturers prepared, and FDA reviewed, marketing applications. 81 Fed. Reg. at 28,978. FDA extended that period until 2022, but a court order then imposed, and FDA ultimately implemented, a September 2020 deadline for applications. *See Wages*, 604 U.S. at 555-56.

By late 2017, FDA began to see an alarming increase in the use of e-cigarettes by middle and high school students. *See Wages*, 604 U.S. at 554-55. In response, FDA increased enforcement actions against products marketed or sold to youth. *See* SER-10, 25-28. In addition, the agency sent letters directing manufacturers with significant market share to submit

10

plans to help restrict youth access to e-cigarettes. *See* SER-13-14. Manufacturers proposed measures like age-verification technology for online sales, limits on the quantity of e-cigarettes that a customer may purchase within a particular period of time, contractual penalties for retailers that sell products to youth, and programs to monitor retailer compliance with age-verification and sales restrictions. *See* SER-29.

Despite those efforts, in 2019, youth e-cigarette use hit the highest levels ever recorded, *see* SER-15, leading FDA to revise its enforcement policy. Although FDA continued to enforce sales restrictions, it concluded that age verification and related measures are "not sufficient to address this issue, given the most recent data that youth use of [e-cigarette] products continues to increase." SER-51. "The reality," FDA explained, "is that youth have continued access to [e-cigarette] products in the face of legal prohibitions and even after voluntary actions by some manufacturers." *Id.*

Instead of focusing solely on how products are sold, FDA's 2020 enforcement policy prioritized action with respect to the cartridge-based e-cigarettes with flavors (other than tobacco or menthol flavors) that were especially popular among youth at that time. *See* SER-17. FDA also emphasized the "extraordinary popularity" of flavored e-cigarettes among

11

youth, more generally, SER-20, noting that 93.2% of e-cigarette users aged 12-17 reported that their first e-cigarette was a flavored product, and that 71% of youth users indicated they used e-cigarettes "because they come in flavors I like," SER-21 (quotation marks omitted).

Although the 2020 enforcement policy led to the removal of many flavored products from the market and contributed to a decline in youth use, e-cigarettes remain "the most commonly used type of tobacco product among youth," and "[t]he evidence shows that the availability of a broad range of flavors is one of the primary reasons for the popularity of [e-cigarettes] among youth." ER-31. The market exit of flavored, cartridge-based e-cigarettes led to a substantial rise in youth use of flavored, disposable e-cigarettes, illustrating that the removal of one flavored product option can prompt youth to migrate to other e-cigarette types that offer the desired flavor options, and "underscoring the fundamental role of flavor in driving appeal." ER-32-33.

3. FDA has received and acted on a large number of applications to market e-cigarette products in various flavors. The agency has authorized the marketing of more than three dozen e-cigarette products, most of them tobacco flavored. *See* FDA, *E-Cigarettes Authorized by the FDA* (July 2025),

https://perma.cc/S6GJ-NBJ3 (Tobacco Product Marketing Orders). FDA has determined that these products pose a comparatively low risk of enticing new users because "interest in tobacco flavor is low among youth." FDA, *Technical Project Lead (TPL) Review of PMTAs* 27 (May 12, 2022), https://perma.cc/A9BC-H6R3. At the same time, these products can benefit "established cigarette smokers," who have identified tobacco more often than other flavors as their "flavor of interest," and who could switch to e-cigarettes "as a way to reduce or stop smoking." *Id.* at 32.

In contrast, FDA has generally found that e-cigarettes with flavors other than tobacco present a significant risk to youth. *See supra* pp. 8-12; *Wages*, 604 U.S. at 562. To account for that heightened risk, in determining whether a flavored e-cigarette product is appropriate for the protection of the public health, FDA has looked for evidence that such products provide a benefit to adult smokers beyond that provided by potentially lower-risk tobacco-flavored e-cigarettes. Applying that analysis case-by-case, FDA has granted marketing authorization for six menthol-flavored e-cigarettes for which the "evidence submitted by the applicant showed that these menthol-flavored products provided a benefit for adults who smoke cigarettes relative to that of the applicant's previously authorized tobacco-

13

flavored products." Press Release, FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://perma.cc/63WX-GFBF (NJOY Menthol E-Cigarette Press Release); *see also* Tobacco Product Marketing Orders, *supra*; Press Release, FDA, *FDA Authorizes Marketing of Tobacco- and Menthol-Flavored JUUL E-Cigarette Products* (July 17, 2025), https://perma.cc/7PDN-MYCM (JUUL Menthol E-cigarette Press Release).

## C. Procedural History

In 2020, petitioner Drip More LLC submitted premarket tobacco product applications for e-liquids under the Candy King brand name in flavors such as Berry Dweebz, Peachy Rings, Ice Worms, and Strawberry Bubblegum. *See* ER-6-16. To mitigate the products' risk to youth, the applications included a marketing plan that proposed promotional restrictions as well as sales restrictions. *See* ER-63-68. The applications also claimed that the products would benefit adults by promoting switching or cessation from combustible cigarettes among current smokers, citing a cross-sectional survey of consumers that asked about preferred flavors. *See* ER-21-25.

14

In October 2021, FDA issued a marketing denial order. *See* ER-17-20. As directed by the Tobacco Control Act, FDA considered whether Drip More had carried its burden of showing that the marketing of its flavored e-liquids would be "appropriate for the protection of the public health," taking into account both the "likelihood that those who do not use tobacco products will start using such products" and the "likelihood that existing users of tobacco products will stop." 21 U.S.C. § 387j(c)(2)(A), (4). FDA began by assessing the risk to youth. FDA explained that use of tobacco products "is almost always started and established during adolescence when the developing brain is most vulnerable to nicotine addiction." ER-30. "Because of the lifelong implications of nicotine dependence that can be established in youth, preventing tobacco use initiation in young people is a central priority for protecting population health." ER-31.

The available evidence showed that "flavored [e-cigarette products] pose a significant risk to youth." ER-34. FDA noted that the rate of youth e-cigarette use had declined from its peak in 2019, coinciding with increased enforcement efforts. ER-30. But "[d]espite this decline, [e-cigarettes] remained the most widely used tobacco product among youth, with youth use at levels comparable to what originally led FDA to

15

declare a youth vaping epidemic." ER-30. And the agency explained that "[t]he evidence shows that the availability of a broad range of flavors is one of the primary reasons for the popularity of [e-cigarettes] among youth" and that "flavors not only facilitate initiation, but also promote established regular [e-cigarette] use." ER-31-32. It observed that "there were still 3.6 million youth [e-cigarette] users in 2020 and the majority used a flavored [e-cigarette] product." ER-34.

FDA explained that flavoring makes products "more palatable for novice youth and young adults." ER-32. And the evidence indicates that "flavors can influence the rewarding and reinforcing effects of e-liquids, thereby facilitating [e-cigarette] use and increasing abuse liability." *Id.* Representative studies of behavior over time show that the use of flavored e-cigarettes, compared to tobacco-flavored e-cigarettes, is "associated with progression … as well as escalation in the number of days [e-cigarettes] were used." *Id.*

FDA acknowledged that Drip More had proposed marketing and sales restrictions that aimed to reduce the risk to youth. *See* ER-36 n.xix. But the agency found that "to date, none of the [e-cigarette applications] that FDA has evaluated have proposed advertising and promotion

restrictions that would decrease appeal to youth to a degree significant enough to address and counter-balance the substantial concerns, and supporting evidence, … regarding youth use." *Id.* Likewise, the agency explained that it was "not aware of access restrictions that … have been successful in sufficiently decreasing the ability of youth to obtain and use [e-cigarette products]." *Id.* Accordingly, the agency did not evaluate the marketing plans submitted with Drip More's application. *See id.*

Having found that Drip More's flavored e-cigarettes pose a significant risk to youth, FDA looked for evidence of a corresponding benefit, and it found that the applications "lack[ed] sufficient evidence demonstrating that [petitioner's] flavored [e-cigarettes] will provide a benefit to adult users that would be adequate to outweigh the risks to youth." ER-39. In particular, FDA looked for evidence demonstrating that the new products are likely to help adult smokers completely transition from, or significantly reduce, their use of combustible cigarettes. And because tobacco-flavored e-cigarettes provide the same type of potential benefit but do not present the same risks to youth, *see id.*; ER-36, FDA explained that an application to market flavored e-cigarette products must demonstrate an "added benefit" relative to tobacco-flavored products "that

17

is adequate to outweigh the [comparatively greater] risks to youth," ER-39-40.

FDA thus reviewed the applications "for evidence demonstrating that the new flavored products will provide an added benefit" to smokers relative to the benefit provided by tobacco-flavored products. ER-39. The agency found no "randomized controlled trial" or "longitudinal cohort study" or any "other evidence" that showed such a benefit. ER-39-40. The agency noted that the application contained a "cross-sectional customer survey," but it found this evidence not sufficient because the survey did not "evaluate the specific products in the application[]," "evaluate product switching or cigarette reduction resulting from use of these products over time," or "evaluate these outcomes based on flavor type to enable comparisons between tobacco and other flavors." *Id.*; *see* ER-34-38. Because Drip More did not show that the potential benefits of its flavored products outweigh the substantial risk to youth, FDA denied the applications. *See* ER-17-20.

18

## SUMMARY OF ARGUMENT

I.  FDA denied authorization to market petitioner's flavored e-cigarette products based on the same analysis upheld in *FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542 (2025), and *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657 (9th Cir. 2023).  As with the applications at issue in *Wages* and *Lotus Vaping*, FDA denied the applications here based on the determination that the flavored e-cigarette products at issue create a significant risk of youth initiation and continued use of tobacco products, and that petitioner had submitted insufficient evidence that the potential benefits of its flavored products outweigh their substantial risk. Accordingly, FDA properly denied the applications because petitioner had not shown that marketing the products would be "appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2)(A).

