**21-71380**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Drip More LLC,

*Petitioner,*

v.

U.S. Food and Drug Administration,

*Respondent.*

On Petition For Review Of Marketing Denial Order Issued By The
U.S. Food and Drug Administration

## PETITIONER DRIP MORE LLC'S
## REPLY BRIEF

Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
(202) 434-4269
gotting@khlaw.com

*Counsel for Petitioner*

Dated: January 23, 2026

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................ii

ARGUMENT ......................................................................................1

    I.    FDA Violated The TCA's Notice-And-Comment Procedures ..............................................................................1

    II.   FDA Violated The APA's Notice-And-Comment Procedures ..............................................................................7

    III.  FDA's Failure To Consider All Information Regarding Potential Underage Use Of Drip More's ENDS Was Not Harmless Error ....................................................................11

    IV.  FDA's PMTA Review Was Arbitrary And Capricious As It Failed To Weigh And Balance All Relevant Evidence......16

    V.   The MDO Was Unlawfully Applied To Drip More's Zero-Nicotine ENDS...........................................................22

CONCLUSION .................................................................................25

CERTIFICATE OF COMPLIANCE.................................................27

CERTIFICATE OF SERVICE .........................................................28

STATEMENT OF RELATED CASES .............................................29

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## <u>Cases</u>

*Agoston v. Commonwealth of Penn.*,
71 S. Ct. 9 (1950) ...................................................................................... 16

*American Hosp. Ass'n v. NLRB*,
499 U.S. 606 (1991) ................................................................................ 5, 6

*Bidi Vapor LLC v. FDA*,
134 F.4th 1282 (11th Cir. 2025) .............................................................. 7

*Bidi Vapor LLC v. FDA*,
47 F.4th 1191 (11th Cir. 2022) .............................................................. 14

*Evans v. Stephens*,
125 S. Ct. 2244 (2005) ............................................................................ 15

*FDA v. Wages & White Lion Invs., LLC*,
145 S. Ct. 898 (2025) ..................................... 2, 4, 11, 12, 13, 15, 17, 20

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) ................................................................ 21

*Lawrence v. Chater*,
516 U.S. 163 (1996) ................................................................................ 16

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) .............................................................................. 5

*Lotus Vaping Techs., LLC v. FDA*,
73 F.4th 657 (9th Cir. 2023) ............................ 11, 12, 13, 14, 15, 16, 23

*MacLean v. Dep't of Homeland Security*,
543 F.3d 1145 (9th Cir. 2008) ................................................................ 10

*Mobil Exploration and Producing North America, Inc. v. FERC*,
881 F.2d 193 (5th Cir. 1989) .................................................................. 10

*Nicopure Labs, LLC v. FDA,*
  266 F. Supp. 3d 360 (D.D.C. 2017)......................................................23

*North Carolina v. North Carolina State Conf. of NAACP,*
  137 S. Ct. 1399 (2017) .......................................................................15

*Pfaff v. Dep't of Housing & Urban Dev.,*
  88 F.3d 739 (9th Cir. 1996) ...............................................................10

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947) ............................................................... 14, 18, 23

*State of Maryland v. Baltimore Radio Show,*
  338 U.S. 912 (1950) ...........................................................................15

*Wages & White Lion Inves., LLC v. FDA,*
  90 F.4th 357 (5th Cir. 2024)................................................................2

## Statutes

21 U.S.C. §387g ............................................................................... 1, 4
21 U.S.C. §387g(a)(1)(A)........................................................................6
21 U.S.C. §§387g(a)(3)-(4) ................................................................ 1, 2
21 U.S.C. §387g(a)(4)............................................................................1
21 U.S.C. §387g(a)(4)(B)(v) ...................................................................4
21 U.S.C. §387j ....................................................................................4
21 U.S.C. §387j(c)(2)(D)....................................................................6, 7

## Regulations

81 Fed. Reg. 28974 (May 10, 2016) ................................................23, 24

iii

Petitioner Drip More LLC ("Drip More") files this reply in support of its petition for review.