Petitioner does not attempt to show that its e-cigarette products would provide a benefit for the public health, nor does it object to FDA's conclusion that the evidence offered to support a benefit was unreliable. Instead, petitioner argues that FDA misjudged the products' risks because it ostensibly failed to consider petitioner's sales data.  But FDA reasonably relied on the scientific literature and its own enforcement experience to

19

conclude that petitioner's flavored products pose a risk to youth even in the absence of specific evidence that youth have historically used petitioner's products. FDA reasonably determined that flavors are a primary driver of youth use of e-cigarettes and that youth demand for e-cigarettes is fluid and will shift to whichever flavored products are available on the market. Petitioner's data failed to demonstrate otherwise.

Petitioner likewise fails to establish any prejudicial error in FDA's decision not to specifically consider its proposed marketing plan. Even if there were error in that decision, this Court has squarely held that such an error is harmless where "the proffered marketing plan[] contained materially identical measures to those that the FDA had already described as insufficient." *Lotus Vaping*, 73 F.4th at 673-76. As in *Lotus Vaping*, petitioner's marketing plan here included only measures that FDA had already considered and found inadequate. Petitioner has not identified how its "marketing measures are materially different from those the FDA has already said are insufficient," *id.* at 674, nor has petitioner identified any basis for this Court to ignore the binding precedent in *Lotus Vaping*.

The record also supports FDA's denial of authorization to market petitioner's zero-nicotine products. Petitioner now contends that those

20

products do not meet the statutory definition for a tobacco product, but in its applications, petitioner expressly stated that each product was a tobacco product under the statute. And FDA reasonably accepted those representations, because even if a product does not contain nicotine itself, it remains a tobacco product if it is reasonably expected to be mixed with an e-liquid containing nicotine. Furthermore, if petitioner's zero-nicotine e-liquids were not tobacco products, petitioner was not required to apply for marketing authorization for them. Having applied for such authorization, petitioner cannot now challenge the denial order by arguing that FDA should not have adjudicated the applications at all.

II.  Petitioner also contends that FDA erred by failing to go through notice-and-comment rulemaking before it applied a "comparative efficacy standard" that assessed petitioner's applications for flavored e-cigarette products for an added benefit over tobacco-flavored e-cigarettes. But FDA's approach to deciding those applications flows directly from the Tobacco Control Act, which "expressly contemplates comparisons of different tobacco products" in such adjudications. *Wages*, 604 U.S. at 578-79. In any event, agencies are free to announce regulatory standards either by general rule or individual order in an adjudication. The Tobacco

21

Control Act directs FDA to adjudicate marketing applications, and the Supreme Court has confirmed that FDA has "discretion to work out the meaning of the TCA's comparative standard when evaluating premarket tobacco product applications," *id*. at 582. The Act does not require FDA to promulgate implementing regulations before doing so, and the agency was not "required to issue [predecisional] guidance." *Id.* Petitioner's related argument that FDA has impermissibly imposed a de facto ban on flavored e-cigarettes ignores that FDA has in fact granted marketing authorization for such products when the applicant has demonstrated that the products are appropriate for the protection of the public health.

## STANDARD OF REVIEW

The Court reviews FDA's denial of an application to market a new tobacco product under the Administrative Procedure Act (APA), *see* 21 U.S.C. § 387*l*(b), assessing whether the order is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). "The scope of this review 'is narrow,' and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA v. Wages &*

22

*White Lion Invs., LLC*, 604 U.S. 542, 567 (2025); *see Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657, 668 (9th Cir. 2023) (same).

## ARGUMENT

**I.     FDA appropriately denied marketing authorization based on a lack of evidence that marketing Drip More's products would be appropriate for the protection of the public health.**

### A.     The record amply supports FDA's determination.

1.  Petitioner sought marketing authorization for flavored e-cigarettes based on evidence substantially similar to that presented in *FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542 (2025), and *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657 (9th Cir. 2023), and FDA reviewed petitioner's applications using the same methodology used in those cases.  The Supreme Court and this Court have already affirmed the validity of FDA's method of considering such applications, *see Wages*, 604 U.S. at 566-92; *Lotus Vaping*, 73 F.4th at 668-78, and there is no reason for the Court to reach a different conclusion here.

Under the TCA, FDA "shall deny" an application to market a new tobacco product unless the applicant shows that marketing the product would be "appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2)(A).  In making that assessment, FDA may rely on "information

23

submitted" in the application as well as "any other information before the [agency] with respect to such tobacco product," such as the general scientific literature. *Id.* § 387j(c)(2). FDA evaluates "the risks and benefits to the population as a whole," taking into account both the "likelihood that those who do not use tobacco products will start using such products" and the "likelihood that existing users of tobacco products will stop." *Id.* § 387j(c)(4).

FDA's review of Drip More's applications showed that for "flavored [e-cigarette products], the known and substantial risk to youth in particular is high." ER-36. FDA found that e-cigarettes have "remained the most widely used tobacco product among youth, with youth use at levels comparable to what originally led FDA to declare a youth vaping epidemic." ER-30. And the agency observed that "there were still 3.6 million youth [e-cigarette] users in 2020 and the majority used a flavored [e-cigarette] product." ER-34; *see* ER-31-32.

The evidence showed that "the availability of a broad range of flavors is one of the primary reasons for the popularity of [e-cigarettes] among youth." ER-31. Flavoring makes e-cigarette products "more palatable for novice youth and young adults," and the "flavors can influence the

24

rewarding and reinforcing effects of e-liquids, thereby facilitating [e-cigarette] use and increasing abuse liability." ER-32. At bottom, the "data available in the literature provide[d] clear and overwhelming evidence that [e-cigarette products] are the most widely used products by youth, [that] the majority of youth users use a flavored [e-cigarette product]," and that "[f]lavors are associated with [e-cigarette] initiation and progression among youth." ER-34; ER-37 n.xxii.

Given that substantial risk to youth, FDA looked for reliable evidence that Drip More's flavored products would provide a greater benefit than potentially lower-risk tobacco-flavored e-cigarette products in leading existing smokers to completely switch from combustible cigarettes or significantly reduce their use. But Drip More did not provide any such evidence in its applications: It had no "randomized controlled trial[s]" or "longitudinal cohort stud[ies]" that examined "the benefit to adult users" of its flavored products compared to lower-risk tobacco-flavored products. ER-39. Nor did FDA identify any "other evidence" that supports the finding of such a benefit. ER-39-40.

FDA noted that the applications contained a "cross-sectional customer survey," ER-39, which asked about "past" and "current

[e-cigarette] brand use" and "[e-cigarette] flavor use in general," ER-25, but the study did not "evaluate the specific products in the application[s]," ER-40. Moreover, the agency found that this evidence was inadequate to "evaluate product switching or cigarette reduction resulting from use of these products over time," *id.*, because such consumer surveys "entail a one-time assessment of self-reported outcomes," ER-37. The agency also found the survey evidence inadequate because it did not evaluate outcomes "based on flavor type to enable comparisons between tobacco and other flavors." ER-40; *see* ER-34-38. Absent such evidence, petitioner could not show that the benefit of its products outweighs their risk, and FDA properly issued a marketing denial order under the statute.

This Court has already held in *Lotus Vaping* that "the Tobacco Control Act expressly authorizes the FDA to consider comparative evidence" and that the agency acted "well within Congress's statutory directive when it compared the claimed cessation benefits of flavored and non-flavored products." 73 F.4th at 669-70 (alteration and quotation marks omitted). The Court further held that "FDA did not act arbitrarily or capriciously" in finding a "cross-sectional actual use survey" to be unreliable evidence that the products at issue provide a potential benefit to smokers, and rejected a

26

manufacturer's reliance on such evidence. *Id.* at 673. Petitioner does not attempt to show that its products have a benefit for the protection of the public health, and it does not contest the agency's conclusion that the evidence submitted was unreliable.

2. Lacking a demonstrable benefit, petitioner has an uphill climb to challenge the agency's risk-benefit analysis. Petitioner does not dispute the extent of underage use of e-cigarettes generally or the extent to which flavored products drive their popularity. Instead, petitioner contends that FDA disregarded evidence that youth do not use petitioner's products in particular. But petitioner errs in contending that its sales data show that its products pose a "low risk to minors." Br. 17; *see* Br. 31. As an initial matter, FDA's consideration of the risk to youth was not limited to minors (*i.e.*, those under 18), but also included young adults, which generally includes individuals up to age 24. *See, e.g.*, ER-31 (citing evidence that "75% of young adults [aged] 18-24" "reported that the first e-cigarette that they used was flavored"); ER-32 (explaining that "the flavoring in tobacco products (including [e-cigarettes]) make them more palatable for novice youth *and young adults*, which can lead to initiation, more frequent and repeated use, and eventually established regular use" (emphasis added));

27

ER-33 ("Youth *and young adult* brains are more vulnerable to nicotine's effects than the adult brain due to ongoing neural development." (emphasis added)); ER-33 (citing a study showing "substantial evidence" that e-cigarette use "increases risk of ever using combusted tobacco cigarettes among youth *and young adults*" (emphasis added)). And petitioner's data shows numerous purchasers in the young-adult category including, as petitioner admits, some young people under the age of 21. *See* ER-77-86.

Furthermore, it is unsurprising that petitioner's online sales data does not include purchasers whom petitioner knows to be under the legal age to purchase its products. As FDA explained, however, "many youth obtain their [e-cigarette] products from friends or sources in their social networks" or on a "secondary market," SER-52, and thus petitioner's data on the age of purchasers does not directly address the likelihood of consumption by underage youth. *See also Lotus Vaping*, 73 F.4th at 675 (explaining that many youth obtain "the flavored products they desire[] through alternate means, like their friends and social networks").

In any event, FDA reasonably found that "[t]he role of flavors in increasing the appeal of tobacco products to youth—across tobacco

28

product categories—is well-established" and that the "popularity of certain styles is likely fluid and affected by the marketplace"—that is, "the options, especially flavors, that are available for consumers to choose from." ER-32. FDA explained that in its enforcement experience, "the removal of one flavored product option prompted youth to migrate to another [e-cigarette] type that offered the desired flavor options, underscoring the fundamental role of flavor in driving appeal." ER-33. FDA thus reasonably relied on evidence concerning the market in general, concluding that even if youth had previously chosen other brands of flavored e-liquids, leaving petitioner's products on the market would ultimately pose a similar risk to youth as is posed by other products.