## ARGUMENT

### I. FDA Violated The TCA's Notice-And-Comment Procedures

1. FDA maintains the comparative efficacy requirement does not constitute a "tobacco product standard" under 21 U.S.C. §387g that was required to go through notice-and-comment rulemaking. FDA 54. This position fails on multiple grounds. To begin, the requirement is literally based on the type of flavoring contained in an ENDS product. If a manufacturer's ENDS is non-tobacco flavored, then the manufacturer must meet the comparative efficacy standard to avoid an automatic marketing denial order ("MDO") prior to scientific review of the application. At a minimum, under the TCA, this is a standard "respecting the… ingredients, additives, [or] constituents" of a tobacco product. 21 U.S.C. §387g(a)(4); Drip More 49.

Moreover, the comparative efficacy requirement has been uniformly applied by FDA to restrict and/or eliminate the distribution and sale of virtually all non-tobacco flavored ENDS because it views such flavors as raising youth appeal and health concerns. *See* 21 U.S.C.

1

§§387g(a)(3)-(4) (e.g., defining a "tobacco product standard" as reducing "harmful" constituents or components). As such, FDA cannot fairly argue that this requirement is about something other than flavors.[1]

FDA responds that the comparative efficacy requirement is not a tobacco product standard; rather, it flows from the TCA's PMTA review provisions requiring comparisons of health risks among tobacco products. FDA 46-48, 54, 57. But that is not what happened here. Contrary to FDA's assertions, the comparative efficacy standard was not applied as part of an "individualized" review of Drip More's ENDS products. FDA 57; *see also* 46-48, 54. Indeed, FDA concedes it never weighed or balanced the absence of a comparative efficacy study against any other information contained in Drip More's PMTA as required under the TCA. Drip More 19-22 (FDA admitting in the Marketing Denial Order ("MDO") (ER-18) and Technical Project Lead ("TPL") Review (ER-39) it did not review any other aspects of the PMTA); *see* Drip More 5-8 (demonstrating the TCA requires a full scientific review).

---

[1] *See Wages & White Lion Inves., LLC v. FDA*, 90 F.4th 357, 384 n.5 (5th Cir. 2024) (*en banc*) (holding FDA violated the TCA's notice-and-comment procedures), *abrogated on other grounds*, *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898 (2025).

2

Instead, the reality is that FDA applied the requirement to Drip More's PMTA as one would apply any singular, controlling standard—as an across-the-board, binding norm—just as it did with every other PMTA for non-tobacco flavored ENDS. In fact, FDA barely reviewed the application itself; instead, it limited the review to a mere box-checking exercise. Drip More 19, 50, 58-59.

FDA nevertheless contends there has been no *de facto* ban because it has approved a few menthol-flavored ENDS that met the standard. FDA 57. Although FDA has granted marketing authorization for six menthol-flavored ENDS (a mere 0.0006% of the total number of non-tobacco ENDS flavored products seeking marketing authorization), this only proves the point. As it did with applications for over one million non-tobacco flavored products, FDA applied the comparative efficacy requirement in those six cases as well—i.e., it was not implemented as part of a "holistic" review (FDA 57); rather, it was enforced as an across-the-board standard. Drip More 51-52.[2]

---

[2] Even if six menthol-flavored ENDS have been approved, that still means there is a *de facto* ban for all non-tobacco, non-menthol flavored ENDS. And that is significant here. All of Drip More's ENDS products subject to the MDO fall within that ban. ER-6-16.

In any event, FDA fails to recognize that tobacco product standards also include restrictions on the sale of tobacco products, not just complete bans. *See* 21 U.S.C. §387g(a)(4)(B)(v). Accordingly, FDA has, at a minimum, significantly restricted the marketing of menthol-flavored ENDS through the comparative efficacy standard.

2.      FDA next argues that even if the comparative efficacy requirement amounts to a tobacco product standard, it is not obligated to promulgate an implementing regulation. FDA 48, 53, 55. Instead, FDA claims that it may develop such a standard through adjudication—i.e., the PMTA review process. FDA 48, 52-55. However, the Supreme Court in *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898 (2025) ("*Wages II*") made clear that adjudication is not an option if there is a statutory requirement for notice-and-comment rulemaking. Drip More 52. And that is the case here.[3] Drip More 48-55.

 FDA nevertheless asserts that the plain language of the TCA itself permits the adoption of a tobacco product standard by rulemaking or by adjudication. FDA 56 (citing 21 U.S.C. §§387g, 387j). But

---

[3] Moreover, *Wages II* explicitly stated it was not considering whether FDA was obligated to adopt the comparative efficacy standard through notice-and-comment rulemaking. 145 S. Ct. at 915-16, 927.