Petitioner's related assertion (at 31) that no high school or middle school respondent reported having used a Drip More product in certain national surveys is similarly unavailing. That data does not establish that Drip More's products have been historically unpopular for youth. To the contrary, the survey results reflect that many middle-school and high-school students either do not know what brand of e-cigarette they use or use brands that are not listed on these surveys. *See, e.g.*, Jan Birdsey et al., *Tobacco Product Use Among U.S. Middle and High School Students—National*

29

*Youth Tobacco Survey, 2023*, 72 Morbidity & Mortality Wkly. Rep. 1173, 1180 tbl. 3 (2023) (reflecting that more than 40% of respondents to the surveys referenced in petitioner's brief stated that they either did not know what brand they used or used a brand that was not listed on the survey).

In any event, petitioner's observation is not responsive to the agency's reasoning for the reasons explained above. FDA reasonably found that the scientific literature showed that flavored e-cigarettes pose a known and significant risk to youth and that the "popularity of certain styles is likely fluid and affected by the marketplace," but "the role of flavor is consistent." ER-32. That was a "reasonable inference based on the data before" FDA. *Wages*, 604 U.S. at 586. Petitioner's evidence is hardly "of sufficient heft to call into question whether the FDA's 'factual determinations' about the powerful effect of flavor is supported by 'substantial evidence' in the 'existing administrative record.'" *Id.*

FDA's scientific determinations on this matter are entitled to significant deference. *See Wages*, 604 U.S. at 567 (explaining that "reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency"); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 182

30

(2025) (explaining that courts must be at their "most deferential" for "scientific judgments").  The issues here implicate FDA's scientific judgments regarding the risks and benefits of Drip More's products, and FDA's assessment of the scientific literature, and the Supreme Court has confirmed that such judgments are entitled to deference.

3.  Petitioner similarly errs in arguing (at 35) that FDA failed to consider alternatives to a marketing denial order such as requiring petitioner to file "periodic reports regarding post-authorization sales demographics."  As an initial matter, because many youth obtain their e-cigarettes from social sources, it is unclear how petitioner's belated proposal to file reports on sales demographics could give FDA sufficient assurance that the products are not leading youth or young adults to initiate tobacco use.  *See Lotus Vaping*, 73 F.4th at 675 (explaining FDA had concluded that "monitoring retailers' sales w[as] ineffective in preventing youth use because children maintained a steady stream of access to the flavored products they desired through alternate means, like their friends and social networks").  In any event, FDA is "not required to consider alternative regulatory approaches before denying [a] manufacturer['s] applications for premarket approval." *Prohibition Juice Co. v. FDA*, 45 F.4th

31

8, 26 (D.C. Cir. 2022). Petitioner's argument would flip the statutory standard on its head: The Tobacco Control Act requires that applicants make a certain showing before their products can be authorized for sale, *id.*, and provides that FDA "*must* deny an application unless it is shown that the product 'would be appropriate for the protection of the public health.'" *Wages*, 604 U.S. at 552 (quoting 21 U.S.C. § 387j(c)(2)(A)). Petitioner failed to make that showing before the agency, and the fact that the agency may subsequently revoke authorization for a product that proves harmful cannot supplant the statutory standard for granting an application in the first instance.

## B. Any error in failing to consider Drip More's marketing plan was harmless.

Petitioner argues (at 28-47) that FDA's marketing denial order should be set aside because FDA failed to consider Drip More's marketing plan, which proposed measures intended to reduce the risk of underage use. This Court squarely rejected that argument in *Lotus Vaping*, 73 F.4th at 673-75, explaining that, even assuming FDA should have considered such marketing plans, such an error was harmless.

32

1. FDA has extensive experience with sales-access and marketing restrictions, and it explained in denying petitioner's applications that it was "not aware of access restrictions that, to date, have been successful in sufficiently decreasing the ability of youth to obtain and use [e-cigarettes]." ER-36 n.xix. FDA's 2020 guidance details that, from April 2018 to August 2019, the agency issued more than 6,000 warning letters and more than 1,000 civil-money-penalty complaints to online and brick-and-mortar retailers for illegal sales of e-cigarettes to minors. *See* SER-13-15. During that period, FDA also issued dozens of warning letters to manufacturers, distributors, and retailers for selling e-liquids with labeling or advertising that resembled kid-friendly food products, such as juice boxes, candy, or cookies, and for certain advertising via social media influencers that appeal to youth. SER-13-15; *see also* SER-32 & n.85. FDA also asked manufacturers to propose measures they could implement to help restrict youth access to e-cigarettes. *See* SER-14; *see also supra* p. 11 (identifying some of the measures that manufacturers proposed).

Youth e-cigarette use continued to increase notwithstanding these efforts. SER-15, 29-30. FDA's experience has thus shown that "[t]he reality is that youth have continued access to [e-cigarette] products in the face of

33

legal prohibitions and even after voluntary actions by some manufacturers." SER-28, 51. As already explained, this is due in substantial part to the fact that youth overwhelmingly obtain e-cigarettes from social sources, such as friends and family members, and do not purchase the products themselves. *See* SER-52-53.

FDA recognized that it "is theoretically possible that significant mitigation efforts could adequately reduce youth access and appeal such that the risk for youth initiation would be reduced." ER-36 n.xix. But given the magnitude of the problems regarding youth use of flavored e-cigarettes, FDA explained in denying petitioner's applications that no "access" or "advertising and promotion restrictions" have been identified that would "decrease appeal to youth to a degree significant enough to address and counter-balance" such "substantial concerns." ER-36 n.xix. Under these circumstances, and in light of FDA's independent determination that petitioner had not submitted sufficient evidence of likely benefits to adults, FDA reasonably determined that consideration of petitioner's proposed advertising and sales-access restrictions would not tip the balance between adult benefits and youth risks and therefore would not alter FDA's conclusion as to whether the marketing of petitioner's

34

products would be appropriate for the protection of the public health. *See* ER-36 n.xix. As this Court put it in *Lotus Vaping*, by the time "FDA reviewed [petitioner's] applications, it had already concluded that eliminating marketing aimed at youth users and monitoring retailers' sales were ineffective in preventing youth use because children maintained a steady stream of access to the flavored products they desired through alternate means." 73 F.4th at 675.

Petitioner notes (at 29) that FDA has characterized marketing and sales-access plans "as 'critical,' 'directly relevant,' 'important,' and 'necessary.'" But petitioner confuses what is a necessary aspect of an application to market a new tobacco product with what is sufficient to show that granting the application is appropriate for the protection of the public health. *See Avail Vapor, LLC v. FDA*, 55 F.4th 409, 425 (4th Cir. 2022). In granting applications to market tobacco-flavored e-cigarette products, FDA has required that measures be in place to reduce youth access. *See, e.g.*, FDA, *Technical Project Lead (TPL) Review of PMTAs for Applications Submitted by R.J. Reynolds Vapor Company* 4, 18-19 (Oct. 12, 2021), https://go.usa.gov/xef5N. For flavored products like petitioner's that are especially popular among youth, however, FDA has determined that

35

known marketing and sales restrictions do not sufficiently reduce the risk of youth use so as to tip the balance between risks and benefits. *See* SER-28 (finding that "focusing on how the product was sold would not appropriately address youth use" of products that especially appeal to youth, like flavored, cartridge-based products); *see also* SER-51.

2. In *Lotus Vaping*, this Court "assume[d] without deciding," that FDA erred in not reviewing the manufacturers' marketing plans, but held that "any error was harmless." 73 F.4th at 673. As this Court explained, the Tobacco Control Act incorporates the APA's instruction that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; 21 U.S.C. § 387*l*(b). This Court then laid out the standard that "[a]n error is harmless if it 'had no bearing on the procedure used or the substance of [the] decision reached.'" *Lotus Vaping*, 73 F.4th at 673-74 (quoting *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011)). Applying that standard, this Court joined several others in holding that a manufacturer is "unable to identify any prejudice" from FDA's failure to review a marketing plan where the plan contains "materially identical measures to those that the FDA had already described as insufficient." *Id.* at 674; *see, e.g., Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 630-31 (2d Cir.

2023); *Liquid Labs LLC v. FDA*, 52 F.4th 533, 543-44 (3d Cir. 2022); *Avail Vapor*, 55 F.4th at 425-27; *Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 508 (6th Cir. 2021); *Electric Clouds, Inc. v. FDA*, 94 F.4th 950, 966-69 (10th Cir. 2024); *Prohibition Juice*, 45 F.4th at 24-25.

Turning to the marketing plans at issue in *Lotus Vaping*, the Court reasoned that the manufacturers had not "identif[ied] how their marketing measures are materially different from those the FDA has already said are insufficient." 73 F.4th at 674. The plans at issue there provided that products would "continue to be strictly marketed and sold to adults in adult-only retailers and through age-verified online websites" and that products would not be promoted "on non-age-gated social media, radio or television." *Id.* (quotation marks omitted). They also provided for "requiring distributors and retailers to register as licensed or authorized resellers," "contractually binding [the manufacturer's] authorized retailers to use age-gating marketing procedures," "engaging in post-marketing surveillance," and "quantity restrictions for online sales." *Id.* at 674-75.

The Court's decision in *Lotus Vaping* controls this issue. Petitioner does not attempt to show that its marketing plan includes any novel restrictions that FDA has not already deemed inadequate to reduce the risk

37

to youth, nor could it. Petitioner's plan includes traditional marketing restrictions like "avoid[ing] marketing strategies that could attract underage individuals" and sales restrictions like "age verification measures for online sales." Br. 30-31. It also includes "[c]ontractual [r]equirements" that would require distributors and retailers to "conduct compliance audits," "limit purchase quantities," and stop working with "other downstream establishments that have sold products to minors." *id*; *see also* ER-63-76. These measures are the same ones that the Court considered in *Lotus Vaping*, and that FDA has already deemed to be insufficient, concluding that they are all "ineffective in preventing youth" access because they fail to adequately address the concern that minors will access products through alternate means, like "friends and social networks." *Lotus Vaping*, 73 F.4th 675; *see* SER-14-16 (explaining that manufacturers had tried mystery shopper programs to monitor retailer compliance, establishing and enforcing contractual penalties for retailers that sell to youth, using age-verification technology, and limiting purchase quantities, among other measures, and that all had proven unsuccessful in substantially curbing youth use).