4

Congress singled out flavor restrictions or bans—a point FDA fails to acknowledge in its response—because of their market-wide impact on manufacturers and retailers, and required such restrictions be set as tobacco product standards through notice-and-comment rulemaking, thus ensuring all stakeholders can be heard before such limits take effect. 21 U.S.C. §§387g(a)(3), (c)(1). FDA offers no account of why the "best" reading of the TCA would allow it to impose a uniform restriction or prohibition on non-tobacco flavored ENDS via numerous PMTA denials, thereby circumventing the rulemaking process. Drip More 53 (citing *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024)).[4]

Moreover, FDA's reliance on *American Hosp. Ass'n v. NLRB*, 499 U.S. 606 (1991), misses the mark. There, the Supreme Court held that the National Labor Relations Board ("NLRB") could rely on its general rulemaking authority to adopt a rule governing collective bargaining which the NLRB could then use to guide its exercise of discretion when making individualized bargaining unit determinations. *Id.* at 609-613.

---

[4] FDA cites to several decisions for the proposition that a standard developed through adjudication can be applied in other cases. FDA 48-49. But those decisions did not involve instances where the underlying statute required that a standard be promulgated through notice-and-comment rulemaking.

Drip More's case is different. Here, Congress specifically addressed when and why notice-and-comment rulemaking is required for a flavor restriction or ban. As such, it makes no sense that Congress would have intended for FDA to rely on MDOs to effect a flavor restriction or ban outside the product-standard setting process. Drip More 54 (citing 21 U.S.C. §387j(c)(2)(D)). In any event, unlike the NLRB in *American Hosp. Ass'n*, FDA did not rely on the comparative efficacy standard to exercise its discretion when evaluating PMTAs. Instead, FDA reviewers had to apply it, without exception, to every application for a non-tobacco flavored ENDS. Drip More 19, 50.[5]

Finally, FDA misconstrues 21 U.S.C. §387g(a)(1)(A), which it reads as broadly reserving authority to act under other TCA provisions. FDA 55-56. That provision is a "special rule" for cigarettes and does not apply to ENDS. Even if it did, it cannot be read to permit FDA to create

---

[5] FDA claims that because TCA provisions governing tobacco product standards and PMTA reviews both turn on the APPH health standard, this somehow implies FDA can also essentially adopt a flavor restriction or ban through adjudication. FDA 56-57. But all of this must be read in the proper context. The better interpretation is that Congress was simply ensuring that when a tobacco product standard is enforced across many PMTAs, as may be done pursuant to 21 U.S.C. §387j(c)(2)(D), it is grounded in the same health standard.

what is, in substance, a tobacco product standard through the PMTA process. Rather, when read together with the PMTA provisions, it confirms only that FDA may issue an MDO when a product fails to comply with a tobacco product standard duly promulgated through notice-and-comment rulemaking. *See* 21 U.S.C. §387j(c)(2)(D).[6]

## II. FDA Violated The APA's Notice-And-Comment Procedures

FDA does not deny the comparative efficacy standard otherwise qualifies as a "legislative rule" under the Administrative Procedure Act ("APA") and is therefore subject to the APA's notice-and-comment procedures, as FDA reviewers were given absolutely no discretion to consider other evidence in the PMTAs supporting an APPH finding. FDA had no choice but to issue an MDO if such a study was missing, with the standard being applied as a binding norm, no questions asked,

---

[6] FDA cites *Bidi Vapor LLC v. FDA,* 134 F.4th 1282, 1287 (11th Cir. 2025) to support its claim that it may develop a standard through flexible, case-by-case adjudication. *Bidi* is inapplicable here. *Bidi* did not involve the comparative efficacy test or FDA's history of applying it across-the-board to all non-tobacco flavored ENDS. *Bidi* only involved tobacco-flavored ENDS (*id.* at 1283) and an MDO that was based on an individualized, scientific review of Bidi's PMTA (*id.* at 1287).

7

for every single PMTA (covering over one million non-tobacco flavored ENDS products). Drip More 56-60.

Instead, FDA once again argues that, notwithstanding the APA, FDA had broad discretion to develop the comparative efficacy standard through case-by-case adjudication. FDA 49. FDA maintains that adjudication was "especially appropriate" for the PMTA review process as it affords FDA flexibility to apply the TCA and evaluate evidence submitted in each application. FDA 50. FDA then further notes the MDO issued here only applies to Drip More, and therefore did not conclusively decide PMTAs for other manufacturers. FDA 51.