38

3. Petitioner errs in arguing (at 37-42) that *Wages* abrogated *Lotus Vaping*. The Supreme Court in *Wages* approved the same standard this Court applied in *Lotus Vaping*, explaining that the harmless-error rule applies "[w]hen it is clear that the agency's error 'had no bearing on the procedure used or the substance of [the] decision reached.'" *Wages*, 604 U.S. at 590. To the extent that the Supreme Court made new law on harmless error, it was only in rejecting the Fifth Circuit's cramped reading of the harmless-error rule that applied the rule only "[w]here the agency 'was *required*' to take a particular action." *Id.* at 589 (quotation marks omitted).

Notably, although the Supreme Court held the certiorari petition in *Lotus Vaping* until it decided *Wages*, the Court then denied the petition, signaling that this Court's analysis in that case was correct. *See Lotus Vaping Techs., LLC v. FDA*, 145 S. Ct. 1920 (2025) (denying certiorari). If *Wages* had announced a standard different from the one applied in *Lotus Vaping*, as petitioner argues, the Supreme Court would likely have instead granted the petition in *Lotus Vaping*, vacated, and remanded for this Court to apply the new standard in the first instance. *See Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam) (explaining that the grant-vacate-remand

39

procedure is appropriate "[w]here intervening developments … reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration"); *cf., e.g.*, *Vincent v. Garland*, 144 S. Ct. 2708 (2024) ("Petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Tenth Circuit for further consideration" in light of merits decision.). Because the Supreme Court instead denied certiorari in *Lotus Vaping*, this Court's decision in that case remains binding precedent.

In any event, petitioner cannot explain what prejudice would exist even under a lesser standard. This is not a case "[w]here the agency has rested decision on an unsustainable reason" but "by another course of reasoning the agency might come to the same result." *Wages*, 604 U.S. at 591 (alteration in original) (quotation marks omitted). Rather, the agency here had already considered the relevant marketing and sales restrictions and found them lacking. A quick review of the record demonstrates that FDA was in fact correct that the applications did not contain any new marketing or sales restrictions—and petitioner does not argue otherwise. And it is hard to see how there could be prejudice here where petitioner

40

does not challenge the agency's conclusion that the application submitted insufficient evidence of a benefit. Thus, there is no reason to reverse FDA's marketing denial order.

### C. FDA did not err in denying authorization to market Drip More's zero-nicotine products.

FDA properly denied all of Drip More's applications for flavored e-liquids, including 14 applications for e-liquids not containing nicotine. The TCA generally requires an applicant to receive authorization from FDA before marketing any "new tobacco product," 21 U.S.C. § 387j(a)(2), and the statute defines "tobacco product" as "any product made or derived from tobacco, or containing nicotine from any source, that is intended for human consumption, including any component, part, or accessory of a tobacco product," *id.* § 321(rr)(1). These components or parts include the "materials intended or reasonably expected … [t]o be used with … the human consumption of a tobacco product," 21 C.F.R. § 1140.3, such as flavored e-liquids not containing nicotine where they are intended or reasonably expected to be mixed with nicotine, including, for example, another e-liquid containing nicotine. *See* 81 Fed. Reg. 29,032.

41

Petitioner's argument that FDA erred in treating the zero-nicotine products as new tobacco products subject to review is at odds with petitioner's decision to submit new tobacco product applications for these products. In its applications, petitioner sought an order authorizing the marketing of the zero-nicotine ("0mg") products—authorization that would not have been required if those products were not new tobacco products. *See, e.g.,* SER-62 ("Drip More LLC is seeking market orders under section 910(c)(1)(A)(i) of the [Federal Food, Drug, and Cosmetic Act] for its Candy King Batch 0mg, 3mg, 6mg 100ml e-liquid described above."). In these applications, petitioner represented that each product—including each zero-nicotine product—is "an e-liquid that contains tobacco-derived nicotine and is intended for use in open-system (refillable) [e-cigarettes]." *E.g.,* SER-59. Drip More further represented that each product "meets the definition of a tobacco product as set forth in [§ 321(rr)(1)]." *Id.*[1]

---

[1] *See* SER-65 (Candy King Lemon Drops), SER-71 (Candy King on Ice), SER-77 (Candy King on Ice Strawberry), SER-83 (Candy King on Ice Worms), SER-89 (Candy King Peachy Rings), SER-95 (Candy King Pink Squares), SER-101 (Candy King Strawberry Belts), SER-107 (Candy King Strawberry Rolls), SER-113 (Candy King Strawberry Watermelon), SER-119 (Candy King Worms), SER-125 (Candy King Berry Dweebz), SER-131 (Candy King Gush), SER-137 (Candy King Hard Apple).

42

Having submitted 14 zero-nicotine products for authorization and having stated that they meet the definition of a tobacco product, petitioner cannot now claim that FDA's treatment of the products was arbitrary and capricious. Petitioner did not raise that argument before FDA, *see Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) ("A party forfeits arguments that are not raised during the administrative process."), and indeed, affirmatively waived such a challenge when it submitted its applications to the agency, *see SSA Terminals v. Carrion*, 821 F.3d 1168, 1174 (9th Cir. 2016) ("The administrative waiver doctrine … provides that it is inappropriate for courts reviewing agency decisions to consider arguments not raised before the administrative agency involved.").

In any event, it was reasonable for FDA to accept petitioner's representation that the zero-nicotine products are tobacco products under the statute. As petitioner acknowledges (at 62), flavored e-liquids without nicotine are subject to regulation under the TCA as a "component or part of a tobacco product" if they are "intended or reasonably expected to be mixed with liquid nicotine." ER-55; *see* 21 U.S.C. § 321(rr)(1); 21 C.F.R. § 1140.3; 81 Fed. Reg. at 29,032; *see also Lotus Vaping*, 73 F.4th at 665-66 (explaining that one of the manufacturer petitioners in that case, Nude

43

Nicotine, sold flavorless nicotine-containing e-liquids "designed to be used in [refillable] devices" and "suitable for flavor addition"). The agency has explained that such products include a component or part like "an e-liquid sealed in final packaging that is sold or distributed to a consumer for use" in an e-cigarette. 81 Fed. Reg. at 28,995. Based on Drip More's representations that the zero-nicotine products are tobacco products, it was reasonable for FDA to think that they are intended to be used as a component or part of a tobacco product, including because they may be mixed with nicotine. *See Nicopure Labs, LLC v FDA*, 266 F. Supp. 3d 360, 389-91 (D.D.C. 2017) ("[A] nicotine-free liquid that gets added to the mix — to provide flavor or make the inhalation experience less harsh — becomes a 'component' of the tobacco product when it is added.").

Petitioner errs in arguing that its zero-nicotine products must not be intended to be mixed with nicotine because "[a] consumer wishing to use these flavors with nicotine would simply purchase one of Drip More's nicotine options." Br. 62. As an initial matter, Drip More failed to make this argument before FDA. Regardless, the argument is unavailing because consumers may purchase a zero-nicotine product because they intend to mix and match it with other flavors, along with an unflavored nicotine

44

product, to their desired taste and nicotine strength. It thus does not stand to reason that petitioner's nicotine-containing e-liquids are necessarily a substitute for someone who instead wishes to purchase the zero-nicotine e-liquid and then add nicotine and flavors in a preferred manner.

As already explained, there would have been no reason for Drip More to seek marketing authorization for its zero-nicotine products if it did not consider them to be tobacco products. The submission of these products for marketing authorization is thus, by itself, strong evidence of petitioner's intent to treat them as tobacco products, and the agency committed no error in treating these products likewise.

## II. FDA properly conducted a comparative analysis in adjudicating Drip More's applications.

As the Supreme Court and this Court have made clear, FDA properly reviewed Drip More's applications for evidence that the company's flavored products provide "an added benefit to adult smokers relative to tobacco-flavored products," ER-39—an approach the Supreme Court referred to in *Wages* as a "comparative-efficacy requirement," *Wages*, 604 U.S. at 578. *See id.* at 578-82 (holding that FDA did not impermissibly change its position in analyzing comparative efficacy); *Lotus Vaping*, 73

45

F.4th at 668-70 (holding that "FDA had statutory authority" to "requir[e] applicants to demonstrate that their flavored products better promote smoking cessation than comparable tobacco-flavored products"). Petitioner errs in arguing that FDA was not allowed to use that approach without first going through notice-and-comment procedures.

A.  As an initial matter, the analysis that FDA applied to its review of petitioner's products (referred to by petitioner as the "comparative efficacy standard" or "comparative efficacy requirement") is not a new standard devised by FDA; rather, it flows from the Tobacco Control Act.  As the Supreme Court explained, the Act "expressly contemplates comparisons of different tobacco products."  *Wages*, 604 U.S. at 578.  It requires an applicant to provide information concerning "whether [its] tobacco product *presents less risk than other tobacco products*."  *Id.* (alteration in original) (quoting 21 U.S.C. § 387j(b)(1)(A)).  And "FDA's determination that a new tobacco product is 'appropriate for the protection of the public health' is an inherently comparative judgment."  *Id.*; *see also Lotus Vaping*, 73 F.4th at 669 (explaining that the "considerations" required by statute "are inherently comparative").  By requiring FDA to account for the "increased or decreased likelihood" that existing tobacco users will stop

46

using such products and that new users will start using such products, 21 U.S.C. § 387j(c)(4), the TCA "calls out for various types of comparisons, including comparisons between new tobacco products and those that are already available, as well as between different types of new tobacco products that may attract new smokers," *Wages*, 604 U.S. at 579.

Rather than enacting a regulatory standard, FDA applied the statutory criteria to Drip More's applications. FDA canvassed the scientific evidence as to the risks of various tobacco products. *See* ER-30-34. It then made relevant comparisons, including between Drip More's flavored products and other tobacco-flavored e-cigarette products. FDA explained that the evidence showed that there was a "significant increase in risk of youth initiation associated with flavored [e-cigarettes] compared to tobacco-flavored [e-cigarettes]." ER-36; *see* ER-32. And FDA reasoned that the existence of "comparator tobacco-flavored [e-cigarettes]" bears on the extent of the public-health benefit that a flavored product may provide. ER-38. Accordingly, FDA examined "the degree of benefit" of Drip More's non-tobacco-flavored product "over a tobacco-flavored variety in facilitating smokers completely switching or significantly reducing their

47

smoking." ER-36. That is simply an application of the Tobacco Control Act to this particular context based on the agency's accumulated experience.