That does not, however, accurately describe how FDA's PMTA reviews actually played-out. To be clear, FDA did not fashion the comparative efficacy standard while reviewing Drip More's PMTA or in evaluating any other manufacturer's application for that matter. Rather, it was first publicly disclosed in a press release announcing MDOs for 55,000 non-tobacco flavored PMTAs. FDA, News Release: *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They Appropriately Protect Public Health* (Aug. 26, 2021), https://tinyurl.com/n9c9rwu8.

FDA then proceeded to apply the comparative efficacy test to over one million non-tobacco flavored ENDS products seeking marketing authorization. Drip More 20 n.9. This does not resemble at all a process of developing a standard through careful, case-by-case adjudication.

Moreover, FDA did not make a deliberate or conscious decision to apply the comparative efficacy standard in Drip More's case based on an individualized review of the company's PMTA. For example, as discussed in its opening brief, FDA had sales data from Drip More and its own National Youth Tobacco Survey ("NYTS") results from 2018-2021 showing minors were not using Drip More's products. Drip More 17-18. As the comparative efficacy standard was formulated by FDA to account for high use rates by minors (*see*, *e.g.*, ER-38 stating that the standard is necessary due to "substantial risk to youth" posed by non-tobacco flavored ENDS generally), this raises serious questions whether Drip More's PMTA should have ever been subject to the standard in the first place. But FDA plowed ahead, without any substantive analysis of the PMTA as a whole (the MDO was issued before FDA initiated any scientific review), thus belying any claims FDA applied the standard to Drip More in case-by-case manner.

9

FDA also misses the point when it argues that proceeding by adjudication was not an abuse of discretion even though the comparative efficacy standard "affects the rights of broad classes of unspecified individuals"—a well-established exception limiting the circumstances under which adjudication is otherwise appropriate. Drip More 61 (citing *MacLean v. Dep't of Homeland Security*, 543 F.3d 1145, 1151 (9th Cir. 2008) ("*MacLean*")).[7] FDA maintains that for this exception to apply the standard must differ from a prior policy that the regulated community had previously relied upon. FDA 51-52 (citing *Pfaff v. Dep't of Housing & Urban Dev.*, 88 F.3d 739, 748 (9th Cir. 1996) ("*Pfaff*")). Setting aside the fact that *MacLean* (which was issued over a decade after *Pfaff*) does not impose such narrowing criteria, and that even *Pfaff* does not expressly limit the exception to those instances, this is not, as FDA claims (FDA 52), just about fair notice.

---

[7] Even decisions cited by FDA suggest it is an abuse of discretion not to go through APA notice-and-comment rulemaking where large numbers of entities would be impacted. *See, e.g.*, *Mobil Exploration and Producing North America, Inc. v. FERC*, 881 F.2d 193, 199 (5th Cir. 1989) (allowing adjudication for a "relatively minor procedural requirement with limited effect").

10

Congress expressed concerns in the TCA about FDA essentially imposing flavor restrictions or bans without input from all stakeholders, including ENDS manufacturers and retailers. *Supra* 5. Accordingly, even if the comparative efficacy requirement does not rise to a tobacco product standard, it was still an abuse of discretion to proceed via adjudication, thereby ignoring Congress's clearly stated concerns.

### III. FDA's Failure To Consider All Information Regarding Potential Underage Use Of Drip More's ENDS Was Not Harmless Error

1.      FDA is wrong when it contends *Wages II* did not abrogate the harmless error test as articulated by this Court in *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657 (9th Cir. 2023). FDA 39. Contrary to FDA's assertion, the Supreme Court in *Wages II* set out to "identify the correct harmless-error rule." 145 S. Ct. at 930-31. Its consideration was not limited to, as claimed by FDA, rejecting the Fifth Circuit's interpretation of the harmless error rule as only applying when an agency is otherwise required to take a certain action. FDA 39.

Indeed, as detailed in Drip More's opening brief (38-40), *Wages II* rejected the notion that a petitioner "must prove that an error had a 'substantial bearing' on the [agency's] decision" or that the agency

11

"would have" reached a contrary result absent the alleged error. 145 S. Ct. at 930. In other words, if it is not entirely "clear" that the agency's error had no bearing on the decision, then there is no harmless error. *Id.* This means that even if the Court sees a "strong" possibility that the agency would have still reached the same result, it must nevertheless remand the decision. *Id.*; *see* Drip More 39.