B. Even if FDA's approach were viewed as a regulatory standard, FDA has authority to develop such standards through adjudication. The Supreme Court in *Wages* reaffirmed that "[u]nless Congress has specified otherwise, agencies are generally free to develop regulatory standards 'either by general [legislative] rule or by individual order' in an adjudication." 604 U.S. at 565 (second alteration in original) (quoting *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 202 (1947)). The Supreme Court and this Court have long recognized that an agency may "announc[e] new principles in an adjudicative proceeding," even if those principles are in the form of a "general standard" that "would govern future conduct." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292, 294 (1974); *see Mendez-Garcia v. Lynch*, 840 F.3d 655, 664 (9th Cir. 2016) ("[A]n agency is not precluded from announcing new principles in an adjudicative proceeding."). Indeed, the very "nature of adjudication is that similarly situated non-parties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal." *Neustar, Inc. v. FCC*, 857 F.3d 886, 895 (D.C. Cir. 2017) (quotation marks omitted). This "choice between

48

rulemaking and adjudication lies in the first instance within the [agency]'s discretion." *Bell Aerospace*, 416 U.S. at 294.

Petitioner's argument (at 56-58) that the comparative-efficacy standard is a "legislative rule" is therefore misplaced. Standards announced in "adjudicative decision[s]" do not fit within the APA's "legislative/interpretive framework for rulemaking." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 950 (9th Cir. 2007). Accordingly, there is no need for such standards to fall under one of the APA's exemptions for non-legislative rules. The National Labor Relations Board, for example, has long announced substantive standards entirely through adjudication, and its authority to do so has long been upheld. *See Bell Aerospace*, 416 U.S. at 294.

Ultimately recognizing that the APA permits FDA to establish standards through adjudication, petitioner briefly argues (at 60-61) that it was an abuse of discretion for FDA not to proceed through rulemaking before applying the analysis here. "Since *Bell Aerospace*," however, "'the [Supreme] Court has not even suggested that a court can constrain an agency's choice between rulemaking and adjudication.'" *Velasco-Giron v. Holder*, 773 F.3d 774, 779 (7th Cir. 2014) (alteration omitted). FDA's

49

"judgment that adjudication best serves [the agency's] purpose is entitled to great weight," *Bell Aerospace*, 416 U.S. at 294. Nothing indicates that FDA abused its discretion here.

Indeed, there is "ample indication" that "adjudication is especially appropriate" in this context. *Bell Aerospace*, 416 U.S. at 294. The marketing-application process allows manufacturers to submit relevant evidence to FDA and gives FDA an opportunity to review that evidence and consider how to apply the TCA's standards in the concrete circumstances presented by applications to market particular products. Furthermore, proceeding by adjudication allows FDA more flexibility to assess new evidence that a manufacturer might include in a future application as well as changes in the market. FDA did not abuse its discretion in deciding that "an adjudicatory proceeding would produce the relevant information necessary to fair consideration" of the standard to be applied in deciding applications to market new tobacco products, and "that the notice and comment procedures required for formal rulemaking were impracticable and unnecessary." *Mobil Expl. & Producing N. Am., Inc. v. FERC*, 881 F.2d 193, 199 (5th Cir. 1989).

50

Petitioner suggests (at 61) that there is an abuse of discretion whenever a standard "affects the rights of broad classes of unspecified individuals." But the marketing denial order here applies only to petitioner's products; it does not serve as a conclusive order concerning any other manufacturer's products. Nor does it matter that FDA has acted consistently and applied the same analysis in numerous adjudications. That an agency has acted consistently across adjudications is a hallmark of good agency decisionmaking, not a reason to require a rulemaking. Adjudications often "contain[] reasoning that sweeps broadly," and the fact that an agency's reasoning might apply as precedent to "a large number of similar cases" alone carries "little weight" in deciding whether a standard was properly issued in an adjudication. *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023).

In any event, this Court has found an abuse of discretion in only a far more "narrow class of cases" than petitioner suggests: where a new standard adopted by adjudication is not only "very broad and general in scope and prospective in application," but where it also "departs radically from the agency's previous interpretation of the law," where "the public has relied substantially and in good faith on the previous interpretation,"

51

and "where fines or damages are involved." *Pfaff v. U.S. Dep't of Hous. & Urb. Dev.*, 88 F.3d 739, 748 (9th Cir. 1996). The Supreme Court and this Court have already held that FDA's approach to deciding these applications is not such a departure from the agency's previous interpretation of the law. *See, e.g.*, *Wages*, 604 U.S. at 578-582 (explaining that FDA is best "understood as having extended, not reversed, its previous guidance"); *Lotus Vaping*, 73 F.4th at 670-703 (rejecting the argument that "FDA unfairly surprised [manufacturers] by demanding that they compare their flavored e-liquids to *tobacco*-flavored ones"). Nor did manufacturers rely substantially and in good faith on a previous interpretation. Rather, many manufacturers appear[ed] to have received the FDA's message," and they "attempt[ed] (albeit unsuccessfully) to draw comparisons between dessert-, candy-, and fruit-flavored and tobacco-flavored products." *Wages*, 604 U.S. at 581-82. Moreover, FDA's marketing denial order does not impose fines or damages; rather, it continues the preexisting status quo in which petitioner's products could not lawfully be marketed without FDA authorization.

C. The Tobacco Control Act reinforces these well-settled principles of administrative law and permits FDA to establish regulatory standards

through adjudications. The TCA requires manufacturers to submit applications to market new tobacco products, 21 U.S.C. § 387j(b), and it directs FDA to adjudicate such applications, *id.* § 387j(c). And although the Act obligates the agency to issue interpretative rules and regulations in some other contexts, *see, e.g.*, *id.* § 387e(j)(3)(B) (specifying that FDA "shall issue regulations" with respect to "substantially equivalent" tobacco products); *id.* § 387k(*l*)(1) (specifying that FDA "shall issue regulations or guidance" with respect to the review of "modified risk tobacco products"), there is no such obligation for FDA to promulgate implementing regulations in the premarket-adjudication context of § 387j(c). Other courts of appeals have thus held that the Act allows FDA "to develop its premarket policy through a flexible, case-by-case adjudicative approach," and that FDA did not err by developing standards through adjudications and without promulgating "regulations." *Gripum, LLC v. FDA*, 47 F.4th 553, 559 (7th Cir. 2022); *see also Bidi Vapor LLC v. FDA*, 134 F.4th 1282, 1287 (11th Cir. 2025). And the Supreme Court recently confirmed in *Wages* that FDA has "discretion to work out the meaning of the TCA's comparative standard when evaluating premarket tobacco product application"; FDA "was not required to issue [pre-decisional] guidance." 604 U.S. at 582.

53

Petitioner argues (at 48-51) that by applying the comparative-efficacy standard, FDA has promulgated a tobacco product standard that needed to go through notice and comment under the TCA. *See* 21 U.S.C. § 387g(c). That argument is meritless. The TCA permits FDA to promulgate tobacco product standards, which are "uniform rules governing the composition of tobacco products or restricting their sale and distribution," *Fontem US, LLC v. FDA*, 82 F.4th 1207, 1218 (D.C. Cir. 2023); *see* 21 U.S.C. § 387g(a)(4), but it does not require them. And FDA has not claimed to establish a tobacco product standard governing flavored e-cigarettes, nor did FDA deny Drip More's applications on the ground that the products failed to "conform in all respects to a tobacco product standard," 21 U.S.C. § 387j(c)(2)(D). Rather, FDA weighed the relevant evidence as it pertained to Drip More's applications and explained that Drip More failed to demonstrate that its products are appropriate for the protection of the public health, *id.* § 387j(c)(2)(A). *See supra* pp. 23-32. FDA does not "impermissibly impose 'tobacco product standards'" when it undertakes a "holistic adjudicatory review of [a product]'s risks and benefits" under 21 U.S.C. § 387j(c). *Bidi Vapor*, 134 F.4th at 1287.

54

Petitioner suggests that FDA was required to undertake notice-and-comment rulemaking because the agency could have established a tobacco product standard. *See* Br. 48-51. But nothing in the TCA contemplates that the agency had to go through the rulemaking process. While the Act gives FDA the authority to promulgate tobacco product standards through rulemaking, 21 U.S.C. § 387g, it does not require the agency to do before comparing flavored e-cigarette products to tobacco-flavored ones, *see Wages*, 604 U.S. at 582. As explained, "[a] contrary rule would be in tension with *Chenery II*'s teaching that, absent a statutory prohibition, agencies may generally develop regulatory standards through either adjudication or rulemaking." *Id.*

Indeed, the tobacco product standard set forth in 21 U.S.C. § 387g(a)(1)(A) underscores that FDA remains free to set standards through adjudication. That provision establishes a rule that a cigarette "shall not contain" certain characterizing flavors, but the provision expressly states that nothing in the provision "shall be construed to limit [FDA's] authority to take action" in other sections under the Act, *id.* — including its authority to deny premarket applications under § 387j because the manufacturer has

failed to show that its flavored products are appropriate for the protection of the public health.

Petitioner's contention (at 53-55) that notice-and-comment is more consistent with the structure of the Tobacco Control Act is unconvincing. The structure of the TCA, like the APA, contemplates that FDA may develop its analysis through rulemaking or adjudication. *See* 21 U.S.C. §§ 387g, 387j. Petitioner observes that FDA can enforce tobacco product standards in subsequent adjudications, but that is not informative; it is commonplace for an agency to be able to enforce a promulgated rule in that way. *See, e.g.*, *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 611-13 (1991) (explaining that an agency may "rely on rulemaking to resolve certain issues of general applicability" in adjudications). The fact that FDA may act through rulemaking does not mean that it may not act through adjudication. Petitioner also notes that FDA must find that a tobacco product standard is appropriate for the protection of the public health, 21 U.S.C. § 387g(a)(3), but that substantive requirement is unsurprising— and says little about mandatory procedures. Indeed, the fact that Congress instructed FDA to apply the same public-health standard in adjudications

56

only underscores that Congress intended FDA to be able to develop regulatory standards through either rulemaking or adjudication.