To be sure, *Lotus Vaping* began its discussion by reciting the correct harmless error test. FDA 39 (stating an error is harmless if it "had no bearing" on the decision) (*id.* at 673). But FDA then fails to acknowledge that the decision went on to characterize the test as actually requiring a much higher bar for petitioners. *See Lotus Vaping*, 73 F.4th at 674-75 (describing the test as obligating the petitioner to demonstrate it had suffered prejudice, that an agency error resulted in harm, or that the agency would have made a different decision absent the error); *see also* FDA 36 (noting *Lotus Vaping* obligated petitioner to "identify any prejudice"); Drip More 41-42 (noting that FDA in its underlying *Lotus Vaping* briefs had advocated for a more stringent harmless error rule, a point FDA does not address in its response).

12

As such, the *Lotus Vaping* decision is inconsistent with the harmless error rule as clarified in *Wages II*, and FDA's response does not provide any compelling argument to the contrary.

2.     Given the more lenient harmless error rule in *Wages II*, FDA is thus mistaken when it claims *Lotus Vaping* controls here. FDA 37-38. That decision held Lotus had not shown its marketing and access restrictions were any different from those FDA had previously found deficient (*see Lotus Vaping*, 73 F.4th at 674, listing certain measures appearing in FDA's 2020 enforcement policy guidance), so petitioner's proposed plans would not have changed FDA's decision to issue an MDO. FDA 37-38. But that analysis is inapplicable to Drip More.

First, FDA concedes it never looked at Drip More's extensive marketing and access restrictions to determine if they might impact FDA's analysis. ER-36 n.xix. In fact, Drip More *did* set out measures that do not appear in the 2020 enforcement guidance (e.g., conducting retailer training programs, imposing retailer and distributor hiring practices, requiring Drip More approval for certain advertising, and not bundling vape products with other consumable products). Drip More 13-17. Further, under *Wages II*, Drip More does not need to show these

measures would have made a difference. It is enough such information is "critical" and "relevant" to the APPH determination (Drip More 8-9), and thus it might have impacted FDA's analysis. Drip More 42 (citing *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1205 (11th Cir. 2022)).

In response, FDA then violates *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (which, as we will see, is one of many such violations), in offering *post hoc* rationalization by attempting such analysis for the first time in this litigation. *Id.* ("[Courts] must judge the propriety of [agency] action solely by the grounds invoked by the agency."); FDA 37-38, 40. FDA concludes that Drip More failed to propose any measures in addition to those outlined in *Lotus Vaping*. *Id.* But as demonstrated above, that is not true. Accordingly, it was not harmless error for FDA to completely ignore Drip More's proposals.

Second, FDA's response is completely silent as to additional evidence presented by Drip More that was not present in the *Lotus Vaping* case indicating that the company's ENDS do not in fact present a high risk to minors. Drip More 44; FDA 35 (FDA falsely claiming Drip More's products are "especially popular among youth"). FDA requested age-demographic sales data and had four years' worth of its own NYTS

14

survey results showing that minors are not using Drip More's products. Drip More 17-18. It was not harmless error for FDA to disregard such relevant information and otherwise fail to consider it in the context of Drip More's marketing and access restrictions. Drip More 44-45.

3. As FDA offers little to explain how *Lotus Vaping's* application of the harmless error rule is consistent with *Wages II*, FDA instead argues that the Supreme Court's denial of certiorari in *Lotus Vaping*, as opposed to a grant-vacate-remand ("GVR"), somehow signals that the decision was correct. FDA 39-40. Not so. The Supreme Court has stated repeatedly that a denial of certiorari cannot be read as revealing the Court's views on the merits of the case. *See, e.g., North Carolina v. North Carolina State Conf. of NAACP*, 137 S. Ct. 1399, 1400 (2017) (Chief Justice Roberts stating "[t]he denial of a writ of certiorari imports no expression of opinion upon the merits of the case"); *Evans v. Stephens*, 125 S. Ct. 2244 (2005) (citing *State of Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919 n.1 (1950)) ("[T]his Court has rigorously insisted that such a denial carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review.").