Finally, FDA has not imposed a "de facto ban" on flavored products. Br. 51. Rather, it has explained in adjudications how the Tobacco Control Act's standard is applied to flavored e-cigarette products. The individualized review of Drip More's applications belies petitioner's claim of a de facto ban, demonstrating that FDA is instead engaged in the task of case-by-case adjudications. And it is clear that FDA has not imposed a de facto ban on flavored e-cigarette products because the agency has in fact authorized several non-tobacco-flavored e-cigarettes, specifically in menthol flavors, where applicants submitted evidence showing that their products provide a benefit greater than that provided by tobacco-flavored products. *See* Tobacco Product Marketing Orders, *supra*; NJOY Menthol E-Cigarette Press Release, *supra*; JUUL Menthol E-Cigarette Press Release, *supra*. Drip More simply failed to provide evidence demonstrating that its flavored products provide a similar benefit. *See Gripum*, 47 F.4th at 559.

57

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

*Of Counsel:*

MICHAEL B. STUART
  *General Counsel*
  *U.S. Department of Health and Human*
    *Services*

SEAN R. KEVENEY
  *Chief Counsel*
  *Food and Drug Administration*

WENDY S. VICENTE
  *Deputy Chief Counsel, Litigation*

MAGGIE R. REDDEN
  *Associate Chief Counsel*

  *Food and Drug Administration*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

JOSHUA M. KOPPEL

*s/ Ben Lewis*

BEN LEWIS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7250*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2494*
  *benjamin.r.lewis@usdoj.gov*

December 2025

58

**STATEMENT OF RELATED CASES**

Pursuant to Ninth Circuit Rule 28-2.6, respondent states that *MH Global LLC v. FDA*, No. 21-71327 (9th Cir.), raises closely related issues.

*s/ Ben Lewis*
Ben Lewis

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,131 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Ben Lewis*
Ben Lewis

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Service will be accomplished by the appellate CM/ECF system.

*s/ Ben Lewis*

Ben Lewis

**ADDENDUM**

# TABLE OF CONTENTS

Administrative Procedure Act (APA)

    5 U.S.C. § 706................................................................A1

Tobacco Control Act (TCA)

    21 U.S.C. § 321.............................................................A2
    21 U.S.C. § 387a...........................................................A3
    21 U.S.C. § 387g...........................................................A5
    21 U.S.C. § 387j..........................................................A15
    21 U.S.C. § 387*l*.........................................................A24

**Administrative Procedure Act (APA)**

**5 U.S.C. § 706**

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**Tobacco Control Act (TCA)**

**21 U.S.C. § 321**

**§ 321. Definitions; generally**

For the purposes of this chapter—

\*\*\*

**(rr)(1)** The term "tobacco product" means any product made or derived from tobacco, or containing nicotine from any source, that is intended for human consumption, including any component, part, or accessory of a tobacco product (except for raw materials other than tobacco used in manufacturing a component, part, or accessory of a tobacco product).

**(2)** The term "tobacco product" does not mean an article that is a drug under subsection (g)(1), a device under subsection (h), or a combination product described in section 353(g) of this title.

**(3)** The products described in paragraph (2) shall be subject to subchapter V of this chapter.

**(4)** A tobacco product shall not be marketed in combination with any other article or product regulated under this chapter (including a drug, biologic, food, cosmetic, medical device, or a dietary supplement).

**(5)** The term "tobacco product" does not mean an article that is a food under paragraph (f), if such article contains no nicotine, or no more than trace amounts of naturally occurring nicotine.

**21 U.S.C. § 387a**

**§ 387a. FDA authority over tobacco products**

**(a) In general**

Tobacco products, including modified risk tobacco products for which an order has been issued in accordance with section 387k of this title, shall be regulated by the Secretary under this subchapter and shall not be subject to the provisions of subchapter V.

**(b) Applicability**

This subchapter shall apply to all cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco and to any other tobacco products that the Secretary by regulation deems to be subject to this subchapter. This subchapter shall also apply to any tobacco product containing nicotine that is not made or derived from tobacco.

**(c) Scope**

**(1) In general**

Nothing in this subchapter, or any policy issued or regulation promulgated thereunder, or in sections 101(a), 102, or 103 of title I, title II, or title III of the Family Smoking Prevention and Tobacco Control Act, shall be construed to affect, expand, or limit the Secretary's authority over (including the authority to determine whether products may be regulated), or the regulation of, products under this chapter that are not tobacco products under subchapter V or any other subchapter.

**(2) Limitation of authority**

**(A) In general**

The provisions of this subchapter shall not apply to tobacco leaf that is not in the possession of a manufacturer of tobacco products, or to the producers of tobacco leaf, including tobacco growers, tobacco warehouses, and tobacco grower cooperatives, nor shall any employee of the Food and Drug Administration have any authority to enter onto a farm owned by a producer of tobacco leaf without the written consent of such producer.

A3

**(B) Exception**

Notwithstanding subparagraph (A), if a producer of tobacco leaf is also a tobacco product manufacturer or controlled by a tobacco product manufacturer, the producer shall be subject to this subchapter in the producer's capacity as a manufacturer. The exception in this subparagraph shall not apply to a producer of tobacco leaf who grows tobacco under a contract with a tobacco product manufacturer and who is not otherwise engaged in the manufacturing process.

**(C) Rule of construction**

Nothing in this subchapter shall be construed to grant the Secretary authority to promulgate regulations on any matter that involves the production of tobacco leaf or a producer thereof, other than activities by a manufacturer affecting production.

**(d) Rulemaking procedures**

Each rulemaking under this subchapter shall be in accordance with chapter 5 of Title 5. This subsection shall not be construed to affect the rulemaking provisions of section 102(a) of the Family Smoking Prevention and Tobacco Control Act.

**(e) Center for Tobacco Products**

Not later than 90 days after June 22, 2009, the Secretary shall establish within the Food and Drug Administration the Center for Tobacco Products, which shall report to the Commissioner of Food and Drugs in the same manner as the other agency centers within the Food and Drug Administration. The Center shall be responsible for the implementation of this subchapter and related matters assigned by the Commissioner.

**(f) Office to assist small tobacco product manufacturers**

The Secretary shall establish within the Food and Drug Administration an identifiable office to provide technical and other nonfinancial assistance to small tobacco product manufacturers to assist them in complying with the requirements of this chapter.

**(g) Consultation prior to rulemaking**

Prior to promulgating rules under this subchapter, the Secretary shall endeavor to consult with other Federal agencies as appropriate.

A4

**21 U.S.C. § 387g**

**§ 387g. Tobacco product standards**

### (a) In general

#### (1) Special rules

##### (A) Special rule for cigarettes

Beginning 3 months after June 22, 2009, a cigarette or any of its component parts (including the tobacco, filter, or paper) shall not contain, as a constituent (including a smoke constituent) or additive, an artificial or natural flavor (other than tobacco or menthol) or an herb or spice, including strawberry, grape, orange, clove, cinnamon, pineapple, vanilla, coconut, licorice, cocoa, chocolate, cherry, or coffee, that is a characterizing flavor of the tobacco product or tobacco smoke. Nothing in this subparagraph shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter applicable to menthol or any artificial or natural flavor, herb, or spice not specified in this subparagraph.

##### (B) Additional special rule

Beginning 2 years after June 22, 2009, a tobacco product manufacturer shall not use tobacco, including foreign grown tobacco, that contains a pesticide chemical residue that is at a level greater than is specified by any tolerance applicable under Federal law to domestically grown tobacco.

#### (2) Revision of tobacco product standards

The Secretary may revise the tobacco product standards in paragraph (1) in accordance with subsection (c).

#### (3) Tobacco product standards

##### (A) In general

The Secretary may adopt tobacco product standards in addition to those in paragraph (1) if the Secretary finds that a tobacco product standard is appropriate for the protection of the public health.

**(B) Determinations**

**(i) Considerations**

In making a finding described in subparagraph (A), the Secretary shall consider scientific evidence concerning--

**(I)** the risks and benefits to the population as a whole, including users and nonusers of tobacco products, of the proposed standard;

**(II)** the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

**(III)** the increased or decreased likelihood that those who do not use tobacco products will start using such products.

**(ii) Additional considerations**

In the event that the Secretary makes a determination, set forth in a proposed tobacco product standard in a proposed rule, that it is appropriate for the protection of public health to require the reduction or elimination of an additive, constituent (including a smoke constituent), or other component of a tobacco product because the Secretary has found that the additive, constituent, or other component is or may be harmful, any party objecting to the proposed standard on the ground that the proposed standard will not reduce or eliminate the risk of illness or injury may provide for the Secretary's consideration scientific evidence that demonstrates that the proposed standard will not reduce or eliminate the risk of illness or injury.

**(4) Content of tobacco product standards**

A tobacco product standard established under this section for a tobacco product--

**(A)** shall include provisions that are appropriate for the protection of the public health, including provisions, where appropriate--

A6

**(i)** for nicotine yields of the product;

**(ii)** for the reduction or elimination of other constituents, including smoke constituents, or harmful components of the product; or

**(iii)** relating to any other requirement under subparagraph (B);

**(B)** shall, where appropriate for the protection of the public health, include--

**(i)** provisions respecting the construction, components, ingredients, additives, constituents, including smoke constituents, and properties of the tobacco product;

**(ii)** provisions for the testing (on a sample basis or, if necessary, on an individual basis) of the tobacco product;

**(iii)** provisions for the measurement of the tobacco product characteristics of the tobacco product;

**(iv)** provisions requiring that the results of each or of certain of the tests of the tobacco product required to be made under clause (ii) show that the tobacco product is in conformity with the portions of the standard for which the test or tests were required; and

**(v)** a provision requiring that the sale and distribution of the tobacco product be restricted but only to the extent that the sale and distribution of a tobacco product may be restricted under a regulation under section 387f(d) of this title;

**(C)** shall, where appropriate, require the use and prescribe the form and content of labeling for the proper use of the tobacco product; and

**(D)** shall require tobacco products containing foreign-grown tobacco to meet the same standards applicable to tobacco products containing domestically grown tobacco.