15

And this is not surprising. As noted in the decision cited by FDA for support, there are many reasons having nothing to do with a case's merits that might drive a denial instead of a GVR. *Lawrence v. Chater*, 516 U.S. 163, 174 (1996) (*per curiam*) (stating "[r]espect for lower courts, the public interest in finality of judgments, and concern about our own expanding certiorari docket all counsel against undisciplined GVR'ing."); *id.* at 166, 173 (noting GVR is discretionary and concluding such authority should be "exercised sparingly"). In fact, all this Court knows from the Supreme Court's denial is that there were not enough votes to grant the petition. *See Agoston v. Commonwealth of Penn.*, 71 S. Ct. 9 (1950) ("A denial simply means that as a matter of 'sound discretion' fewer than four members of the Court deemed it desirable to review a decision of the lower court.") (citation omitted).

Accordingly, this Court should not assume that the denial of certiorari in the *Lotus Vaping* matter reflects in any way on that decision's application of the harmless error rule.

## IV. FDA's PMTA Review Was Arbitrary And Capricious As It Failed To Weigh And Balance All Relevant Evidence

1. FDA repeatedly argues the Supreme Court's holding in *Wages II* upheld the approach employed by the agency in denying

PMTAs, including Drip More's, via the comparative efficacy standard. FDA 2, 19, 23. FDA is mistaken. *Wages II's* holding is more narrow. The Supreme Court only found that the comparative efficacy standard did not run afoul of the "change-in-position" doctrine. *See, e.g., Wages II*, 145 S. Ct. at 919, 927. It did not hold FDA properly issued MDOs based solely on the absence of a comparative efficacy study or whether that approach satisfies the TCA's command that FDA review and weigh *all* contents of a PMTA. *See* Drip More 5-8. Indeed, if the Supreme Court had so held, there would have been no reason to remand on an entirely different issue—whether FDA's failure to consider Wages's marketing plan was harmless error. *Wages II*, 145 S. Ct. at 930-31.

2.     FDA does not dispute that it completely failed to consider sales data and its own NYTS survey results demonstrating that minors are not using Drip More's products. Drip More 17-18. As FDA neither weighed that information against all other data in the PMTA, nor explained why it was ignored, the MDO is arbitrary and capricious. Drip More 5-7 (demonstrating the TCA requires FDA to review and balance all information in an application); 8-11 (noting FDA flagged sales data and national demographic survey results as highly relevant, and that the TCA

17

obligates FDA to consider such data); 18-22 (FDA admitting it did not conduct a full scientific review of all information in the PMTA).

In its brief, FDA continues to flout *Chenery* and relies on *post hoc* rationalization when it contends the sales data show "young adults" (aged 18-24) have used Drip More products and thus there is a risk to that population as well. FDA 27-28. But the MDO was not based on risks to "young adults"; it only mentions concerns regarding risks to "youth." ER-17-18. Indeed, the TPL was careful to distinguish "youth" from "young adults" throughout its analysis. *See, e.g.*, ER-30-34. For example, both the "Conclusion" (ER-34) of the TPL section discussing risks to youth, and the ultimate "Conclusion and Recommendation" section (ER-39) which served as the basis for Drip More's MDO, only mention "youth."[8]

In yet another transgression of *Chenery*, FDA now argues that sales data are irrelevant because minors often get their ENDS from social sources. FDA 28. This explanation as to sales data does not appear in the record. Further, even if it did, this does not mean sales data can be totally

---

[8] In any event, concerns regarding youth clearly drove FDA's analysis and the need for the comparative efficacy standard. *See* ER-30-34 (focusing primarily on youth and adolescents as opposed to young adults); ER-35-38 (citing youth, not young adults, numerous times as the basis for requiring a comparative efficacy study).

overlooked. FDA specifically requested such information to help better understand underage use patterns. ER-59. FDA never explains why, all of a sudden, sales data are now completely immaterial to the APPH analysis.

Moreover, FDA conveniently ignores its own NYTS data, which capture underage use (not sales), and thus account for access through social sources. Instead, FDA puts forth more *post hoc* rationalization when it says some respondents did not report the brand used. FDA 29-30. Again, this is nowhere to be found in the record. Regardless, in the NYTS surveys covering four years (2018-2021) and tens of thousands of students annually, not a single respondent identified a Drip More ENDS. Drip More 17-18. It seems a virtual impossibility that Drip More did not appear in the survey results if its products were, in fact, playing a role in underage use. Thus, FDA cannot reasonably argue this is irrelevant to an APPH analysis or should not be balanced against all other information in Drip More's PMTA. Drip More 28-29 (FDA must evaluate relevant factors and grapple with conflicting evidence).