A7

**(5) Periodic reevaluation of tobacco product standards**

The Secretary shall provide for periodic evaluation of tobacco product standards established under this section to determine whether such standards should be changed to reflect new medical, scientific, or other technological data. The Secretary may provide for testing under paragraph (4)(B) by any person.

**(6) Involvement of other agencies; informed persons**

In carrying out duties under this section, the Secretary shall endeavor to--

> **(A)** use personnel, facilities, and other technical support available in other Federal agencies;

> **(B)** consult with other Federal agencies concerned with standard setting and other nationally or internationally recognized standard-setting entities; and

> **(C)** invite appropriate participation, through joint or other conferences, workshops, or other means, by informed persons representative of scientific, professional, industry, agricultural, or consumer organizations who in the Secretary's judgment can make a significant contribution.

**(b) Considerations by Secretary**

**(1) Technical achievability**

The Secretary shall consider information submitted in connection with a proposed standard regarding the technical achievability of compliance with such standard, including with regard to any differences related to the technical achievability of compliance with such standard for products in the same class containing nicotine not made or derived from tobacco and products containing nicotine made or derived from tobacco.

**(2) Other considerations**

The Secretary shall consider all other information submitted in connection with a proposed standard, including information concerning the countervailing effects of the tobacco product

A8

standard on the health of adolescent tobacco users, adult tobacco users, or nontobacco users, such as the creation of a significant demand for contraband or other tobacco products that do not meet the requirements of this subchapter and the significance of such demand.

**(c) Proposed standards**

**(1) In general**

The Secretary shall publish in the Federal Register a notice of proposed rulemaking for the establishment, amendment, or revocation of any tobacco product standard.

**(2) Requirements of notice**

A notice of proposed rulemaking for the establishment or amendment of a tobacco product standard for a tobacco product shall--

**(A)** set forth a finding with supporting justification that the tobacco product standard is appropriate for the protection of the public health;

**(B)** invite interested persons to submit a draft or proposed tobacco product standard for consideration by the Secretary;

**(C)** invite interested persons to submit comments on structuring the standard so that it does not advantage foreign-grown tobacco over domestically grown tobacco; and

**(D)** invite the Secretary of Agriculture to provide any information or analysis which the Secretary of Agriculture believes is relevant to the proposed tobacco product standard.

**(3) Finding**

A notice of proposed rulemaking for the revocation of a tobacco product standard shall set forth a finding with supporting justification that the tobacco product standard is no longer appropriate for the protection of the public health.

A9

**(4) Comment**

The Secretary shall provide for a comment period of not less than 60 days.

**(d) Promulgation**

**(1) In general**

After the expiration of the period for comment on a notice of proposed rulemaking published under subsection (c) respecting a tobacco product standard and after consideration of comments submitted under subsections (b) and (c) and any report from the Tobacco Products Scientific Advisory Committee, the Secretary shall--

**(A)** if the Secretary determines that the standard would be appropriate for the protection of the public health, promulgate a regulation establishing a tobacco product standard and publish in the Federal Register findings on the matters referred to in subsection (c); or

**(B)** publish a notice terminating the proceeding for the development of the standard together with the reasons for such termination.

**(2) Effective date**

A regulation establishing a tobacco product standard shall set forth the date or dates upon which the standard shall take effect, but no such regulation may take effect before 1 year after the date of its publication unless the Secretary determines that an earlier effective date is necessary for the protection of the public health. Such date or dates shall be established so as to minimize, consistent with the public health, economic loss to, and disruption or dislocation of, domestic and international trade. In establishing such effective date or dates, the Secretary shall consider information submitted in connection with a proposed product standard by interested parties, including manufacturers and tobacco growers, regarding the technical achievability of compliance with the standard, and including information concerning the existence of patents that make it impossible to comply in the timeframe envisioned in the proposed

A10

standard. If the Secretary determines, based on the Secretary's evaluation of submitted comments, that a product standard can be met only by manufacturers requiring substantial changes to the methods of farming the domestically grown tobacco used by the manufacturer, the effective date of that product standard shall be not less than 2 years after the date of publication of the final regulation establishing the standard.

**(3) Limitation on power granted to the Food and Drug Administration**

Because of the importance of a decision of the Secretary to issue a regulation

**(A)** banning all cigarettes, all smokeless tobacco products, all little cigars, all cigars other than little cigars, all pipe tobacco, or all roll-your-own tobacco products; or

**(B)** requiring the reduction of nicotine yields of a tobacco product to zero,

the Secretary is prohibited from taking such actions under this chapter.

**(4) Amendment; revocation**

**(A) Authority**

The Secretary, upon the Secretary's own initiative or upon petition of an interested person, may by a regulation, promulgated in accordance with the requirements of subsection (c) and paragraph (2), amend or revoke a tobacco product standard.

**(B) Effective date**

The Secretary may declare a proposed amendment of a tobacco product standard to be effective on and after its publication in the Federal Register and until the effective date of any final action taken on such amendment if the Secretary determines that making it so effective is in the public interest.

**(5) Referral to Advisory Committee**

**(A) In general**

The Secretary may refer a proposed regulation for the establishment, amendment, or revocation of a tobacco product standard to the Tobacco Products Scientific Advisory Committee for a report and recommendation with respect to any matter involved in the proposed regulation which requires the exercise of scientific judgment.

**(B) Initiation of referral**

The Secretary may make a referral under this paragraph--

    **(i)** on the Secretary's own initiative; or

    **(ii)** upon the request of an interested person that--

        **(I)** demonstrates good cause for the referral; and

        **(II)** is made before the expiration of the period for submission of comments on the proposed regulation.

**(C) Provision of data**

If a proposed regulation is referred under this paragraph to the Tobacco Products Scientific Advisory Committee, the Secretary shall provide the Advisory Committee with the data and information on which such proposed regulation is based.

**(D) Report and recommendation**

The Tobacco Products Scientific Advisory Committee shall, within 60 days after the referral of a proposed regulation under this paragraph and after independent study of the data and information furnished to it by the Secretary and other data and information before it, submit to the Secretary a report and recommendation respecting such regulation, together with all underlying data and information and a statement of the reason or basis for the recommendation.

A12

### (E) Public availability

The Secretary shall make a copy of each report and recommendation under subparagraph (D) publicly available.

## (e) Menthol cigarettes

### (1) Referral; considerations

Immediately upon the establishment of the Tobacco Products Scientific Advisory Committee under section 387q(a) of this title, the Secretary shall refer to the Committee for report and recommendation, under section 387q(c)(4) of this title, the issue of the impact of the use of menthol in cigarettes on the public health, including such use among children, African-Americans, Hispanics, and other racial and ethnic minorities. In its review, the Tobacco Products Scientific Advisory Committee shall address the considerations listed in subsections (a)(3)(B)(i) and (b).

### (2) Report and recommendation

Not later than 1 year after its establishment, the Tobacco Product Scientific Advisory Committee shall submit to the Secretary the report and recommendations required pursuant to paragraph (1).

### (3) Rule of construction

Nothing in this subsection shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter applicable to menthol.

## (f) Dissolvable tobacco products

### (1) Referral; considerations

The Secretary shall refer to the Tobacco Products Scientific Advisory Committee for report and recommendation, under section 387q(c)(4) of this title, the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children. In its review, the Tobacco Products Scientific Advisory Committee shall address the considerations listed in subsection (a)(3)(B)(i).

A13

**(2) Report and recommendation**

Not later than 2 years after its establishment, the Tobacco Product Scientific Advisory Committee shall submit to the Secretary the report and recommendations required pursuant to paragraph (1).

**(3) Rule of construction**

Nothing in this subsection shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter at any time applicable to any dissolvable tobacco product.

**21 U.S.C. § 387j**

**§ 387j. Application for review of certain tobacco products**

**(a) In general**

**(1) New tobacco product defined**

For purposes of this section the term "new tobacco product" means

**(A)** any tobacco product (including those products in test markets) that was not commercially marketed in the United States as of February 15, 2007; or

**(B)** any modification (including a change in design, any component, any part, or any constituent, including a smoke constituent, or in the content, delivery or form of nicotine, or any other additive or ingredient) of a tobacco product where the modified product was commercially marketed in the United States after February 15, 2007.

**(2) Premarket review required**

**(A) New products**

An order under subsection (c)(1)(A)(i) for a new tobacco product is required unless--

**(i)** the manufacturer has submitted a report under section 387e(j) of this title; and the Secretary has issued an order that the tobacco product--

**(I)** is substantially equivalent to a tobacco product commercially marketed (other than for test marketing) in the United States as of February 15, 2007; and

**(II)** is in compliance with the requirements of this chapter; or

**(ii)** the tobacco product is exempt from the requirements of section 387e(j) of this title pursuant to a regulation issued under section 387e(j)(3) of this title.

**(B) Application to certain post-February 15, 2007, products**

Subparagraph (A) shall not apply to a tobacco product--

A15

**(i)** that was first introduced or delivered for introduction into interstate commerce for commercial distribution in the United States after February 15, 2007, and prior to the date that is 21 months after June 22, 2009; and

**(ii)** for which a report was submitted under section 387e(j) of this title within such 21-month period,

except that subparagraph (A) shall apply to the tobacco product if the Secretary issues an order that the tobacco product is not substantially equivalent.

### (3) Substantially equivalent defined

#### (A) In general

In this section and section 387e(j) of this title, the term "substantially equivalent" or "substantial equivalence" means, with respect to the tobacco product being compared to the predicate tobacco product, that the Secretary by order has found that the tobacco product--

**(i)** has the same characteristics as the predicate tobacco product; or

**(ii)** has different characteristics and the information submitted contains information, including clinical data if deemed necessary by the Secretary, that demonstrates that it is not appropriate to regulate the product under this section because the product does not raise different questions of public health.