Seemingly undeterred, FDA then points to evidence in the TPL showing minors might switch ENDS device types (e.g., from cartridges to disposables) depending on marketplace availability (FDA 29-30;

19

citing discussion of device type at ER-32-33). But FDA conflates its own data regarding device type with switching *brands*; market trends regarding ENDS types say nothing about whether minors will likely move from one brand to Drip More. Indeed, after collecting years of NYTS survey results, the real-world evidence is to the contrary.[9]

3.      FDA continues to argue that Drip More's data showing benefits to adult, addicted smokers, such as a cross-sectional survey of consumers, was insufficient to meet the comparative efficacy standard. FDA 25-27. As discussed *supra* 9, that standard was developed to deal with high underage use rates of non-tobacco flavors. But FDA concedes that as the "known risks increase, so too does the burden of demonstrating a substantial enough benefit." ER-35. This necessarily means that the opposite also holds true; as the risks to minors decrease, so does the manufacturer's burden to show benefits. As Drip More's PMTA contains compelling evidence that its ENDS products do not pose a substantial risk to minors, FDA was obligated to at least explain why the comparative efficacy standard was still applicable to Drip More.

---

[9] FDA's reliance on *Wages II* fails for the same reason. FDA 30 (citing *Wages II*, 145 S. Ct. at 928). *Wages II* was reflecting on the role that flavors play in switching between devices, not brands.

Indeed, Drip More's consumer survey—which did include Drip More customers (FER-1)—demonstrates the following: (i) 71% of the respondents were former smokers and current ENDS users; (ii) 42% of the respondents reported that they were using ENDS to quit smoking; and (iii) the vast majority preferred non-tobacco flavors. FER-2-5. As FDA had instructed manufacturers in its 2019 PMTA guidance document to submit consumer perception and intention studies (FER-6), it should have evaluated this and other evidence submitted by Drip More (including a comprehensive literature review demonstrating numerous benefits of ENDS to adult smokers) (FER-7) in light of the sales data and NYTS results showing a low risk to youth. *See* Drip More 5-12.[10]

FDA nevertheless contends that its scientific determinations are entitled to substantial deference. FDA 30. But that is not what is at issue in this case. Before any deference is owed, FDA must consider all relevant evidence and explain why data weighing against its conclusion was discounted. Drip More 28-29. *See Genuine Parts Co. v. EPA*, 890 F.3d 304,

---

[10] FDA cites *Lotus Vaping* as finding that cross-sectional surveys were not sufficiently robust. FDA 26-27. But that case did not involve evidence showing Lotus's ENDS products presented a low risk of underage use. *Supra* 14.

312 (D.C. Cir. 2018) (agency cannot ignore inconvenient evidence). That is something FDA clearly did not do.[11]

## V. The MDO Was Unlawfully Applied To Drip More's Zero-Nicotine ENDS

FDA does not dispute fourteen of Drip More's ENDS products subject to the MDO are zero-nicotine. *See* FDA 41. As such, they are not subject to regulation under the TCA. Drip More 61-62. Moreover, even assuming FDA may otherwise regulate zero-nicotine products that are "intended or reasonably expected to be mixed with liquid nicotine" (FDA 43), it fails to cite any discussion in the record where FDA made such a finding. For example, there is no indication FDA determined Drip More's customers are, in fact, mixing these e-liquids with nicotine, that Drip More is advertising its e-liquids as a product that can be combined with nicotine, or that Drip More made an explicit admission of such

---

[11] FDA incorrectly accuses Drip More of raising for the first time in this litigation the option of granting marketing authorization but also requiring post-market surveillance to ensure minors do not start using Drip More ENDS. FDA 31. As noted in its brief (Drip More 18), Drip More's PMTA specifically requested FDA consider that option. ER-87-88. Nevertheless, FDA is wrong to say it cannot consider such option during a PMTA review. FDA 31-32. Where there is a low risk to youth, as is the case here, knowing Drip More would conduct post-marketing surveillance would certainly bolster an APPH determination.