#### (B) Characteristics

In subparagraph (A), the term "characteristics" means the materials, ingredients, design, composition, heating source, or other features of a tobacco product.

#### (C) Limitation

A tobacco product may not be found to be substantially equivalent to a predicate tobacco product that has been removed

A16

from the market at the initiative of the Secretary or that has been determined by a judicial order to be misbranded or adulterated.

**(4) Health information**

**(A) Summary**

As part of a submission under section 387e(j) of this title respecting a tobacco product, the person required to file a premarket notification under such section shall provide an adequate summary of any health information related to the tobacco product or state that such information will be made available upon request by any person.

**(B) Required information**

Any summary under subparagraph (A) respecting a tobacco product shall contain detailed information regarding data concerning adverse health effects and shall be made available to the public by the Secretary within 30 days of the issuance of a determination that such tobacco product is substantially equivalent to another tobacco product.

**(b) Application**

**(1) Contents**

An application under this section shall contain--

**(A)** full reports of all information, published or known to, or which should reasonably be known to, the applicant, concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products;

**(B)** a full statement of the components, ingredients, additives, and properties, and of the principle or principles of operation, of such tobacco product;

**(C)** a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such tobacco product;

A17

**(D)** an identifying reference to any tobacco product standard under section 387g of this title which would be applicable to any aspect of such tobacco product, and either adequate information to show that such aspect of such tobacco product fully meets such tobacco product standard or adequate information to justify any deviation from such standard;

**(E)** such samples of such tobacco product and of components thereof as the Secretary may reasonably require;

**(F)** specimens of the labeling proposed to be used for such tobacco product; and

**(G)** such other information relevant to the subject matter of the application as the Secretary may require.

## (2) Referral to Tobacco Products Scientific Advisory Committee

Upon receipt of an application meeting the requirements set forth in paragraph (1), the Secretary--

**(A)** may, on the Secretary's own initiative; or

**(B)** may, upon the request of an applicant,

refer such application to the Tobacco Products Scientific Advisory Committee for reference and for submission (within such period as the Secretary may establish) of a report and recommendation respecting the application, together with all underlying data and the reasons or basis for the recommendation.

## (c) Action on application

### (1) Deadline

#### (A) In general

As promptly as possible, but in no event later than 180 days after the receipt of an application under subsection (b), the Secretary, after considering the report and recommendation submitted under subsection (b)(2), shall--

**(i)** issue an order that the new product may be introduced or delivered for introduction into interstate commerce if the

A18

Secretary finds that none of the grounds specified in paragraph (2) of this subsection applies; or

**(ii)** issue an order that the new product may not be introduced or delivered for introduction into interstate commerce if the Secretary finds (and sets forth the basis for such finding as part of or accompanying such denial) that 1 or more grounds for denial specified in paragraph (2) of this subsection apply.

**(B) Restrictions on sale and distribution**

An order under subparagraph (A)(i) may require that the sale and distribution of the tobacco product be restricted but only to the extent that the sale and distribution of a tobacco product may be restricted under a regulation under section 387f(d) of this title.

**(2) Denial of application**

The Secretary shall deny an application submitted under subsection (b) if, upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product, the Secretary finds that--

**(A)** there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health;

**(B)** the methods used in, or the facilities or controls used for, the manufacture, processing, or packing of such tobacco product do not conform to the requirements of section 387f(e) of this title;

**(C)** based on a fair evaluation of all material facts, the proposed labeling is false or misleading in any particular; or

**(D)** such tobacco product is not shown to conform in all respects to a tobacco product standard in effect under section 387g of this title, and there is a lack of adequate information to justify the deviation from such standard.

A19

**(3) Denial information**

Any denial of an application shall, insofar as the Secretary determines to be practicable, be accompanied by a statement informing the applicant of the measures required to remove such application from deniable form (which measures may include further research by the applicant in accordance with 1 or more protocols prescribed by the Secretary).

**(4) Basis for finding**

For purposes of this section, the finding as to whether the marketing of a tobacco product for which an application has been submitted is appropriate for the protection of the public health shall be determined with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account--

**(A)** the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

**(B)** the increased or decreased likelihood that those who do not use tobacco products will start using such products.

**(5) Basis for action**

**(A) Investigations**

For purposes of paragraph (2)(A), whether permitting a tobacco product to be marketed would be appropriate for the protection of the public health shall, when appropriate, be determined on the basis of well-controlled investigations, which may include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product.

**(B) Other evidence**

If the Secretary determines that there exists valid scientific evidence (other than evidence derived from investigations described in subparagraph (A)) which is sufficient to evaluate the tobacco product, the Secretary may authorize that the determination for purposes of paragraph (2)(A) be made on the basis of such evidence.

A20

**(d) Withdrawal and temporary suspension**

**(1) In general**

The Secretary shall, upon obtaining, where appropriate, advice on scientific matters from the Tobacco Products Scientific Advisory Committee, and after due notice and opportunity for informal hearing for a tobacco product for which an order was issued under subsection (c)(1)(A)(i), issue an order withdrawing the order if the Secretary finds--

**(A)** that the continued marketing of such tobacco product no longer is appropriate for the protection of the public health;

**(B)** that the application contained or was accompanied by an untrue statement of a material fact;

**(C)** that the applicant--

**(i)** has failed to establish a system for maintaining records, or has repeatedly or deliberately failed to maintain records or to make reports, required by an applicable regulation under section 387i of this title;

**(ii)** has refused to permit access to, or copying or verification of, such records as required by section 374 of this title; or

**(iii)** has not complied with the requirements of section 387e of this title;

**(D)** on the basis of new information before the Secretary with respect to such tobacco product, evaluated together with the evidence before the Secretary when the application was reviewed, that the methods used in, or the facilities and controls used for, the manufacture, processing, packing, or installation of such tobacco product do not conform with the requirements of section 387f(e) of this title and were not brought into conformity with such requirements within a reasonable time after receipt of written notice from the Secretary of nonconformity;

**(E)** on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when the application was reviewed, that the labeling of such tobacco

A21

product, based on a fair evaluation of all material facts, is false or misleading in any particular and was not corrected within a reasonable time after receipt of written notice from the Secretary of such fact; or

**(F)** on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when such order was issued, that such tobacco product is not shown to conform in all respects to a tobacco product standard which is in effect under section 387g of this title, compliance with which was a condition to the issuance of an order relating to the application, and that there is a lack of adequate information to justify the deviation from such standard.

## (2) Appeal

The holder of an application subject to an order issued under paragraph (1) withdrawing an order issued pursuant to subsection (c)(1)(A)(i) may, by petition filed on or before the 30th day after the date upon which such holder receives notice of such withdrawal, obtain review thereof in accordance with section 387*l* of this title.

## (3) Temporary suspension

If, after providing an opportunity for an informal hearing, the Secretary determines there is reasonable probability that the continuation of distribution of a tobacco product under an order would cause serious, adverse health consequences or death, that is greater than ordinarily caused by tobacco products on the market, the Secretary shall by order temporarily suspend the authority of the manufacturer to market the product. If the Secretary issues such an order, the Secretary shall proceed expeditiously under paragraph (1) to withdraw such application.

## (e) Service of order

An order issued by the Secretary under this section shall be served--

**(1)** in person by any officer or employee of the department designated by the Secretary; or

**(2)** by mailing the order by registered mail or certified mail addressed to the applicant at the applicant's last known address in the records of the Secretary.

**(f) Records**

### (1) Additional information

In the case of any tobacco product for which an order issued pursuant to subsection (c)(1)(A)(i) for an application filed under subsection (b) is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, as the Secretary may by regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination of, whether there is or may be grounds for withdrawing or temporarily suspending such order.

### (2) Access to records

Each person required under this section to maintain records, and each person in charge of custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

**(g) Investigational tobacco product exemption for investigational use**

The Secretary may exempt tobacco products intended for investigational use from the provisions of this subchapter under such conditions as the Secretary may by regulation prescribe.

A23

**21 U.S.C. § 387*l***

**§ 387*l*. Judicial review**

**(a) Right to review**

**(1) In general**

Not later than 30 days after--

**(A)** the promulgation of a regulation under section 387g of this title establishing, amending, or revoking a tobacco product standard; or

**(B)** a denial of an application under section 387j(c) of this title,

any person adversely affected by such regulation or denial may file a petition for judicial review of such regulation or denial with the United States Court of Appeals for the District of Columbia or for the circuit in which such person resides or has their principal place of business.

**(2) Requirements**

**(A) Copy of petition**

A copy of the petition filed under paragraph (1) shall be transmitted by the clerk of the court involved to the Secretary.

**(B) Record of proceedings**

On receipt of a petition under subparagraph (A), the Secretary shall file in the court in which such petition was filed--

**(i)** the record of the proceedings on which the regulation or order was based; and

**(ii)** a statement of the reasons for the issuance of such a regulation or order.

**(C) Definition of record**

In this section, the term "record" means--

**(i)** all notices and other matter published in the Federal Register with respect to the regulation or order reviewed;

**(ii)** all information submitted to the Secretary with respect to such regulation or order;

A24

**(iii)** proceedings of any panel or advisory committee with respect to such regulation or order;

**(iv)** any hearing held with respect to such regulation or order; and

**(v)** any other information identified by the Secretary, in the administrative proceeding held with respect to such regulation or order, as being relevant to such regulation or order.

**(b) Standard of review**

Upon the filing of the petition under subsection (a) for judicial review of a regulation or order, the court shall have jurisdiction to review the regulation or order in accordance with chapter 7 of Title 5 and to grant appropriate relief, including interim relief, as provided for in such chapter. A regulation or denial described in subsection (a) shall be reviewed in accordance with section 706(2)(A) of Title 5.

**(c) Finality of judgment**

The judgment of the court affirming or setting aside, in whole or in part, any regulation or order shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of Title 28.

**(d) Other remedies**

The remedies provided for in this section shall be in addition to, and not in lieu of, any other remedies provided by law.

**(e) Regulations and orders must recite basis in record**

To facilitate judicial review, a regulation or order issued under section 387f, 387g, 387h, 387i, 387j, or 387p of this title shall contain a statement of the reasons for the issuance of such regulation or order in the record of the proceedings held in connection with its issuance.