intent. And this is telling. FDA has repeatedly stated the existence of such evidence will be evaluated on a "case-by-case basis" (81 Fed. Reg. 28974, 29032 (May 10, 2016)), and that absent such evidence a zero-nicotine ENDS would not be regulated under the TCA (ER-56).[12]

Instead, FDA again violates *Chenery* in offering *post hoc* rationalization to justify its denial of marketing authorization for these products. For example, Drip More pointed out customers would have no need to mix-in nicotine as the company offers many nicotine options. Drip More 62. FDA now argues, for the first time here, consumers might use zero-nicotine products to customize and achieve varied nicotine levels. FDA 29. That is pure speculation on FDA's part and there is no evidence in the record customers are, in fact, engaging in such behavior. Moreover, if this rationale was sufficient, it wholly

---

[12] FDA's reliance on *Lotus Vaping* is misplaced. FDA 43. In that case, there was evidence the manufacturer specifically intended the nicotine-containing e-liquids to be mixed with a flavor addition. Moreover, *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 389-91 (D.D.C. 2017) supports Drip More. FDA 44. That decision indicates the zero-nicotine exception requires a case-by-case analysis for such factors as "circumstances surrounding the distribution of the product or the context in which it is sold…and sales data." *Id.* at 386 (quoting 81 Fed. Reg. at 29015); *id.* at 389 (further noting FDA's commitment to a "case-by-case" approach). That did not happen here.

23

contradicts FDA's claims that supporting evidence must be adduced through a case-by-case analysis, and absent such evidence an e-liquid would not be subject to the TCA; indeed, it would render the exception moot—i.e., every zero-nicotine e-liquid would be a "tobacco product."

And FDA did not stop there. FDA now argues it denied marketing authorization for the zero-nicotine ENDS because the "cover letters" for each non-tobacco flavored product listed the zero-nicotine versions. FDA 42. Again, that explanation does not appear in the record and thus cannot be the basis of the MDO. In any event, that argument fails as the cover letters on their face cannot be reasonably taken as a representation by Drip More that these zero-nicotine ENDS are "tobacco products" under the TCA. FDA points to two sentences—the first, which says the products "contain[] tobacco-derived nicotine," and the second, which states that they therefore "meet[] the definition of 'tobacco product'" in the statute. FDA 42. But that cannot be true for zero-nicotine ENDS; none of them "contain tobacco-derived nicotine" so as to subject them to the TCA. *See, e.g.*, SER-60 (Candy King Batch reporting "Nicotine Strength" as "0mg"). As such, Drip More did not intend for general, summarizing statements made in cover letters,

24

which were clearly describing the bulk of nicotine-containing e-liquids in the PMTA, to somehow turn zero-nicotine ENDS into regulated products.[13]

Finally, FDA cites to several decisions standing for the unremarkable proposition that a party waives an argument not raised during the administrative process. FDA 43. According to FDA, Drip More never argued FDA's treatment of the zero-nicotine products was arbitrary and capricious. *Id.* But Drip More had no reason to raise that argument when it filed the PMTA because FDA had not yet taken the position those products were intended or reasonably expected to be mixed with nicotine. In fact, FDA did not raise this issue until this appeal, and even now fails to present any supporting evidence.

## CONCLUSION

Based on the foregoing, this Court should vacate and remand the MDO.

---

[13] FDA quotes a succeeding sentence in the cover letters where Drip More states it is seeking an order for the e-liquids "described above." FDA 42. But again, those previous statements cannot be fairly interpreted, without any additional evidence required under the exception, as meaning the zero-nicotine e-liquids are subject to the TCA.

25

Dated: January 23, 2026

/s *Eric P. Gotting*
Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioners*

26

**CERTIFICATE OF COMPLIANCE**

I hereby certify the foregoing complies with the length limitations of Circuit Rule 32-1 because it is 5,264 words, excluding the parts that are exempted under Rule 32(f). It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Century Schoolbook font.

/s *Eric P. Gotting*
Eric P. Gotting

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2026, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

/s *Eric P. Gotting*
Eric P. Gotting

28

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned certifies that the following related cases are pending in the Ninth Circuit and raise the same or closely related issues as *Drip More v. FDA*, 21-71380:

*Vertigo Vapor v. FDA*, 24-4011 (held in administrative closure)

*My Vape Order v. FDA*, 21-71302 (status report pending)

*MH Global v. FDA*, 21-71327

/s *Eric P. Gotting*
Eric P. Gotting

29